David W. Tufts (Bar No. 8736)
DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111
Telephone: 801-415-3000
Email: david.tufts@dentons.com

*Counsel for Plaintiffs*
[Additional Counsel on Following Page]

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| VIRGINIA TUCKER, STEPHANIE DOMBROSKI, SANDY PHILLIPS, DAKOTA GRUNWALD, and AMBERLI K. MORRIGAN<br><br>    Plaintiffs,<br><br>    v.<br><br>UTAH DEPARTMENT OF CORRECTIONS; JARED GARCIA, EXECUTIVE DIRECTOR OF THE UTAH DEPARTMENT OF CORRECTIONS, *in his official capacity*; SHARON D'AMICO, WARDEN OF THE UTAH STATE CORRECTIONAL FACILITY, *in her official capacity*; UTAH DEPARTMENT OF HEALTH AND HUMAN SERVICES; TRACY GRUBER, EXECUTIVE DIRECTOR OF THE UTAH DEPARTMENT OF HEALTH AND HUMAN SERVICES, *in her official capacity*; DR. STACEY BANK, EXECUTIVE MEDICAL DIRECTOR OF CLINICAL SERVICES UTAH DEPARTMENT OF HEALTH AND HUMAN SERVICES, *in her official capacity; and* DR. MARCUS WISNER, DIRECTOR OF CORRECTIONAL HEALTH SERVICES, UTAH DEPARTMENT OF HEALTH AND HUMAN SERVICES, *in his official capacity.*<br><br>    Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Civil Case No.:  2:25-cv-01108 |

Jacqueline A. Domenella*
Diane O'Connell*
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606-6361
Telephone: 312-876-8000
Email: jacqui.giannini@dentons.com
Email: diane.oconnell@dentons.com

Evan Wolfson*
Hannah Rochford*
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone: 212-768-6700
Email: evan@freedomtomarry.org
Email: hannah.rochford@dentons.com

Jason M. Groth (Bar No. 16683)
Abigail Cook (Bar No. 19781)
Tom Ford (Bar No. 19795)
ACLU OF UTAH FOUNDATION, INC.
311 South State St., Suite 310
Salt Lake City, UT 84111
Telephone: 801-521-9862
Email: jgroth@acluutah.org
Email: acook@acluutah.org
Email: tford@acluutah.org

Sonja D. Kerr*
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Telephone: 610-675-7192
Email: skerr@lambdalegal.org

Richard Saenz*
Whit Washington*
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: 212-809-8585
Email: rsaenz@lambdalegal.org
Email: wwashington@lambdalegal.org

*Counsel for Plaintiffs*

*Pro hac vice* application forthcoming

## INTRODUCTION

1.      Plaintiffs Virginia Tucker, Stephanie Dombroski, Sandy Phillips, Dakota Grunwald, and Amberli K. Morrigan (hereinafter "Plaintiffs"), are transgender people with the disability of gender dysphoria who are incarcerated at the Utah State Correctional Facility (the "USCF" or the "prison")[1] within the custody of the Utah Department of Corrections ("UDC"). Defendants are public entities and officials who have authority and responsibility for Plaintiffs' medical care and treatment, their meaningful equal access to institutional services, programs and activities, and reasonable accommodations while incarcerated.

2.      Gender dysphoria is a serious medical condition characterized by clinically significant distress resulting from the incongruence between a person's gender identity and the sex they were assigned at birth. For some people, including all Plaintiffs, it also constitutes a disability.

3.      Defendants have persistently failed to provide Plaintiffs with medically necessary care for their gender dysphoria, specifically in denying them individualized assessments and necessary treatments in accordance with clinical guidelines. This includes depriving them of timely and adequate evaluations, accurate diagnoses, mental health services from qualified providers, hormone therapy, and individualized assessments for surgery. When left untreated or inadequately treated, gender dysphoria can cause debilitating distress, depression, impairment of function, risk of self-harm to alter one's genitals or secondary sex characteristics, other self-injurious behaviors, suicidality, suicide, and death.

---

[1] Plaintiffs are transgender. In keeping with their gender identity, judicial practice, and accepted medical standards, this Complaint uses the names they go by and their UDC ID numbers. For identification purposes, Virgina Tucker's UDC ID number is 243055; Stephanie Dombroski's UDC ID number is 252408; Sandy Phillips' UDC ID number is 133168; Dakota Grunwald's UDC ID number is 223233; and Amberli Morrigan's UDC ID number is 250854.

4.      Significantly, Defendants have recognized gender dysphoria as a serious medical condition requiring care since at least December 2018, when UDC adopted an internal policy known as "AG37." AG37 provided guidance on evaluations, mental health services, and hormone therapy for people with gender dysphoria. Rather than providing medically necessary care, however, Defendants relied on AG37 and established the Gender Dysphoria Committee ("GD Committee") to delay and deny evaluations, mental health services, and hormone therapy for people with gender dysphoria like Plaintiffs. On information and belief, Defendants have never provided individual assessments for surgical interventions as medically necessary treatment for gender dysphoria. As a result of Defendants' enforcement of AG37, including the GD Committee's practices, an investigation by the U.S. Department of Justice ("DOJ") concluded that UDC was in violation of the Americans with Disabilities Act, as amended ("ADAAA" or "ADA"), 42 U.S.C. §§ 12131-34 and its implementing regulations, 28 C.F.R. pt. 35.

5.      Defendants' denial of adequate and medically necessary treatment for gender dysphoria increased in severity on May 7, 2025, when Utah H.B. 252 went into effect. This newly enacted law is primarily codified at Utah Code §§ 26B-4-1001 and 1003 (referred to throughout as "H.B. 252") and related sections of the Utah Code.

6.      H.B. 252 bans transgender adults in UDC's custody from receiving medically necessary and potentially lifesaving treatment for gender dysphoria and overrules the professional judgment of Defendants' own medical providers. H.B. 252 denies care by prohibiting the initiation of medical treatment for gender dysphoria. It limits treatment to mental health services, which on its own is an inadequate means of treating gender dysphoria and contrary to accepted medical standards of care. H.B. 252 also prohibits individualized assessments for surgical interventions as treatment for gender dysphoria. H.B. 252 singles out gender dysphoria, a particular disability, for adverse and differential treatment.

4

7.      Pursuant to H.B. 252, Defendants have implemented a blanket ban on the initiation of hormone therapy without any consideration of Plaintiffs' individualized medical needs and the medical judgment of Defendants' own medical providers. This includes refusing to initiate previously prescribed hormone therapy for Plaintiffs Ms. Tucker, Ms. Dombroski, and Ms. Phillips, categorically denying them individualized medical treatment, and knowingly putting them at grave risk of continued physical and psychological harm. Similarly, Defendants have denied individualized assessments for surgical intervention to Plaintiffs Mr. Grunwald and Ms. Morrigan on the basis of their disability, gender dysphoria.

8.      Defendants Mr. Garcia, Ms. D'Amico, Ms. Gruber, Dr. Bank, and Dr. Wisner's failure to provide adequate medical care to Plaintiffs Ms. Tucker, Ms. Dombroski, and Ms. Phillips, despite their serious medical needs caused by gender dysphoria, violates the Eighth Amendment's prohibition on cruel and unusual punishment. Defendants are aware of the substantial risks in failing to timely and adequately treat Plaintiffs and have demonstrated deliberate indifference to Plaintiffs' gender dysphoria by denying care and prohibiting the initiation of hormone therapy.

9.      Additionally, Defendants UDC and the Department of Health and Human Services ("DHHS") discriminate against Plaintiffs in violation of the ADA, 42 U.S.C. §§ 12131(1) – 12134, and its implementing regulations, 28 C.F.R. § 35, because Plaintiffs are qualified people with a disability of gender dysphoria. Through Defendants' enforcement of AG37 and the GD Committee's practices and implementation of H.B. 252, Defendants have denied Plaintiffs meaningful equal access to services, programs and activities that are available to non-disabled people or those with medical impairments and disabilities other than gender dysphoria in UDC's custody. Defendants have denied reasonable accommodations and modifications to policies and practices to ensure meaningful equal access subjecting Plaintiffs to continued harm and discrimination.

5

10.     Defendants have denied or limited Plaintiffs' equal access to healthcare by, among other things, providing a lack of timely and accurate assessments, and failing to provide condition-specific mental health services, hormone therapy, and individualized assessments of the need for surgery, all due to disability or suspected disability of gender dysphoria. Defendants single out this particular disability, gender dysphoria, for unequal and discriminatory treatment. Defendants do not deny or limit these treatments as to other suspected medical impairments and disabilities.

11.     Plaintiffs bring this action seeking redress for Defendants Mr. Garcia, Ms. D'Amico, Ms. Gruber, Dr. Bank, and Dr. Wisner's deliberate indifference to their serious medical needs and to vindicate their rights to be free from discrimination on the basis of disability by all Defendants.

**JURISDICTION AND VENUE**

12.     Plaintiffs bring this action pursuant to 42 U.S.C. §§ 1983 and 1988 and the Americans with Disabilities Act, 42 U.S.C. § 12133, seeking preliminary and permanent injunctive relief and declaratory relief to redress the deprivation under color of state law of rights secured by the United States Constitution and federal laws.

13.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters arise under the U.S. Constitution and federal laws, and under 28 U.S.C. §§ 2201 and 2202 for purposes of issuing declaratory and injunctive relief.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this judicial district.

15.     This Court has personal jurisdiction over each and every Defendant because all Defendants were either residents of Utah, were employed in Utah, or conducted business in Utah, and were acting under color of state law during all relevant times.

6

# PARTIES

A.      **Plaintiffs**

16.      **Plaintiff Virginia Rose Tucker ("Ms. Tucker")** is a 25-year-old transgender woman incarcerated since August 2019. Ms. Tucker has the disability of gender dysphoria and has been denied adequate medical care including medically necessary hormone therapy, faced significant delays in care causing her harm, been discriminated against in the provision of healthcare services because of her disability, and been denied meaningful equal access to all services, programs, and benefits and reasonable accommodations while in UDC's custody. Based on her diagnosis of gender dysphoria, Ms. Tucker is living with a disability as defined under the ADA and is a qualified individual with a disability under the ADA, Title II.

17.      **Plaintiff Stephanie Dombroski ("Ms. Dombroski")** is a 49-year-old transgender woman incarcerated since January 2023. Ms. Dombroski has the disability of gender dysphoria and has been denied adequate medical care including medically necessary hormone therapy, faced significant delays in care causing her harm, been discriminated against in the provision of healthcare services because of her disability, and been denied meaningful equal access to all services, programs, and benefits and reasonable accommodations while in UDC's custody. Based on her diagnosis of gender dysphoria, Ms. Dombroski is living with a disability as defined under the ADA .and is a qualified individual with a disability under the ADA, Title II.

18.      **Plaintiff Sandy Phillips ("Ms. Phillips")** is a 53-year-old transgender woman incarcerated since October 2022. Ms. Phillips has the disability of gender dysphoria and has been denied adequate medical care including medically necessary hormone therapy, faced significant delays in care causing her harm, been discriminated against in the provision of healthcare services because of her disability, and been denied meaningful equal access to all services, programs, and benefits and reasonable accommodations while in UDC's custody. Based on her diagnosis of

7

gender dysphoria, Ms. Phillips is living with a disability as defined under the ADA and is a qualified individual with a disability under the ADA, Title II.

19.  **Plaintiff Dakota Grunwald ("Mr. Grunwald")** is a 29-year-old transgender man incarcerated since January 2014. Mr. Grunwald has the disability of gender dysphoria and has been denied medical care, faced significant delays in care causing him harm, been discriminated against in the provision of healthcare services because of his disability, and been denied meaningful equal access to all services, programs, and benefits and reasonable accommodations while in UDC's custody. Based on his diagnosis of gender dysphoria, Mr. Grunwald is living with a disability as defined under the ADA and is a qualified individual with a disability under the ADA, Title II.

20.  **Plaintiff Amberli K. Morrigan ("Ms. Morrigan")** is a 34-year-old transgender woman incarcerated since July 2021. Ms. Morrigan has the disability of gender dysphoria and has been denied medical care, faced significant delays in care causing her harm, been discriminated against in the provision of healthcare services because of her disability, and been denied meaningful equal access to all services, programs, and benefits and reasonable accommodations while in UDC's custody. Based on her diagnosis of gender dysphoria, Ms. Morrigan is living with a disability as defined under the ADA and is a qualified individual with a disability under the ADA, Title II.

**B.**    **Defendants**

21.  **Defendant the Utah Department of Corrections ("UDC")** is a department or agency of the State of Utah. UDC's headquarters is located at 14717 S. Minuteman Drive, Draper, Utah 84020. UDC is the state agency responsible for incarceration of adults sentenced to incarceration by the courts. UDC operates the Utah State Correctional Facility ("USCF" or "the prison") where Plaintiffs are housed. UDC is responsible for the health and well-being of Plaintiffs who are housed at the prison and operates a wide variety of programs and services to meet those

needs. UDC is a public entity. UDC is also responsible for the approval and provision of reasonable accommodations for incarcerated people in its custody who have disabilities. Prior to July 2023, Defendant UDC was the sole entity responsible for the healthcare of incarcerated people. Since July 2023, UDC and DHHS have been and continue to be jointly responsible for the healthcare of the Plaintiffs.

22.    **Defendant Jared Garcia ("Defendant Mr. Garcia")** is the current Executive Director of the UDC. Defendant Mr. Garcia was appointed in February 2025 and supervises all activities of UDC, enforces federal and Utah state laws relevant to UDC, and maintains and operates UDC and its staff, contractors, and agents, including its healthcare for incarcerated people. Defendant Mr. Garcia's administration and enforcement of UDC's policies, procedures, and laws related to healthcare of incarcerated people are actions under color of state law. Defendant Mr. Garcia is sued in his official capacity.

23.    **Defendant Sharon D'Amico ("Defendant Ms. D'Amico")** is the Warden of the USCF in Salt Lake City, Utah. She was appointed on October 29, 2024. Defendant Ms. D'Amico is responsible for overseeing all facets of the correctional facility and its staff, contractors, and agents, including healthcare of incarcerated people in USCF and compliance with state and federal laws and regulations. Defendant Ms. D'Amico's administration and enforcement of UDC's policies, procedures, and laws related to healthcare of incarcerated people are actions under color of state law. Defendant Ms. D'Amico is sued in her official capacity.

24.    **Defendant the Utah Department of Health and Human Services ("DHHS")** is a department or agency of the State of Utah. Its headquarters is located at Multi-Agency State Office Building, 195 North 1950 West, Salt Lake City, UT 84116. DHHS includes the Division of Correctional Health Services ("CHS"). DHHS, through CHS, is responsible for ensuring healthcare for people within UDC as of July 1, 2023, including physical and mental health services

for Plaintiffs. DHHS is responsible for the approval and provision of reasonable accommodations for incarcerated people with disabilities. DHHS is a public entity.

25.    **Defendant Tracy Gruber ("Defendant Ms. Gruber")** is the Executive Director of Utah's DHHS. Defendant Ms. Gruber oversees DHHS, which includes CHS. She is responsible for the administration and supervision of the department and its staff, contractors, and agents, the coordination of policies and program activities, and approval of budgets. Defendant Ms. Gruber is sued in her official capacity.

26.    **Defendant Dr. Stacey Bank ("Defendant Dr. Bank")** is the Executive Medical Director of Clinical Services for Utah's DHHS. She was appointed on October 1, 2024. Defendant Dr. Bank reports to Defendant Ms. Gruber and supervises CHS and its director Dr. Marcus Wisner. On information and belief, Dr. Bank also either serves as, or supervises, the "Director of Clinical Services" who is authorized by AG37/01.00-02.04 to make the final decision about whether and when a person receives a gender dysphoria assessment and what care the person receives, including mental health services, hormone therapy, and individualized surgical assessments, or oversees the implementation of those decisions. Defendant Dr. Bank is sued in her official capacity.

27.    **Defendant Dr. Marcus Wisner ("Defendant Dr. Wisner")** is the Director of CHS for Utah's DHHS. He has served in this role since July 2023. Dr. Wisner reports to Defendant Dr. Bank. He is responsible for overseeing the provision of healthcare to those in UDC's custody and the operation of the infirmary at USCF. On information and belief, Dr. Wisner may serve as the "Director of Clinical Services" authorized by AG37/01.00-02.04 (if Dr. Bank does not) to make the final decision about whether and when a person receives a gender dysphoria assessment and what care the person receives, including mental health services, hormone therapy and individualized surgical assessments or oversees the implementation of those decisions. Director Dr. Wisner is sued in his official capacity.

10

**FACTUAL ALLEGATIONS**

A.    **Background on Gender Dysphoria**

28.    Every individual's sex is multifaceted, comprising a number of characteristics, including but not limited to chromosomal makeup, hormones, internal and external reproductive organs, secondary sex characteristics, and gender identity.

29.    Gender identity refers to a person's internal sense of belonging to a particular gender. Everyone has a gender identity. Gender identity is innate, has biological underpinnings, and cannot be altered voluntarily or changed.

30.    A person's gender identity usually matches the sex they were assigned at birth based on observation of their external genitalia.

31.    While most people have a gender identity that aligns with their sex assigned at birth, transgender people have a gender identity that differs from their sex assigned at birth.

32.    A transgender woman is someone who was assigned male at birth but has a female gender identity. A transgender man is someone who was assigned female at birth but has a male gender identity.

33.    Gender identity is not simply a mutable preference that can be changed at will. A transgender person cannot simply turn off their gender identity like a switch, just as a non-transgender person, also known as a "cisgender" person, cannot turn off their gender identity.

34.    The health and well-being of all people, including those who are transgender, depends on their ability to live in a manner consistent with their gender identity.

35.    For transgender people, the incongruence between their gender identity and sex assigned at birth can cause clinically significant distress.

36.    "Gender dysphoria" is the diagnostic term used for the condition experienced by some transgender people of clinically significant distress resulting from the incongruence between their gender identity and the sex they were assigned at birth.

37.    The *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (2022)* ("*DSM-5-TR*"), and the prior *Fifth Edition (2013), (*"*DSM-5*") of the American Psychiatric Association ("APA"), is the primary guide for mental health and medical providers in the United States for diagnosing mental health conditions and standardizes diagnostic criteria and symptoms to ensure consistency in diagnoses and care nationwide. The APA is the main organization for psychiatrists in the country and the largest in the world.

38.    The DSM diagnostic criteria for gender dysphoria in adults are:

A. A marked incongruence between one's experienced/expressed gender and assigned gender, of at least six months' duration, as manifested by at least two or more of the following:

1. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics

2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender

3. A strong desire for the primary and/or secondary characteristics of the other gender

4. A strong desire to be of another gender (or some alternative gender different from one's assigned gender)

5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender)

6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender)

B. The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

39.    Only transgender people experience gender dysphoria, though not all transgender people experience gender dysphoria.

40.    Gender dysphoria is a serious medical condition that in addition to clinically significant distress can cause depression, anxiety, mental impairment, the impulse to engage in self-surgery and self-harm, and even suicidal ideation, suicide, and death. Treatment for gender dysphoria aims to resolve the distress associated with the incongruence between a transgender person's assigned sex at birth and their gender identity.

41.    There is broad agreement among leading medical and mental-health professional associations and organizations—including the APA, the American Medical Association, the American Psychological Association, the American Academy of Family Physicians, the American Congress of Obstetricians and Gynecologists, the Endocrine Society, the National Association of Social Workers, and the World Professional Association for Transgender Health ("WPATH")— that gender dysphoria is a serious medical condition requiring medical treatment.

42.    A transgender person's gender dysphoria can be alleviated when the person is able to live consistently with their gender identity. In contrast, the longer a person is left without adequate treatment, the greater the risk of severe harm to the person's physical and psychological health.

43.    The WPATH and the Endocrine Society have published clinical practice guidelines for the treatment of gender dysphoria (together, the "Treatment Protocols" or "Clinical Guidelines"). The University of California, San Francisco, has also developed guidelines titled

"Guidelines for the Primary and Gender-Affirming Care of Transgender and Gender Nonbinary People,"[2] which are consistent with WPATH and the Endocrine Society guidelines.

44.     WPATH is a professional organization of more than 2,000 medical and mental health professionals specializing in the treatment of gender diverse people. WPATH has published guidelines for the treatment of gender dysphoria since 1979. The current version of the WPATH guidelines is the *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8* ("WPATH SOC-8"), published in 2022.

45.     The Endocrine Society is a professional association of endocrinologists, endocrine clinicians, and researchers worldwide. It includes scientists, physicians, educators, nurses, and students. The Endocrine Society first issued its guidelines for the treatment of gender dysphoria in 2009. The current version of the Endocrine Society's guidelines was published in 2017 and is titled *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*.

46.     The Treatment Protocols are cited as authoritative and are supported by the major medical and mental health associations in the United States, and elsewhere, including but not limited to the World Health Organization, American Medical Association, the APA, American Psychological Association, American Academy of Family Physicians, the American Association of Public Health, the National Association of Social Workers, the American College of Obstetricians and Gynecologists, and the National Commission on Correctional Health Care ("NCCHC").

---

[2] UCSF Gender Affirming Health Program, *Guidelines for the Primary and Gender-Affirming Care of Transgender and Gender Nonbinary People* (Madeline B. Deutsch, ed., 2nd ed. 2016), https://transcare.ucsf.edu/guidelines.

47.    Treatment for gender dysphoria can involve: social transition (such as dressing, styling one's hair, and using a name and pronouns that match one's gender identity); hormone therapy to masculinize or feminize the body; and various surgeries to change primary and/or secondary sex characteristics to bring them into alignment with the person's gender identity.

48.    Although psychotherapy or counseling can provide support and affirmation to people with gender dysphoria, it is not a substitute for medical treatments such as hormone therapy when such treatments are medically necessary. Likewise, antidepressants and psychotropic medications are inadequate treatments for gender dysphoria when treatments such as hormone therapy are medically necessary.

49.    For some people with gender dysphoria, hormone therapy may not be an adequate treatment when surgical interventions are medically necessary.

50.    The efficacy of gender-affirming healthcare, including social transition, hormone therapy, and surgery in alleviating gender dysphoria is well documented in decades of peer-reviewed research and clinical experience.

51.    The Treatment Protocols require that treatment for those in custody mirror community-based standards of care. NCCHC recommends that the care for incarcerated people with gender dysphoria should follow the Treatment Protocols, including the WPATH SOC-8, which requires an individualized assessment of needs, the potential risks, and an analysis of alternatives while following the accepted standards of care, through a thorough and informed-consent process.

52.    Denying, delaying, or failing to initiate gender-affirming care, including hormone therapy, to people for whom it is medically necessary puts them at a high risk of significant harm to their health and can trigger a high likelihood of negative outcomes, such as depressed mood, dysphoria, surgical self-treatment by auto-castration for transgender women, and/or suicidality.

B.    <u>**UDC's Treatment of Gender Dysphoria Prior to H.B. 252**</u>

53.    Healthcare for people incarcerated at the prison is provided by UDC and, since July of 2023, DHHS, specifically CHS.

54.    Since July 1, 1994, UDC's FD18 Medical Custody Interface Policy has governed the provision of healthcare to people in UDC's custody, requiring UDC to provide for "all clinical needs including medical, mental health . . . and any other service deemed necessary for inmate care." The stated rationale is to ensure that "emergent and basic health needs of inmates housed in Utah Department of Correction prison facilities are met." On April 19, 2023, UDC updated the FD 18 Medical Custody Interface policy which again reaffirms that it is UDC's policy to provide "all clinical needs including medical, mental health, . . . and any other service deemed necessary for inmate care."

55.    Regarding the treatment of gender dysphoria specifically, UDC has had AG37, entitled "*Diagnosis & Treatment of Offenders with Gender Dysphoria,*" in place since December 19, 2018. The purpose of AG37 is to establish a procedure by which UDC "shall diagnose and treat offenders with gender dysphoria." AG37/01.01.

56.    AG37/01.03 requires Defendant UDC to "appropriately diagnose and treat offenders with gender dysphoria in a humane and safe correctional environment. This shall be done in a way that is sensitive to the offender's unique adjustment issues, and is consistent with the core values, vision, and mission of the Department and its commitment to provide adequate healthcare and mental health services to all offenders in its custody."

57.    AG37/01.04 provides that "[t]he Utah Department of Corrections recognizes the need to properly evaluate offenders who express transgender issues." Similarly, AG37/01.05 defines gender dysphoria as the condition of feeling one's emotional and psychological identity as

male, female, or other to be opposite and incongruent to one's "biological sex." The policy requires gender dysphoria to be determined by a professional diagnosis.

58.    AG37/2.00 describes the GD Committee, its members, and the procedure for its use in the medical care of people with gender dysphoria. AG37/02.01 provides that the GD Committee is chaired by UDC's Director of Clinical Services and includes the chair of UDC's LGBTI Committee, UDC's Clinical Director of Mental Health services, the USCF's Warden, UDC's Director of Nursing, and a UDC Psychologist. According to AG37/02.01, the GD Committee is designed to review and determine mental health services and medical care for transgender people who are seeking diagnosis and gender-affirming care, including treatment for gender dysphoria.

59.    AG37/02.02 describes the procedure for a gender dysphoria evaluation for an incarcerated person. Upon intake or at any other time, if an incarcerated person self-identifies as transgender and requests a mental health evaluation through the Inmate Care Request process, the mental health provider is to meet with the requestor within 14 working days.

60.    The incarcerated person is to have an initial evaluation from a mental health provider using the "Transgender Initial Assessment Form." UDC's mental health provider or contractual provider is then to present the results to the GD Committee.

61.    AG37/02.02(D)-(E) provides that UDC's Director of Clinical Services or their designee (who chairs the GD Committee) shall have final approval on whether to refer the person for an assessment for gender dysphoria.

62.    Pursuant to AG37/02.02(E), people who are denied an assessment for gender dysphoria must wait one year to apply for a reevaluation.

63.    AG37/02.02(F) states that if approved for an evaluation of gender dysphoria, a referral is sent to the contract psychologist.

64.    AG37/02.02(H) requires the contract psychologist to meet with the person for an evaluation for gender dysphoria, after the person has signed a Release of Information to allow access to all prior treatment related to gender dysphoria.

65.    AG37/02.03 requires a diagnosis of gender dysphoria to be based on the DSM-5 criteria and made by the contract psychologist.

66.    AG37/02.04(A)-(B) provides that UDC's Director of Clinical Services or their designee shall review and consider any recommendations made by the contract psychologist in developing a treatment plan and UDC's Director of Clinical Services or their designee may require additional consultation in the diagnosis and development of the individual treatment plan.

67.    AG37/02.04(C) states that UDC's Director of Clinical Services or their designee may order treatment with hormone therapy. The UDC's Director of Clinical Services or their designee may consult with the contract psychologist regarding a recommendation for hormone treatment.

68.    AG37/02.04(D) specifically prohibits cosmetic or elective surgical procedures for the purpose of sex reassignment to any incarcerated person.

69.    AG37/02.04(E) provides that people who have been diagnosed with gender dysphoria "shall have access to mental health services available through the Department."

70.    Despite AG37's provisions regarding the role of mental health providers in assessing and treating gender dysphoria, Defendants have failed to provide adequate mental health services for the evaluation and treatment of gender dysphoria, including failing to provide mental health services by qualified mental health providers with experience in the treatment of gender dysphoria.

71.    On information and belief, the GD Committee comprises non-medical and medical administrators and personnel who are not qualified providers for the treatment of gender dysphoria.

The GD Committee has overruled the diagnoses of and treatment recommendations for gender dysphoria made by contractual agents of or providers employed by UDC or DHHS and has imposed additional barriers to medical and mental health services for people with gender dysphoria.

72.     The GD Committee's practices have caused significant delays in obtaining appropriate diagnoses and prescribed treatment for gender dysphoria, including hormone therapy, causing continued harm to Plaintiffs, including severe distress and for some, self-harm.

73.     On information and belief, Defendants have enforced a requirement that before a person can be eligible for hormone therapy, the person must live as that gender for one year. This requirement is longer than the six-months period required under the Utah Medicaid rule.[3] The Medicaid Policy requires solely that a person has a well-documented gender dysphoria/gender incongruence between one's experienced/expressed gender and natal gender of at least six months. Neither Defendants' six-month or one-year requirement is based on the Clinical Guidelines.

74.     On information and belief, the GD Committee has neither authorized the individualized assessment of anyone nor approved anyone for surgical interventions as treatment for gender dysphoria.

75.     On information and belief, no group of incarcerated people other than transgender people with gender dysphoria is subject to this lengthy, multistep committee process for determination of medical and/or mental health services. Conditions other than gender dysphoria are not subjected to a committee process for approval of diagnostic services and treatment by a committee that includes non-medical staff capable of overruling the judgment of qualified medical

---

[3] Utah DHHS, *Utah Medicaid Pharmacy Prior Authorization Request Form Hormone Therapy for Gender Dysphoria* (Last Updated Jan. 1, 2025), https://medicaid-documents.dhhs.utah.gov/pharmacy%2Fpriorauthorization%2Fpdf%2FHormone+Therapy+for+Gender+Dysphoria.pdf.

or psychological providers. Nor are the diagnosis and treatment of conditions other than gender dysphoria subject to a yearlong waiting period before allowing re-application for an evaluation or for care if it is denied by the committee.

76.    On information and belief, Plaintiffs' gender dysphoria diagnoses and treatment recommendations were and are subject to Defendants' GD Committee and/or its Director of Clinical Services, or under the direction of Defendants Mr. Garcia, Ms. Gruber, Ms. D'Amico, Dr. Bank, or Dr. Wisner or their predecessors from approximately 2018 to the present.

77.    On July 21, 2023, UDC and DHHS issued the "Correctional Health Services Transition Update" authored by Defendant Ms. Gruber and Brian Redd, former Executive Director of UDC confirming DHHS and CHS's assumption of care for people incarcerated in UDC. The report explains that as of July 1, 2023, UDC began a transition of medical responsibilities for incarcerated people's care from UDC to DHHS at the Governor's behest. This included development of a memorandum of understanding between the two agencies and the transfer of the UDC Clinical Service Bureau to the DHHS Clinical Health Services section, positioning it under the direction of DHHS's executive medical director. The two departments were to work together during the transition beginning July 1, 2023.

78.    CHS became the primary medical provider for people in UDC's custody, effective July 1, 2024. According to its website, the mandate of CHS is to provide medical care to incarcerated people; its vision statement asserts that it will "improve the lives of staff and individuals who are incarcerated and promote public safety by delivering safe and effective integrated healthcare."[4] DHHS and CHS's assumption of care included continuing UDC's past practices embodied in AG37 and such as the use of a GD Committee.

---

[4] Division of Correctional Health Services, https://dhhs.utah.gov/chs/ (last visited Dec. 04, 2025).

79.     AG37 and the GD Committee process have not been changed and remain in place at this time. Even after the July 2023 transition of healthcare services to DHHS and CHS, Plaintiffs' prison medical records continue to reference the committee.

C.     **The DOJ's Finding that Defendant UDC Violated the ADA**

80.     Sometime prior to March 2024, Plaintiff Ms. Morrigan filed complaints with the DOJ alleging that UDC had violated her rights as a person with the disability of gender dysphoria. She contended that UDC failed to provide her with a timely and adequate evaluation for gender dysphoria, access to gender-affirming clothing, timely and adequate provision of hormone therapy, and an individualized determination of need for surgery to treat her gender dysphoria. The DOJ opened an investigation of UDC under Title II of the ADA in response to Ms. Morrigan's complaints.

81.     Title II of the ADA prohibits a public entity, including UDC and DHHS, from imposing unnecessary eligibility criteria that screen out or tend to screen out people with disabilities from fully and equally enjoying any of the public entity's services, including healthcare programs.

82.     On March 12, 2024, following its investigation, the DOJ issued a Letter of Findings and Conclusions ("DOJ Letter of Findings") to UDC, stating that UDC was in violation of the ADA by failing to timely evaluate Ms. Morrigan and provide her meaningful access to healthcare for her disability of gender dysphoria.[5]

83.     The DOJ found that Ms. Morrigan experienced symptoms of gender dysphoria for many years before she entered UDC's custody in 2021. Her medical condition became increasingly

---

[5] The DOJ Letter of Findings referred to the UDC as the "UDOC." The investigation was completed March 12, 2024, as the transition of most healthcare responsibility from UDC to DHHS/CHS was occurring.

worse while in custody where she was surrounded only by men and lacked control over her daily life and healthcare. While at UDC, a qualified healthcare professional contracted by UDC diagnosed Ms. Morrigan with gender dysphoria and found that she met criteria to receive medical treatment including hormone therapy. However, her access to medically necessary care was unnecessarily delayed due to UDC's process. It took UDC nine months to provide a diagnostic assessment and another six months to prescribe Ms. Morrigan hormone therapy.

84.    The DOJ explained that "…these unnecessary delays and restrictions directly deprived Ms. Morrigan of equal access to medical care based on her disability of gender dysphoria."

85.    The DOJ found that UDC imposed unnecessary eligibility criteria for assessment and treatment for gender dysphoria that it does not require for other requests for medical care for other conditions, with the GD Committee serving as "the gatekeeper for care" in an "unnecessarily protracted multistep process."

86.    The DOJ found that UDC conditioned diagnostic assessments and treatment for gender dysphoria on the GD Committee's prolonged approval process. The DOJ specifically found that some members of the GD Committee expressed bias against transgender people and were reluctant to prescribe medically appropriate treatment for gender dysphoria. This process delayed Ms. Morrigan's healthcare for her disability of gender dysphoria for more than fifteen months after her first request for treatment, despite her submitting multiple follow-up requests and grievances.

87.    The DOJ also found that a UDC physician, a member of the UDC's GD Committee, even tried to talk Ms. Morrigan out of hormone therapy. After the hormone therapy began, UDC healthcare providers failed to conduct laboratory testing to ensure the hormone therapy did not interfere with other prescription medications and to ensure her dose levels were effective.

88.    The DOJ found that "Incarcerated individuals at UDC who seek health care for medical conditions other than gender dysphoria are typically not required to complete an unnecessarily protracted, multistep process. Their access to diagnostic services and treatment does not require approval by a committee that includes non-medical staff and members who are biased against them. Nor must they endure lengthy waiting periods before reapplying for care if their requests for treatment are denied."

89.    The DOJ found that UDC failed to modify policies, practices, or procedures where necessary to avoid discriminating against Ms. Morrigan.

90.    Based on these findings, the DOJ concluded that UDC had violated the ADA by denying Ms. Morrigan equal access to healthcare services and failing to make reasonable modifications to its policies to avoid discrimination based on Ms. Morrigan's disability of gender dysphoria.

91.    The DOJ concluded that corrective action and remedial measures were necessary to bring UDC into compliance with the ADA. The corrective actions and remedial measures included revising policies, practices, and procedures to ensure that people with gender dysphoria were provided equal opportunities to participate in and benefit from UDC services, programs, and activities. The DOJ found that equal access would require providing healthcare services for gender dysphoria consistent with the UDC's treatment of other medical conditions. It would also include reasonable modifications to the UDC's policies, practices, and procedures to ensure that each person, including every transgender person with gender dysphoria, has equal access to all of the UDC services, programs, and activities, including "...required and optional programming."

92.    On April 2, 2024, DOJ filed suit against UDC and DHHS to enforce its investigation orders in the U.S. District Court for the District of Utah in *United States v. Utah,*

Case No. 2:24-cv-00241. The case was voluntarily dismissed on January 30, 2025. None of the Plaintiffs in this case were parties to the prior suit.

93.     Since the issuance of the DOJ Letter of Findings and the related lawsuit, neither UDC nor DHHS has engaged in any corrective action or addressed the ADA violations found by DOJ.

94.     Instead, UDC and DHHS continue to maintain the policies, practices, and procedures found unlawful by DOJ. UDC and DHHS continue to apply AG37 and its GD Committee process to overrule the diagnoses and treatment recommendations of providers and perpetuate a practice of delay or non-approval for gender dysphoria that erects barriers to care that are not imposed on people who have other medical conditions or disabilities.

### D.     Defendants' Improper Use of a Gender Identity Disorder Diagnosis Contrary to their Own Policies

95.     Although AG37 refers to gender dysphoria and requires diagnoses to be made according to the DSM-5, UDC and DHHS have used and continue to incorrectly use the diagnosis of gender identity disorder ("GID"), which is not within the DSM-5.

96.     GID is an outdated and different diagnosis from gender dysphoria. GID was initially introduced in 1975 by the International Classification of Diseases ("ICD"), and published by the World Health Organization, which classified the condition as a mental health condition.[6] Five years later, in 1980, the APA's third edition of its Diagnostic and Statistical Manual of Mental Disorders (DSM) included GID. In 2013, however, the DSM-5 removed the diagnosis of GID from the DSM.

---

[6] Jack Drescher, et al., *Minding the body: Situating gender identity diagnoses in the ICD-11*, 24 Int'l Rev. Psychiatry 568, 570 (Dec. 2012), https://www.researchgate.net/publication/233938371_Minding_the_body_Situating_gender_identity_diagnoses_in_the_ICD-11.

97.     Presently, the DSM-V uses the term Gender Dysphoria. Gender dysphoria is a medical condition and disability within the DSM-5 which is distinct from GID. Gender dysphoria requires clinically significant distress as the presenting feature, termed "dysphoria," that a person experiences as a result of the incongruence between their gender identity and their sex assigned at birth. The current gender dysphoria diagnosis recognizes that incongruence between a person's identity and sex assigned at birth is not the problem in need of treatment—the clinically significant distress associated with that incongruence is.

98.     Defendants and their healthcare providers have no adequate medical basis for using the outdated diagnosis of GID and failing to follow their own policy of evaluating Plaintiffs for gender dysphoria pursuant to the DSM-5 as part of their obligation to provide adequate medical care and to not discriminate based on disability.

E.     **Utah's Enactment of H.B. 252 and Defendants' Implementation of its Prohibition on Treatment for Gender Dysphoria**

99.      On March 19, 2025, the Utah Legislature enacted H.B. 252 (2025 Utah Laws Ch. 88), which Defendants began implementing and enforcing as of its May 7, 2025, effective date. H.B. 252 prohibits Defendants from initiating hormone therapy as treatment for gender dysphoria and categorically bans individual assessment for surgical interventions for treatment of gender dysphoria for incarcerated transgender people with gender dysphoria.

100.     In relevant part, H.B. 252 amended the Utah Health and Human Services Code, adding provisions that govern the health of incarcerated persons, and specifically addressing DHHS's provision of healthcare to those people committed to the custody of UDC and housed at a correctional facility operated by or under a contract with UDC. Utah Code § 26B-4-1001. It amended the Code to specify that DHHS shall help UDC-owned or operated healthcare facilities meet NCCHC accreditation standards and shall work in coordination with UDC and as UDC's

agent to "(i) create policies and procedures for providing comprehensive health care to inmates, (ii) provide inmates with comprehensive health care; and (iii) develop standard population indicators and performance measures relating to the health of inmates." Utah Code § 26B-4-1002.

101.    Section 5 of H.B. 252, codified at Utah Code § 26B-4-1003(1), states that DHHS may not initiate any of the following procedures or treatments for an incarcerated person:

> (a) a cross-sex hormone treatment;

> (b) a primary sex characteristic surgical procedure; or

> (c) a secondary sex characteristic surgical procedure.

102.    Section 3 of H.B. 252, codified at Utah Code § 26B-4-1001, defines cross-sex hormone treatment as "…administering, prescribing, or supplying for effectuating or facilitating an individual's attempted sex change:

> (a) to an individual whose biological sex at birth is a female, a dose of testosterone or other androgens at levels above those normally found in an individual whose biological sex at birth is female; or

> (b) to an individual whose biological sex at birth is male, a dose of estrogen or a synthetic compound with estrogenic activity or effect at levels above those normally found in an individual whose biological sex at birth is male."

103.    The same section defines "primary sex characteristic surgical procedures" as "any of the following if done for the purpose of effectuating or facilitating an individuals' attempted sex change:

> (i) for an individual whose biological sex at birth is male, castration, orchiectomy, penectomy, vaginoplasty or vulvoplasty;

> (ii) for an individual whose biological sex at birth is female, hysterectomy, oophorectomy, metoidioplasty, or phalloplasty;

26

(iii) any surgical procedure that is related to or necessary for a procedure described in Subsection (6)(a)(i) or (ii), that would result in the sterilization of an individual who is not sterile."

104. The statute further defines "secondary sex characteristic surgical procedure" to mean "any of the following if done for the purpose of effectuating or facilitating an individual's attempted sex change:

(i) for an individual whose biological sex at birth is male, breast augmentation surgery, chest feminization surgery, or facial feminization surgery; or

(ii) for an individual whose biological sex at birth is female, mastectomy, breast reduction surgery, chest masculinization surgery, or facial masculinization surgery."

105. The definitions of both primary and secondary sex characteristic surgical procedures thus explicitly exclude "surgery or other procedures or treatments performed on an individual who has a difference of sex development;" or "removing a body part that is cancerous or diseased, or for a reason that is medically necessary, other than to effectuate or facilitate an individual's attempted sex change."

106. H.B. 252 limits Defendants to only "treat an inmate's gender dysphoria and any co-occurring mental health disorder, by providing psychotherapy, mental health services, or any other necessary and appropriate treatment," banning the provision of any medical treatment, including those previously provided by Defendants as necessary and appropriate, like hormone therapy, and continues Defendants' prior practice under AG37/02.04(D) of precluding surgery for "sex reassignment" purposes and thus any individualized assessment for surgery. Utah Code § 26B-4-1003.

107. H.B. 252's effective restriction of treatments to only mental health services not only discriminates by withholding the range of care, but does not actually meet even the mental health

needs of gender dysphoria treatment, particularly given Defendants' failure to provide access to qualified mental health providers with experience in the treatment of gender dysphoria.

108.    Since May 7, 2025, the effective date of H.B. 252, Defendants have refused to initiate hormone therapy for any incarcerated person with gender dysphoria. This includes refusal of hormone therapy prescribed by Defendants' own providers, agents, or contractors even prescribed before the H.B. 252 effective date but ultimately delayed by the GD Committee's process.

109.    On information and belief, all Defendants continue to provide hormone therapy when medically necessary to those who were receiving it prior to the effective date of H.B. 252.

110.    On information and belief, all Defendants continue to provide hormone therapy and individualized assessments for surgical intervention as treatment for medical conditions or impairments other than gender dysphoria.

111.    On information and belief, all Defendants continue to provide health care, including examinations and scheduling of surgery without the burden of a committee process for other health conditions.

**F.    Defendants' Additional Obligations and Knowledge of Plaintiffs' Rights under the ADA.**

112.    Defendants have failed to provide information to Plaintiffs about their rights under the ADA and on Defendants' procedure to file complaints, including by identifying an ADA Coordinator, in a manner that gives notice of their rights.

113.    Defendants are aware of the rights and protections for qualified individuals under the ADA, including as a result of the DOJ's findings of ADA violations, but have refused to make available those protections for people whose disability is gender dysphoria.

28

114.    Defendants have an affirmative duty to diagnose a person's potential disability, a physical or mental impairment. This typically includes screening incarcerated people upon arrival for medical issues and conducting further assessments if a disability is suspected to ensure appropriate care and equal access to programs. It is to also assess the person in order to provide reasonable accommodations and modifications to policies and practices to ensure their meaningful equal access to Defendants' services, benefits and programs. Defendants have failed to properly evaluate Plaintiffs for gender dysphoria, including because they failed to consider Plaintiffs' comorbidities, including hearing impairments and/or learning impairments that could impact assessments for gender dysphoria. Defendants have also failed to participate in any interactive process with the Plaintiffs to ensure reasonable accommodations or policy modifications are provided for gender dysphoria.

115.    UDC and DHHS cannot demonstrate undue hardship or any fundamental alteration to the prison's provision of healthcare or other programs or services that would excuse the entities from making the changes that the DOJ's Letter of Findings directed the entities to do by correcting policies and procedures to comply with the ADA and by providing reasonable accommodations to Plaintiffs.

116.    Defendants discriminate against Plaintiffs by routinely failing to provide them meaningful equal access to adequate medical and mental health services for transgender people who have gender dysphoria. Even though proper diagnoses and effective treatments of gender dysphoria are well-understood among qualified medical professionals, Defendants have adopted policies, procedures, and practices that deny Plaintiffs meaningful equal access to healthcare for their disability of gender dysphoria. Defendants' failures include refusing to make modifications to policies and procedures or even attempting on an individual basis to accommodate Plaintiffs' personal needs as people with disabilities.

29

## FACTS CONCERNING NAMED PLAINTIFFS

117.    For years, each of the Plaintiffs has attempted to use Defendants' internal processes, informal and formal complaints, grievances, and appeals to obtain adequate medical and mental health services for their disability of gender dysphoria and has detailed the ongoing harms they have suffered due to inadequately treated gender dysphoria. All Defendants continue to deny, delay, and fail to provide Plaintiffs access to adequate healthcare for gender dysphoria, including currently denying medically necessary hormone therapy to Ms. Tucker, Ms. Dombroski, and Ms. Phillips, despite knowledge of the seriousness of gender dysphoria and the medical necessity of its prompt treatment.

118.    Defendants also have knowledge of the rights of people with gender dysphoria, a disability, under the ADA through the 2024 DOJ investigation, letter of finding, and lawsuit. Despite knowing of the rights of qualified individuals with the disability of gender dysphoria, Defendants continue to discriminate against all Plaintiffs on basis of their disability by denying them meaningful equal access to services, programs and activities and have denied reasonable accommodations or policy modifications to address their disability.

### A.    <u>Plaintiff Virginia Tucker ("Ms. Tucker")</u>

119.    Ms. Tucker is a 25-year-old transgender woman. She has been incarcerated since August 2019.

120.    Although her sex assigned at birth was male, Ms. Tucker's gender identity is female.

121.    Ms. Tucker identified as a girl from a very young age, preferring her sister's Barbie dolls to playing outside with boys. Her parents were not supportive of any gender non-conformity and shut down any conversation that suggested she was anything other than a heterosexual cisgender boy. Her "grandpa" slapped her for asking to dress as Ariel the Little Mermaid for

Halloween at age 11. Because she knew they would not accept her as a girl or woman, Ms. Tucker learned to hide her gender identity well.

122.    Ms. Tucker's distress at not being able to live as her authentic self has been persistent and dramatic, resulting in a long history of self-harm and suicide attempts beginning at age 13. After her first suicide attempt, child services became involved with the family and Ms. Tucker was removed from her parents' custody and placed in a group home, eventually ending up in juvenile detention. Throughout her time in care and detention, she repeatedly engaged in cutting due to her disability of gender dysphoria. But despite visits from child services and interactions with medical staff at the facilities, her disability of gender dysphoria remained unaddressed. One nurse at a juvenile facility responded to her attempt to talk about being transgender at age 16 by telling her she was not transgender, but just "queer."

123.    As a result of her inadequately treated gender dysphoria, Ms. Tucker has attempted suicide over forty times, with numerous attempts in the last five years requiring significant medical attention by UDC healthcare providers. Ms. Tucker repeatedly requested care for her gender dysphoria disability during these interactions, but medical staff focused exclusively on addressing the physical symptoms of the suicide attempt. Ms. Tucker's suicide attempts relate to the denial and neglect of her requests for help and treatment for her gender dysphoria.

124.    While incarcerated in prison, Ms. Tucker has repeatedly but unsuccessfully requested care for her disability of gender dysphoria. Specifically, Ms. Tucker began requesting hormone therapy in April of 2022 while in the psychiatric ward of the prison after she self-harmed. She asked a UDC nurse for hormone therapy. The UDC nurse told her she could not receive hormone therapy without a diagnosis of gender dysphoria. Thereafter, Ms. Tucker repeatedly asked every three to four months for a diagnosis or help related to her disability of gender dysphoria.

Sometime in 2022, Ms. Tucker was directed to Mike Hoglund, a UDC provider, but he did not assist her with care for gender dysphoria or refer her to another provider.

125.    During the same 2022-2023 timeframe, Ms. Tucker was living as a woman through clothing and grooming to the extent she could in prison. Ms. Tucker requested and was denied access to gender-affirming clothing but she did what she could to present in a manner more consistent with her female gender identity and grew out her hair to wear in a more feminine style.

126.    In November 2023, Ms. Tucker attempted to overdose with medications and home-made alcohol because of the distress caused by her untreated disability of gender dysphoria. She was hospitalized for weeks and had to be intubated and placed in a medically induced coma. During recovery, Ms. Tucker met with Leslie Forbush, UDC's hormone therapy administrator, and again requested hormone therapy. Ms. Forbush took no action to evaluate Ms. Tucker for gender dysphoria. Ms. Tucker was eventually released from the infirmary but spent months using a wheelchair and a walker.

127.    Meanwhile, in February 2024, Dr. Roby, a UDC provider, and Dr. Binks, a DHHS provider, conducted a psychological evaluation of Ms. Tucker. Despite Ms. Tucker's repeated requests to be assessed for gender dysphoria this was not a gender dysphoria evaluation. Ms. Tucker asked for but never saw the results of the evaluation.

128.    In November 2024, while still recovering from her November 2023 suicide attempt, Ms. Tucker was placed in UDC's psychiatric ward for six days because of a letter found in her cell, in which she wrote about her disability of gender dysphoria and suicide. Soon after, on December 9, 2024, Ms. Tucker wrote a medical note to Dr. Binks, asking to discuss her personal gender identity, gender expression, and gender dysphoria, and to be placed on hormone therapy.

129.    On December 18, 2024, Dr. Binks evaluated Ms. Tucker for gender dysphoria. Despite her requests, Ms. Tucker was never shown or provided a copy of the evaluation. On the

same day, Ms. Tucker noticed that her UDC tablet, for the first time, recognized her preferred first and middle names, Virginia Rose, after many requests that UDC make this change. This made her feel optimistic that she was being recognized by UDC as the woman she is, but she still had no confirmation of a diagnosis of gender dysphoria and still was not receiving hormone therapy.

130.    On January 8, 2025, Ms. Tucker made a written request to Charlotte Ray, a UDC employee, for hormone therapy, books, articles, worksheets, and courses to help with gender dysphoria. Months later, she was eventually provided a booklet on her UDC tablet entitled "The Queer and Transgender Resilience Workbook Skills," but no actual treatment for her disability of gender dysphoria.

131.    On or about January 9, 2025, Ms. Tucker learned from "Taylor," a DHHS tech aide, that her UDC and DHHS medical records showed that she had a diagnosis of GID. When she then asked for her diagnosis to be clarified as gender dysphoria, "Alex," also a DHHS tech aide, told her, "it was the same thing."

132.    Sometime in January 2025, Ms. Tucker was orally told that hormone therapy was a necessary type of medical care for her, but that she must wait a full year, until January 2026, before starting hormone therapy. This was later confirmed in Ms. Tucker's medical records by a July 19, 2025 entry made by Whitney Mason, P.A. On February 17, 2025, Ms. Tucker requested in writing to Defendants to be placed on hormone therapy. At about the same time, mid-February 2025, Ms. Tucker heard from Amanda Alkema, the CHS Behavioral Health Director, about being referred to an interdisciplinary case staffing team, on information and belief, the GD Committee.

133.    In March 2025, Ms. Tucker was evaluated again by Dr. Binks. She was not given a written report of that evaluation from Dr. Binks or any provider.

134.    From March 27, 2025, to April 29, 2025, Ms. Tucker made multiple requests for medical care. On March 27, 2025, she filed an ADA grievance in which she stated that she was

diagnosed with gender dysphoria. She has additionally attempted to be approved for hormone therapy and for mental health services for her disability of gender dysphoria. On both April 4, 2025, and April 22, 2025, Ms. Tucker made requests to UDC staff to start hormone therapy. Finally, on April 29, 2025, Ms. Tucker submitted a Level 1 grievance stating she had asked to be put on hormone therapy multiple times, had spoken to Dr. Binks twice, and was being ignored by Defendants.

135.    On May 21, 2025, an unsigned DHHS/CHS Staff Response dated May 1, 2025, was given to Ms. Tucker by UDC Officer Croft. The May 21, 2025, document confirms that despite a request to see a mental health provider beginning in January 2024, further requests of March 11 and March 30, 2024, and requests for a gender dysphoria evaluation on November 20, and December 11, 2024, Ms. Tucker was not evaluated for gender dysphoria until December 18, 2024—a delay of nearly one year since her initial requests for a diagnosis and treatment. The document states Ms. Tucker has Adult Gender Identity Disorder and incorrectly claims Ms. Tucker was not interested in gender-affirming clothing or hormone therapy.

136.    On May 22, 2025, the day after receiving UDC's response to her complaint, Jane Reed, the DHHS Clinical Records Manager, sent Ms. Tucker a letter denying Ms. Tucker all mental health records and results of any psychological evaluations.

137.    On May 23, 2025, Ms. Alkema briefly met with Ms. Tucker and told her that she was part of the GD Committee. Ms. Alkema addressed Ms. Tucker as "Mr.," and Ms. Tucker reminded her of her female pronouns. Ms. Alkema tried to explain why the prison was now unable to provide hormone therapy and blamed it on H.B. 252. She told Ms. Tucker that she should stop asking for hormone therapy.

138.    A few days later, on May 29, 2025, Ms. Tucker submitted a Level 2 Grievance/ADA complaint. She stated that: 1) she was not spoken to about being transgender until after nearly three

years of pleading for help; 2) she had been told by UDC employee Jen Branin that the GD Committee's job is to review if the person needs to see a professional but a licensed person must determine if a person has GD; 3) she was diagnosed with GID instead of gender dysphoria; and 4) there was no treatment plan designed to help her. Ms. Tucker explained that her disability of gender dysphoria and severe distress inhibited her from being able to fully participate in life activities, including work, social involvement, physical activities, and communicating with others. Ms. Tucker also stated that because of the incongruence between her body and spirit, she has on multiple occasions been admitted to UDC's psychiatric ward because of self-harm. In the same complaint, Ms. Tucker stated that if she had been given proper care when she first asked in 2022, she would not be experiencing dysphoria as badly as she is now. Ms. Tucker also asserted she was fully living as a woman at least one year before filing the complaint, by noting that in January of 2024, Annie Snyder, a UDC mental health provider, had seen Ms. Tucker living and presenting herself as a woman.

139.    Within days of Ms. Tucker's May 29, 2025 Level 2 Grievance, Ms. Alkema emailed a response stating: 1) that the CHS Electronic Health Record ("EHR") confirmed Ms. Tucker had reported gender dysphoria as early as February 2024; 2) contends Ms. Tucker "did not bring up gender dysphoria again until December 1, 2024, when she was in the psychiatric infirmary;" 3) admits that a gender dysphoria evaluation was completed by Dr. Binks, a CHS psychologist, on December 18, 2024; 4) confirms that the GD Committee (aka the Interdisciplinary Case Staffing Team-ICST) reviewed Ms. Tucker's December 18, 2024 evaluation; and 5) states that Ms. Tucker meets the criteria for gender dysphoria.

140.    Ms. Alkema's email stated that DHHS records were updated and claimed that the medical records stated that Ms. Tucker was not requesting hormone therapy on January 9, 2025.

Ms. Alkema also noted that Ms. Tucker's request for gender-affirming clothing was made and approved April 9, 2025.

141.    Also, shortly after May 29, 2025, Ms. Tucker received a letter from UDC with Defendant Mr. Garcia's name on UDC letterhead but signed by "The ADA Committee" in response to her March 2025 ADA complaint. This letter acknowledges Ms. Tucker had written expressing her concern about H.B. 252. The undated DHHS letter states:

> Currently, UDC's position is that gender dysphoria is not covered by the ADA. The ADA committee is not considering requests related to gender dysphoria. All hormone replacement therapy (HRT) is being provided by Clinical Health Services, not the ADA Committee. Additionally, the ADA Committee is not issuing gender affirming clothing, those are exceptions that are not being made by the ADA Committee. Such exceptions would need to be requested from your health care provider. If you have issues related to healthcare, you need to raise them with Clinical Health Services. The ADA committee does not govern any medical treatment and does not act against medical judgment. The committee does not schedule medical appointments or issue any medication or medical instruments.

142.    In June 2025, Ms. Tucker was on a staff-created medical list to see Whitney Mason, PA, a UDC or DHHS medical provider, for transgender healthcare. While waiting to see Ms. Mason, the Defendants' medical staff told Ms. Tucker that the list was "only for trans people." She was told that she was "not a real transgender person" and would not be allowed to see Ms. Mason. Ms. Tucker was never given an opportunity to see Ms. Mason.

143.    Nearly a month later, on or about June 27, 2025, Defendants, by Jamie Peterson, responded to Ms. Tucker's Level 2 Grievance. Ms. Peterson stated that: 1) Ms. Tucker was evaluated in March of 2025 by Dr. Binks (as opposed to December 2024 as Ms. Alkema stated); 2) incorrectly claimed that Ms. Tucker was not interested in hormone therapy at that time; and 3) claimed that Ms. Tucker requested hormone therapy but the request had to go to the "Gender Affirming Committee" ("GD Committee") which was not scheduled to meet until May 6, 2025. The response stated that DHHS could not initiate hormone therapy because of the new law starting

May 7, 2025, and that DHHS was "no longer offering HRT." Defendants acknowledged Ms. Tucker's claim that she spoke to CHS staff in 2022-2023, and although Ms. Tucker claims she was seen dressing as a woman in 2023, Ms. Peterson asserted this was not documented in DHHS records.

144.    On July 2, 2025, Ms. Tucker appealed the ADA Level 2 decision. Ms. Tucker explained again that meetings with mental health providers and Mike Hogland were not recorded; she asked to see a professional and have a treatment plan created; she reported increased levels of depression, anxiety, self-harm, and suicidal tendences; and noted she was meeting with a mental health provider for 15-30 minutes once every 6-8 weeks. Ms. Tucker sent three additional grievances in mid-October 2025 after DHHS extended its time to respond to August 8, 2025. The appeal was denied in November 2025, with Defendants admitting Ms. Tucker had fully exhausted all administrative remedies.

145.    Defendants Mr. Garcia, Ms. D'Amico, Ms. Gruber, Dr. Bank, and Dr. Wisner have deprived Ms. Tucker of adequate medical care, including medically necessary hormone therapy, for her disability of gender dysphoria. Defendants rely on AG37 and their implementation of H.B. 252 to prohibit the initiation of hormone therapy as treatment for gender dysphoria.

146.    Defendants Mr. Garcia, Ms. D'Amico, Ms. Gruber, Dr. Bank, and Dr. Wisner set forth no individual basis in Ms. Tucker's care for refusal to provide hormone therapy to her other than H.B. 252. Defendants' implementation of H.B. 252's categorical ban, which does not permit medical decisions based on individual assessments for Ms. Tucker, deviates from the Clinical Guidelines that call for an individualized assessment for medical treatment.

147.    Defendants' significant delay in identifying her disability of gender dysphoria has denied Ms. Tucker the hormone therapy she was prescribed by Defendants' healthcare providers and has caused Ms. Tucker profound psychological distress. This delay also puts her at continued

risk of serious harm—even though Defendants know of her extensive history of self-harm, which is continuing—and suicide attempts due to inadequately treated gender dysphoria.

148.    Defendants have also subjected her to delays in diagnosis and access to both hormone therapy and adequate mental health services for gender dysphoria from qualified mental health providers with experience in treatment of gender dysphoria.

149.     Defendants UDC and DHHS continue to discriminate against Ms. Tucker based on her disability of gender dysphoria. Ms. Tucker's gender dysphoria disability is a physical or mental impairment that limits one or more of her major life activities. Her major life activities that are disrupted include interacting with others (social interaction), thinking, working, and concentrating. When she is overwhelmed by her gender dysphoria disability, she "gets stuck" or "shuts down" and will not leave her bed or her cell. She does not participate socially or go to the library or other services. She has difficulty sleeping, eating, and concentrating.

150.    As a result of Defendants' discriminatory treatment, policies, and practices, Ms. Tucker cannot equally access all UDC and DHHS services and benefits, including healthcare and educational and rehabilitative services, given the significant psychological distress and long-standing efforts to self-harm she experiences due to her disability of gender dysphoria.

151.    Defendants have failed to evaluate or engage in an interactive process with Ms. Tucker to identify reasonable accommodations or propose modifications to their policies to allow her to participate in all services, programs or activities within UDC, and to not be excluded on the basis of her disability of gender dysphoria.

**B.    <u>Plaintiff Stephanie Dombroski ("Ms. Dombroski")</u>**

152.    Plaintiff Stephanie Dombroski is a 49-year-old transgender woman. She has been incarcerated since January 2023.

153.    Although her sex assigned at birth was male, Ms. Dombroski's gender identity is female.

154.    As early as age thirteen, Ms. Dombroski struggled with her gender identity. At that time, she began to understand herself as a young woman. She feared that her family would reject her because she was raised in a conservative Southern Pentecostal family that held strict ideals of what it meant to be a man or woman. She kept her feelings to herself and turned her focus to her education, including obtaining a college degree.

155.    After college, she enlisted in the U.S. Navy and served honorably for 23 years. Throughout her years of service, she felt she had to hide her true self to move up in the military ranks. Although she was successful in the military and eventually reached the rank of Senior Chief Petty Officer in the Navy, her pride in that accomplishment was dampened by the belief that if people knew she was a woman, she would not be "good enough" to have her position. She feared the impact on her career if she were to come out as a transgender woman.

156.    After her incarceration, Ms. Dombroski finally began to live openly as a woman. She began to seek medical and mental health services through requests for an evaluation for gender dysphoria and to receive treatment including approval for hormone therapy. In April 2024, Ms. Dombroski twice met with a mental health therapist, a UDC or DHHS provider, for a gender dysphoria assessment. During these appointments Ms. Dombroski asked the provider about gender-affirming clothing and hormone therapy.

157.    Two months later, in June 2024, Dr. Karen Malm, a UDC or DHHS provider, completed an evaluation of Ms. Dombroski and diagnosed her with gender dysphoria.

158.    The following month, in July 2024, DHHS records show that the "GD interdisciplinary team" (also referred to as the GD Committee), overruled Dr. Malm's diagnosis of

gender dysphoria and approval for hormone therapy. The GD Committee declared that Dr. Malm's diagnosis of gender dysphoria was not supported.

159.    Believing that she would soon begin to receive the treatment that she needed, in July 2024, Ms. Dombroski met with Leslie Forbush, who told her that she did not meet Defendants' criteria for hormone therapy. Ms. Dombroski was devastated to learn that before receiving hormone therapy Defendants require that she must live a certain amount of time as a female, six months under the Utah Medicaid rule. Ms. Dombroski was confused by this as she had been living as a woman to the extent she could in the prison, and even Ms. Forbush stated she would continue to ask for gender-affirming clothing for Ms. Dombroski.

160.    On August 2, 2024, Ms. Dombroski again requested medical treatment related to her disability of gender dysphoria. A DHHS mental health provider again denied her request for treatment including hormone therapy. Ms. Dombroski grew concerned that the UDC or DHHS electronic records system failed to indicate that she is a transgender woman with the medical condition of gender dysphoria. Notwithstanding Dr. Malm's June 2024 diagnosis of gender dysphoria, none of the Defendants responded to Ms. Dombroski's inquiry about her medical records to confirm that her diagnosis of gender dysphoria was recorded and accurate.

161.    A few weeks later, Ms. Dombroski met with Stephanie Vranes Ringwood Ney, PA, a DHHS provider. Ms. Ney's DHHS records show that Ms. Dombroski presented to the clinic with concerns about her disability of gender dysphoria, as she had been told the GD Committee denied her hormone therapy. Ms. Dombroski told Ms. Ney she had been dealing with worsened depression due to the distress caused by her untreated disability of gender dysphoria and that she had experienced thoughts of engaging in self-harm to remove her testicles. The assessment plan was to refer Ms. Dombroski back to mental health services. Ms. Ney also discussed Ms. Dombroski's

case with Christina Eleni Malters, PA, a DHHS provider, who stated that Ms. Dombroski would be discussed at the next HRT committee meeting.

162.    In September 2024, Ms. Dombroski again met with Ms. Forbush for appropriate treatment for her disability of gender dysphoria, including hormone therapy. She was concerned that Defendants had not recorded gender dysphoria. She requested that Ms. Forbush "put the [gender dysphoria] diagnosis in my chart." Despite her request, on October 27, 2024, Ms. Dombroski's medical chart was noted "GID." From that point forward, UDC and DHHS medical records reference Ms. Dombroski's condition as GID.

163.    For months, Ms. Dombroski continued to seek medical and mental health services for her disability of gender dysphoria. On or about April 14, 2025, Defendants sent Ms. Dombroski a letter signed by the "ADA Committee" that stated:

> This letter acknowledges the ADA committee received your letter outlining concerns to recent legislation HB 252. After review of your letter and other similar letters, the Department is providing this response.
> Currently, UDC's position is that gender dysphoria is not covered by the ADA. The ADA committee is not considering requests related to gender dysphoria. All hormone replacement therapy (HRT) is being provided by Clinical Health Services, not the ADA Committee. Additionally, the ADA Committee is not issuing gender affirming clothing, those are exceptions that are not being made by the ADA Committee. Such exceptions would need to be requested from your health care provider. If you have issues related to healthcare, you need to raise them with Clinical Health Services. The ADA committee does not govern any medical treatment and does not act against medical judgment. The committee does not schedule medical appointments or issue any medication or medical instruments.

164.    On May 7, 2025, Ms. Dombroski submitted a formal complaint to DHHS to receive hormone therapy for her disability of gender dysphoria. On June 12, 2025, Jamie Peterson, a DHHS provider, sent a written denial of Ms. Dombroski's grievance in which Peterson stated that Ms. Dombroski could not receive hormone therapy as she was not diagnosed with gender dysphoria prior to May 7, 2025, despite acknowledging Dr. Malm's diagnosis of Ms. Dombroski having gender dysphoria in June 2024. For over a year, Ms. Dombroski has continued to seek

medical and mental health services for the severe distress she suffers due to untreated gender dysphoria. Defendants Mr. Garcia, Ms. D'Amico, Ms. Gruber, Dr. Bank, and Dr. Wisner have deprived Ms. Dombroski of adequate medical care, including medically necessary hormone therapy, for her disability of gender dysphoria. Defendants rely on AG37 and their implementation of H.B. 252 to prohibit the initiation of hormone therapy as treatment for gender dysphoria.

165.    Defendants Mr. Garcia, Ms. D'Amico, Ms. Gruber, Dr. Bank, and Dr. Wisner purportedly have denied hormone therapy to Ms. Dombroski based on their requirement that she live as a woman for a period of time, and now assert they are prohibited from initiating hormone therapy due to the implementation of H.B. 252. Defendants' determination that she has not met their requirement is unsupported by Ms. Dombroski's multiple requests. Records show that since at least April 2024, Ms. Dombroski has lived openly as a woman and since September 2024, Defendants have provided gender-affirming commissary items to her.

166.    Defendants' implementation of H.B. 252's categorical ban, which does not permit medical decisions based on individual assessments for Ms. Dombroski, deviates from the Clinical Guidelines that call for an individualized assessment for medical treatment.

167.    Defendants' significant delay in diagnosing her disability of gender dysphoria has denied Ms. Dombroski the hormone therapy she was prescribed by Defendants' healthcare providers and adequate mental health services for gender dysphoria from qualified mental health providers with experience in treatment of gender dysphoria. Defendants' actions have caused Ms. Dombroski to suffer clinical distress, worsened depression, and recurring thoughts of self-harm.

168.    Defendants UDC and DHHS discriminate against Ms. Dombroski based on her disability of gender dysphoria. Ms. Dombroski's gender dysphoria disability is a physical or mental impairment that limits one or more of her major life activities. Her major life activities that are

disrupted are emotional regulation caused by significant psychological distress, sleeping and her ability to care for herself and interact with others.

169.    As a result of Defendants' discriminatory treatment, policies, and practices, Ms. Dombroski cannot equally access all the UDC and DHHS services and benefits, including healthcare and educational and rehabilitative services, given the significant psychological distress she experiences due to her disability, gender dysphoria.

170.    Defendants have failed to evaluate or engage in an interactive process with Ms. Dombroski to identify reasonable accommodations or propose modifications to their policies to allow her to participate fully in all services, programs and activities within UDC, and to not be excluded on the basis of her disability of gender dysphoria.

### C.    Plaintiff Sandy Phillips ("Ms. Phillips")

171.    Plaintiff Sandy Phillips is a 53-year-old transgender woman. She has been incarcerated since October 2022.

172.    Although her sex assigned at birth was male, Ms. Phillips' gender identity is female.

173.    Ms. Phillips began to feel she was a woman at around age 18. She began to live and express herself as a woman at her home, where she felt safe to do so. Ms. Phillips shared her feelings of being a woman with her former wife and began to keep a wardrobe of her own women's clothing at their home. In addition to her wife, Ms. Phillips' parents also supported her and told her that they were not surprised to learn that she is a transgender woman. Ms. Phillips felt safe to live in her home as a woman but did not feel safe doing so publicly.

174.    After she was in USCF, Ms. Phillips began to understand more about what it meant to be a transgender person and began to seek out medical care for the distress that she was experiencing. In mid-2023, during a mental health appointment with Ms. Forbush, Ms. Phillips

requested that she be provided transgender care. Ms. Forbush told her that before medical care could be provided she would need to first meet with a doctor.

175.    Over the next year, Ms. Phillips began to live more openly as a woman. On September 10, 2024, Ms. Phillips submitted a request for medical care including hormone therapy (e.g., estrogen pills or shots) and the cost for treatment. She explained that she was wearing women's underwear and had been provided with a bra and now needed to physically transition by growing her breasts. Her medical records show that she was again instructed to see the medical staff, as she had been told by Ms. Forbush, and then to see mental health services. On September 17, 2024, and again on September 26, 2024, Ms. Phillips wrote further requests indicating she had disclosed herself as a transgender woman and was requesting hormone therapy.

176.    Following the September requests, Ms. Phillips submitted additional medical requests on October 10, 2024, and November 8, 2024, to be evaluated for gender dysphoria and to be diagnosed so that she could receive hormone therapy, and to see Ms. Forbush.

177.    Eventually, Ms. Phillips met with Dr. Paul Binks, who evaluated her and diagnosed her with gender identity disorder on November 27, 2024. The "gender identity disorder" diagnosis was recorded in her UDC and DHHS records.

178.    On information and belief, after Dr. Binks' diagnosis, the GD Committee approved Ms. Phillips for hormone therapy in January 2025. Ms. Phillips believed that she would soon begin hormone therapy because Ms. Forbush told her that she would put an order in for Ms. Phillips to begin hormone therapy.

179.    Soon after learning that she would begin hormone therapy, and as documented in UDC and DHHS records, Ms. Phillips went to the prison's pill line several times in March and April 2025 asking for her hormone therapy. Despite this she was not provided with hormone pills, causing her to become distressed, frustrated, and confused.

180.    Contrary to Ms. Phillips' belief that she had been approved for hormone therapy, on March 5, 2025, a UDC provider note stated she was approved for makeup and clothing for her gender dysphoria disability but "no indication for meds."

181.    On or about March 21, 2025, Ms. Phillips spoke with Ms. Forbush again and was told that she would not be provided with hormone therapy, Ms. Phillips was devastated and became upset while at work in the prison. Related to her ongoing frustrations caused by the denial of hormone therapy, she got into an argument and lost her prison job for about three months.

182.    Since mid-2023, Ms. Phillips has requested an evaluation for gender dysphoria so that she could receive adequate medical care including hormone therapy. In that time, Defendants Mr. Garcia, Ms. D'Amico, Ms. Gruber, Dr. Bank, and Dr. Wisner have never provided Ms. Phillips with medically necessary hormone therapy for her disability of gender dysphoria. Defendants rely on AG37 and their implementation of H.B. 252 to prohibit the initiation of hormone therapy as treatment for gender dysphoria.

183.    Defendants Mr. Garcia, Ms. D'Amico, Ms. Gruber, Dr. Bank, and Dr. Wisner's delays in the evaluation and diagnosis of Ms. Phillips' gender dysphoria disability caused Defendants to determine that she had not met their requirement that she live as a woman for a one-year period. Regardless, through her requests, Ms. Phillips had informed Defendants that she was living as a woman, including wearing gender-affirming clothing as early as September 2024.

184.    Defendants' implementation of H.B. 252's categorical ban, which does not permit medical decisions based on individual assessments for Ms. Phillips, deviates from Clinical Guidelines that call for an individualized assessment for medical treatment.

185.    Defendants' significant delay in diagnosing her gender dysphoria has denied Ms. Phillips the hormone therapy she was prescribed by Defendants' healthcare providers and adequate

mental health services from qualified mental health providers with experience in treatment of gender dysphoria. Defendants' actions have caused Ms. Phillips to suffer clinical distress.

186.    Defendants UDC and DHHS discriminate against Ms. Phillips based on her disability of gender dysphoria. Ms. Phillips' gender dysphoria is a physical or mental impairment that limits one or more of her major life activities. Her major life activities that are disrupted are emotional regulation caused by significant psychological distress, her ability to care for herself, social interaction, and ability to maintain work.

187.    Defendants UDC and DHHS have also regarded Ms. Phillips as having a disability of GID from November 27, 2024, and with an "end date" of December 31, 2025, even while denying and delaying her an accurate evaluation concerning gender dysphoria and relying on an outdated diagnosis contrary to the Defendants' own AG37 policy.

188.    As a result of Defendants' discriminatory treatment, policies, and practices, Ms. Phillips cannot equally access all of the UDC and DHHS services and benefits, including healthcare and educational and rehabilitative services, given the significant psychological distress she experiences due to her disability of gender dysphoria.

189.    Defendants have failed to evaluate or engage in an interactive process with Ms. Phillips to identify reasonable accommodations or propose modifications to its policies to allow her to participate fully in all services, programs or activities within UDC, and to not be excluded on the basis of her disability of gender dysphoria.

### D.    **Plaintiff Dakota Grunwald ("Mr. Grunwald")**

190.    Plaintiff Dakota Grunwald is a 29-year-old transgender man. He has been incarcerated as an adult since 2015.

191.    Although his sex assigned at birth was female, Mr. Grunwald's gender identity is male.

192.    When he was in second or third grade, Mr. Grunwald started to realize that he was a boy. Because he understood himself to be a boy, once he began to undergo puberty, he began to feel distress caused by changes to his body, particularly his chest.

193.    For years, he thought he must be crazy for feeling that he was a boy. Mr. Grunwald did not know how to ask for help, or even fully understand what he was experiencing, and he feared that if he told anyone he would be committed to a psychiatric hospital. Because of these fears, he did not tell anyone about what he was feeling, and he suffered with his distress by himself for years. This distress caused him to attempt suicide multiple times throughout his adolescence.

194.    On July 15, 2015, at age eighteen, Mr. Grunwald was moved into UDC custody at the USCF. At the USCF, Mr. Grunwald finally learned what it meant for someone to be transgender and understood that he was a transgender man. This was a great relief for him as he realized that he "was not crazy" and that there were other people like him including other transgender people in UDC.

195.    Mr. Grunwald has attempted to receive medical care for gender dysphoria throughout his incarceration. Early on, he was verbally told that UDC's "policy" excluded transgender people from receiving hormone therapy unless the person had started receiving it before entering prison.

196.    Mr. Grunwald also learned that UDC did not have a policy in place for transgender men to have chest binders or to get appropriate men's undergarments. In 2019, Mr. Grunwald began to ask UDC officials for these items and was successful in obtaining a binder and undergarments after discussions with Deputy Warden Dorn. These items were not designated as medical needs but were made available to him through the commissary.

197.    Despite having access to a chest binder, Mr. Grunwald's dysphoria related to his chest has continued to worsen. He wears his binder except when he must shower and to sleep. He

showers quickly so that he does not have to see his chest and so that others cannot view him. He removes his binder when he sleeps so that he does not injure himself and puts it on immediately when he wakes up.

198.    As early as January 2017, Defendants were aware of Mr. Grunwald's self-harm related to his distress. His records show multiple medical incidents related to cutting himself and need for medical care including stitches. For example, in early January 2018, Mr. Grunwald went to UDC's Kristi Baker, PA for treatment because he had been cutting himself and the injuries required five stitches. UDC health care providers did not offer Mr. Grunwald any mental health services related to his distress and did not assess him for gender dysphoria.

199.    Months after his continued cutting, Mr. Grunwald met with UDC providers whom he believed were evaluating him for gender dysphoria and who would diagnose him with gender dysphoria so that he could receive necessary care. His records show three appointments in July 2018 with Dr. Bryce Roby, a UDC psychologist. On August 30, 2018, Mr. Grunwald met again with Dr. Roby who was joined by Lorry Stufflebeam, a UDC Licensed Clinical Social Worker. For an almost two-year period, and despite a history of self-harm and suicide attempts, UDC continued to not treat his disability of gender dysphoria.

200.    On January 23, 2019, Mr. Grunwald was seen by Ann Snyder, a UDC employee and licensed social worker, related to his self-harm and reported suicidal ideation. His available medical records do not include information about his history prior to incarceration of suicide attempts including suicidal ideation caused by his gender-related distress. On February 11, 2020, Mr. Grunwald was seen by Todd Gay, PA, a UDC provider, for his continued self-harm. Months later, on August 18, 2020, and again on October 30, 2020, Mr. Grunwald requested an appointment with Mike Hoglund, a UDC provider, but both requests were ignored. Finally, on December 24,

2020, Ms. Forbush saw Mr. Grunwald. Ms. Forbush confirmed that Mr. Grunwald had not been seen by a psychiatric provider for nearly an entire year, since January 2020.

201.    On January 12, 2021, Dr. Darrel Olsen, a UDC provider, noted in his medical treatment notes that Mr. Grunwald had been diagnosed with gender dysphoria and met the requirements for hormone therapy. Dr. Olsen told Mr. Grunwald that he could start him on testosterone that same day, and that his hormone therapy had been previously delayed because it was denied "by higher ups." Mr. Grunwald began receiving hormone therapy on January 19, 2021.

202.    After Mr. Grunwald had received hormone therapy for some months, on September 22, 2021, Mr. Grunwald began to request additional treatment for his disability of gender dysphoria: chest surgery. He made this request to Mr. Gay who would "send [the request] to the committee for discussion." Two months later, Mr. Gay informed Mr. Grunwald that the committee (likely the GD Committee) had denied the request for evaluation for surgical care.

203.    Mr. Grunwald has made numerous informal and formal requests through the grievance process and ADA complaint process that he be evaluated for chest surgery; that he receive reasonable accommodations for his disability of gender dysphoria, including that Defendants provide a support group for transgender men; and that he receive mental health services from qualified mental health professionals with experience in treating gender dysphoria.

204.    Mr. Grunwald continued to receive hormone therapy, and on June 27, 2023, Vivian Nguyan, PA, a UDC provider, met with Mr. Grunwald and wrote an assessment and plan reporting that "pt is supratherapeutic at 1137, upper limit of safe per Trans line guidelines." She discussed with Mr. Grunwald that she would have to decrease his dosages of hormone therapy in the future because he was supratherapeutic, meaning that he was receiving a dosage of testosterone that was higher than the typical dose, and as a result was showing elevated human chorionic gonadotropin.

However, it appears UDC providers have continued to provide Mr. Grunwald with these same dosage levels and have not sent him to a specialist for assessment.

205.    Despite receiving hormone therapy, Mr. Grunwald continues to experience severe gender dysphoria and distress. On February 20, 2025, Mr. Grunwald filed an Offender ADA Request & Decision Form with UDC and DHHS. He identified his disability as "Gender Dysphoria" explaining that he is uncomfortable in his own body, struggles with showering and changing his clothes, and does not want anyone to see him in a state of undress. Mr. Grunwald stated that his gender dysphoria disability has limited his access to at least two specific programs or services offered by Defendants. Mr. Grunwald stated that "I'm not getting my mental health therapy that I need, I've been denied top surgery through medical and mental health services." He stated that the specific accommodation he requested was "to have my top surgery aka Double Mastectomy."

206.    In response to this ADA request, on March 13, 2025, UDC in a letter signed only "[t]he ADA Committee" denied Mr. Grunwald's ADA complaint, referring to it as only a request for a reasonable accommodation through modifications to policies and practices for chest surgery. The letterhead listed UDC Executive Director Jared Garcia and stated that the "ADA committee does not govern any medical treatment and does not act against medical judgment." The letter states that the ADA committee is "designed to provide accommodations to allow access to department programs and services." Although Mr. Grunwald had already requested help from the medical staff, Mr. Grunwald was sent back to "medical."

207.    Defendants have denied Mr. Grunwald's requests for a reasonable accommodation of showering at a private time. He requested this accommodation because his severe distress at having to expose his body or to have to view himself causes him severe distress. He removes his

binder to shower but must then quickly shower so that his chest is not viewed by others and so that he does not have to see his chest causing him distress.

208.    Mr. Grunwald has requested that he be provided access to a mental health group for transgender men as treatment for his disability of gender dysphoria. Defendants have created a mental health group for transgender women, but not for transgender men.

209.    While Mr. Grunwald has continued to receive hormone therapy after the implementation of H.B. 252, he is in a constant state of worry that his hormone therapy could be stopped at any time under the new law and given the comments that he is "supratherapeutic," which has been unresolved due to Defendants' failure to appropriately monitor his hormone therapy or to send him to a specialist for assessment. All of this has worsened his gender-related distress.

210.    Defendants UDC and DHHS discriminate against Mr. Grunwald based on his disability of gender dysphoria. Mr. Grunwald's gender dysphoria disability is a physical or mental impairment that limits one or more of his major life activities. His major life activities that are disrupted are the ability to care for himself, maintain personal hygiene including showering, emotional regulation caused by significant psychological distress, and social interaction.

211.    Defendants rely on AG37 and their implementation of H.B. 252 to prohibit an individual assessment for surgical intervention as treatment for gender dysphoria. Defendants rely on the AG37/02.04(D) policy that excludes surgical procedures for any "sex reassignment" purpose. Defendants have denied Mr. Grunwald an individual evaluation for surgical interventions as treatment for his disability of gender dysphoria. There is no medical or scientific support for Defendants refusing to assess Mr. Grunwald for chest surgery as treatment for his gender dysphoria disability.

212.    Defendants maintain a *de facto* policy or practice of denying surgical interventions for treatment of gender dysphoria. Consistent with its use of the GD Committee as a "screen-out" process, Defendants have implemented a blanket ban on assessments for surgical interventions as treatment for gender dysphoria. As the DOJ found in March 2024, the GD Committee's screen-out process is contrary to the ADA. Consistent with its use of the GD Committee as a "screen-out" process, Mr. Gay has told Mr. Grunwald that the GD Committee will deny any request for chest surgery related to treatment for gender dysphoria.

213.    H.B. 252 prohibits individual assessment for surgical intervention only applies to treatment for gender dysphoria, a disability. Defendants have denied Mr. Grunwald an individual assessment for surgical interventions because it is treatment for his disability of gender dysphoria.

214.    As a result of Defendants' discriminatory treatment, policies, and practices, Mr. Grunwald cannot equally access all UDC and DHHS services, programs and activities, including healthcare and educational and rehabilitative services, due to worsening psychological distress and active self-harm related to his disability of gender dysphoria.

215.    Defendants have failed to evaluate or engage in an interactive process with Mr. Grunwald to identify reasonable accommodations or propose modifications to its policies to allow him to participate fully in all services, programs, or activities within UDC and to not be excluded on the basis of his disability of gender dysphoria.

**E.    Plaintiff Amberli Kimiko Morrigan ("Ms. Morrigan")**

216.    Plaintiff Amberli Kimiko Morrigan is a 34-year-old transgender woman. She has been incarcerated since July 2021.

217.    Although her sex assigned at birth was male, Ms. Morrigan's gender identity is female.

218.    From an early age, Ms. Morrigan felt she was a girl. She recalls learning how to sew from her mother and making girl clothes for herself but knowing that she could not wear them. Around the age of fourteen, she began to struggle with distress from the incongruence between her sense of herself and the sex she was assigned at birth.

219.    Prior to her incarceration, Ms. Morrigan had started to live partially openly as a transgender woman at home. She worked at a software company where she first learned about ADA protections and was provided accommodations for certain mental health disabilities by her employer.

220.    Soon after her incarceration, Ms. Morrigan began to request medical and mental health services for the gender-related distress she experienced. On or about December 27, 2021, Dr. Brian Chandler, a UDC employee or agent, evaluated Ms. Morrigan and concluded that she did not have gender dysphoria. Ms. Morrigan filed a grievance concerning this, which was denied. She continued to file grievances related to her need for care and an accurate evaluation for gender dysphoria. Defendants' actions caused significant delay of some 10 months before Ms. Morrigan was finally diagnosed with gender dysphoria in June 2022.

221.    Despite Ms. Morrigan's numerous attempts to use Defendants' formal grievance process to receive adequate medical and mental health services for her disability of gender dysphoria, Defendants continued to fail to provide her with this care. In a 2022 grievance, Ms. Morrigan identified herself as a transgender woman and a disabled person and alleged that "mental health support" was severely lacking. UDC denied this grievance.

222.    From August to November 10, 2022, Ms. Morrigan filed an additional three grievances and/or appeals about denial of treatment for gender dysphoria. UDC denied these grievances. And on November 10, 2022, she completed a Level 2 grievance concerning her medication and mental health services for her gender dysphoria disability. She stated that her

access to mental health services was limited to five appointments over 17 months. This appeal was also denied.

223.    In January 2023, Ms. Morrigan began to receive hormone therapy from UDC providers. Despite this, problems continued with her access to medical care. She again filed a grievance on March 13, 2023, regarding her hormone levels, the dosage of her hormone therapy, and that it had been over ten weeks since she had requested to be seen by medical staff, which was denied.

224.    In 2022, Ms. Morrigan filed an ADA complaint with the DOJ against UDC alleging discrimination because of her disability of gender dysphoria. In response to her ADA complaint, the DOJ opened an investigation against UDC under the ADA.

225.    Defendants' failure to provide Ms. Morrigan with adequate medical care also interfered with her ability to fulfill parole eligibility requirements. On March 21, 2023, Ms. Morrigan grieved that a male-specific treatment program she was required to complete as a requirement for parole eligibility was not suitable for transgender women. Ms. Morrigan alleged that the program leader, Ms. Gustafson, told her that the reason she could not have a curriculum conducive for a woman was because she still had to "subject herself to hormone therapy" and have "gender assignment surgery" to be considered a "real woman." This complaint was denied.

226.    Defendants' delays and denials of adequate health care for Ms. Morrigan's severe gender dysphoria caused her to suffer serious harm. On May 21, 2023, Ms. Morrigan performed a rudimentary but successful auto-castration, removing her testes, and flushing them down the toilet. Ms. Morrigan removed her testes to relieve her symptoms of dysphoria.

227.    Defendants' medical staff took Ms. Morrigan to University Medical Center ("UMC"), where she required emergency care due to loss of blood during the auto-castration. She also sustained a hernia related to the auto-castration. She stayed at UMC for one day and then

returned to the USCF infirmary for a day. Next, she was moved into the Currant Building, USCF's building for incarcerated people needing mental health treatment and was under self-injury watch and razor restrictions.

228.    Since her initial May 2023 placement in Currant Building, Ms. Morrigan has returned to the mental health unit approximately twelve times due to the significant distress caused by her disability of gender dysphoria, which has been exacerbated by sexual harassment and abuse. Her distress has caused her to be unable to socialize. For example, Ms. Morrigan rarely goes to the lunch hall because she is fearful of harassment and violence she has experienced in the past related to her gender identity. This causes her dysphoria to worsen, increasing anxiety and depression, and reducing her ability to socialize and interact with others. She continues to suffer harms including Defendants' removal of her gender-affirming clothing. These actions cause her dysphoria to worsen and impede her ability to work and socialize with others.

229.    On or about June 15, 2023, the State of Utah Board of Pardons and Parole denied Ms. Morrigan's ADA complaint and her request for a reasonable accommodation to be excused from enrollment in the male treatment program. Although Defendants denied her ADA complaint, their denial recognized her as a disabled person. Months later, Ms. Morrigan was denied parole in January 2024 because she did not complete the treatment program for men and for "poor institutional behavior," which on information and belief is related to her need for medical and mental health services for her disability of gender dysphoria and her advocacy to access this care.

230.    On March 12, 2024, the DOJ sent its Letter of Findings to UDC finding the entity to be in violation of the ADA.

231.    Defendants' enforcement of AG37 and its GD Committee's procedures unnecessarily delayed approval of Ms. Morrigan's medical care because it singles out gender dysphoria for a process that Defendants do not require for other medical or mental health

impairments. The DOJ found that Ms. Morrigan's access to this medically necessary care was unnecessarily delayed due to UDC's biased and prolonged approval process utilizing its GD Committee.

232.    On or about January 13, 2025, despite her active self-harm, Ms. Forbush advised Ms. Morrigan that UDC had set a new policy. Under this policy if she "uses" the psychiatric facility "too often," her hormone therapy will be stopped. Since then, Ms. Morrigan has been afraid to report on her accurate mental health status and to discuss suicidal concerns with mental health providers. This policy has caused Ms. Morrigan to limit what she tells mental health services because she fears that sharing more about her active thoughts of self-harm will cause Defendants to stop her hormone therapy.

233.    On information and belief, Defendants' new policy was created in response to Ms. Morrigan's mental health needs related to her disability of gender dysphoria. The policy is not based on any clinical guidelines and does not apply to any other disability. This policy also denies Ms. Morrigan meaningful equal access to Defendants' programming and services because of her disability of gender dysphoria.

234.    Despite receiving hormone therapy, Ms. Morrigan continues to suffer from clinical distress, self-harm, suicidal thoughts, and hopelessness caused by her disability of gender dysphoria. She is constantly thinking of her need for care including surgical care, her need for mental health services for gender dysphoria, and the fear of losing her hormone therapy if she seeks to use psychiatric care. Frequently, she wakes up thinking of suicide. She often sleeps 12-14 hours a day. She also fears going to the library or other places out of fear that she will be targeted because she is a transgender woman.

235.    Defendants UDC and DHHS discriminate against Ms. Morrigan based on her disability of gender dysphoria. Ms. Morrigan's gender dysphoria disability is a physical or mental

impairment that limits one or more of her major life activities. Her major life activities that are disrupted are her ability to work, emotional regulation due to severe psychological distress, ability to care for herself, ability to interact with others, and disturbances in her sleep.

236.    Defendants rely on AG37 and their implementation of H.B. 252 to prohibit an individual assessment for surgical intervention as treatment for gender dysphoria. Defendants rely on AG37/02.04(D) policy that excludes surgical procedures for any "sex reassignment" purpose. Defendants maintain a *de facto* policy or practice of denying surgical interventions for treatment of gender dysphoria. Consistent with its use of the GD Committee as a "screen-out" process, Defendants have implemented a blanket ban on assessments for surgical interventions as treatment for gender dysphoria. As the DOJ found in March 2024, the GD Committee's screen-out process is contrary to the ADA.

237.    H.B. 252's prohibition of individual assessments for surgical intervention only applies to treatment for gender dysphoria, a disability. Defendants have denied Ms. Morrigan an individual assessment for surgical interventions because it is treatment for her disability of gender dysphoria.

238.    Defendants have failed to accommodate Ms. Morrigan's need for mental health services for her disability of gender dysphoria from qualified mental health providers with experience in the treatment of gender dysphoria.

239.    Defendants have singled out Ms. Morrigan on the basis of her disability of gender dysphoria by implementing a new policy that would penalize her by stopping her hormone therapy.

240.    Defendants have denied Ms. Morrigan's request for a reasonable accommodation to participate in the treatment program that is appropriate for a transgender woman to benefit from, so that she can complete this requirement for parole eligibility. Without this reasonable accommodation so that she can complete the program, she continues to be ineligible.

241.     As a result of Defendants' discriminatory treatment, policies, and practices, Ms. Morrigan cannot equally access all UDC and DHHS services, programs and activities, including healthcare and educational and rehabilitative services, given the significant psychological distress she experiences due to her disability of gender dysphoria. Defendants' discriminatory treatment has caused Ms. Morrigan to suffer from severe gender dysphoria and worsening distress as has been recorded by Defendants' providers.

242.     Defendants have failed to evaluate or engage in an interactive process with Ms. Morrigan to identify reasonable accommodations or propose modifications to its policies to allow her to participate fully in all benefits, services, and settings within UDC, and to not be excluded on the basis of her disability of gender dysphoria.

### COUNT I

**Plaintiffs Ms. Tucker, Ms. Dombroski, and Ms. Phillips**

**Against Defendants Mr. Garcia, Ms. Gruber, Ms. D'Amico, Dr. Bank, and Dr. Wisner in Their Official Capacities**

**Violations of the Eighth Amendment to the U.S. Constitution and 42 U.S.C. § 1983**

243.     Plaintiffs incorporate paragraphs 1 through 242 as if fully set forth herein.

244.     At all relevant times, Defendants knew that Plaintiffs Ms. Tucker, Ms. Dombroski, and Ms. Phillips had gender dysphoria, a serious medical condition characterized by clinical distress, which, without adequate medical and mental health services, would jeopardize their physical health and could cause depression; impairment of function; risk of self-harm to alter one's genitals or secondary sex characteristics; other self-injurious behaviors; suicidality; suicide; and death.

245.     Defendants knew that incarcerated people with gender dysphoria face a substantial risk of harm if they do not receive timely medically necessary care for their gender dysphoria and

clinical distress. Such care, as stated in the Clinical Guidelines, includes but is not limited to accurate and timely evaluations for gender dysphoria, mental health services from qualified mental health providers with experience to treat gender dysphoria, and hormone therapy.

246.    Defendants have known and continue to be aware that the prevailing medically accepted standards for the treatment of gender dysphoria are the Treatment Protocols, including the WPATH SOC-8, the Endocrine Society guidelines, and others.

247.    Defendants have known and continue to be aware that a timely and individualized assessment consistent with the prevailing Clinical Guidelines is necessary to determine medically necessary care. The medical necessity of hormone therapy for Plaintiffs Ms. Tucker, Ms. Dombroski, and Ms. Phillips is supported by their medical records and the Clinical Guidelines.

248.    Defendants have determined that hormone therapy is medically necessary for Plaintiffs Ms. Tucker, Ms. Dombroski, and Ms. Phillips but have denied that care to these Plaintiffs through enforcement of AG37 and its GD Committee's practices.

249.    At all relevant times Plaintiffs Ms. Tucker, Ms. Dombroski, and Ms. Phillips were in the care and custody of UDC and received care through Defendants.

250.    Each Defendant was employed at all relevant times by UDC or DHHS, and as such, was acting in their official capacity and under the color of state law.

251.    Defendants have refused to provide and have significantly delayed medically necessary care to Plaintiffs Ms. Tucker, Ms. Dombroski, and Ms. Phillips. The denial and delay of this care has caused serious physical and mental injury to Plaintiffs and continues to put them at substantial risk of harm to their health including clinically significant distress. Defendants' delay and denial of medical care constitute deliberate indifference to a serious medical need.

252.    Defendants' implementation and enforcement of H.B. 252 establishes a blanket ban on initiating hormone therapy to Plaintiffs Ms. Tucker, Ms. Dombroski, and Ms. Phillips, without

consideration of any independent medical judgment formed by healthcare providers, in violation of the Eighth Amendment's prohibition on cruel and unusual punishment.

253.    Defendants have implemented, condoned, ratified, followed, and/or enforced and continue to implement, condone, ratify, follow, and/or enforce a policy or custom, having the force of law, of refusing requests to initiate appropriate and effective treatment for gender dysphoria, irrespective of a person's medical need.

254.    Defendants have failed and continue to fail to train and supervise UDC and DHHS staff, contractors, and agents with respect to the proper provision of medically necessary treatment for gender dysphoria, despite knowing that gender dysphoria is a serious medical condition and that failing to train and supervise staff, contractors, and agents with respect to the provision of medically necessary treatment for this serious medical condition places Plaintiffs Ms. Tucker, Ms. Dombroski, and Ms. Phillips at substantial risk of serious mental and physical harm.

255.    Defendants' failure to provide Plaintiffs Ms. Tucker, Ms. Dombroski, and Ms. Phillips with adequate treatment for gender dysphoria including medically necessary hormone therapy has caused and continues to cause these Plaintiffs irreparable harm. As a direct and proximate result of Defendants' purposeful and intentional actions, Ms. Tucker, Ms. Dombroski, and Ms. Phillips have suffered and continue to suffer harm including severe clinical distress, self-harm, and suicidality.

## COUNT II

### All Plaintiffs

### Against Defendants UDC and DHHS

### Discrimination on Basis of Disability
### (Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*)

256.    The foregoing paragraphs from 1 to 242 are incorporated herein.

257.    Defendants UDC and DHHS are public entities as defined by 42 U.S.C. § 12131(1)(A) and (B).

258.    Based on their diagnosis of gender dysphoria, Plaintiffs all have a disability within the meaning and scope of 42 U.S.C. § 12102. Accordingly, Plaintiffs are qualified individuals with a disability within the meaning of the ADA, 42 U.S.C. § 12131(2), and are part of the class of persons protected by the ADA, which makes it unlawful for a public entity to discriminate against an individual with a disability, or to deny meaningful equal access to the benefits of the services, programs, or activities of a public entity to a person with a disability.

259.    Defendants discriminate against Plaintiffs on the basis of or by reason of their disability by continued enforcement of AG37 and the GD Committee's practices that deprive Plaintiffs equal access to medical care based on their disability of gender dysphoria, including timely and accurate diagnosis, access to hormone therapy, adequate mental health services from qualified mental health providers with experience in the treatment of gender dysphoria, and individual assessments for surgical interventions.

260.    Defendants discriminate against Plaintiffs on the basis of or by reason of their disability of gender dysphoria by continued enforcement of AG37 and the GD Committee's practices that the DOJ's investigation found to violate the ADA and Defendants have failed to change.

261.    Defendants discriminate against Plaintiffs on the basis of or by reason of their disability of gender dysphoria by implementation of H.B. 252 including its categorical bans on medical treatment, depriving Plaintiffs of equal access to medical care based on their disability of gender dysphoria, including denial of timely and accurate diagnosis, access to hormone therapy, adequate mental health services from qualified mental health providers with experience in the treatment of gender dysphoria, and individual assessments for surgical interventions.

262.    Defendants discriminate against Plaintiffs on the basis of or by reason of their disability by denying Plaintiffs meaningful access to the benefits of Defendants' services, programs, or activities because they are persons with the disability of gender dysphoria.

263.    Defendants discriminate against Plaintiffs on the basis of or by reason of their disability by failing to provide Plaintiffs with information about their rights pursuant to the ADA. Defendants further fail to utilize an interactive process, to provide reasonable accommodations and or to offer modifications in policies, practices, or procedures to avoid such discrimination and exclusion by reason of the Plaintiffs' disability of gender dysphoria.

264.    Defendants violated the ADA by failing to provide Plaintiffs with reasonable accommodations, and modifications of policies and practices, despite knowing of Plaintiffs' protected rights under the ADA.

265.    Defendants' acts and omissions violate the ADA, which prohibits discrimination on the basis of disability and protects persons such as Plaintiffs from the type of injuries set forth herein.

266.    As a direct and legal result of Defendants' actions and omissions, Plaintiffs have suffered and continue to suffer harm including clinical distress and denial of the benefits of Defendants' services, programs, or activities.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests that this Court enter judgment:

A.    Declaring that H.B. 252's categorical ban on medically necessary care for the treatment of gender dysphoria, both facially and as applied to Plaintiffs:

1.    violates the Eighth Amendment to the U.S. Constitution by mandating that Defendants remain deliberately indifferent to Plaintiffs' serious medical need of gender dysphoria and

2.      violates the ADA by subjecting qualified individuals with the disability of gender dysphoria to discrimination and excluding them from participation in and denying them the benefits of Defendants' services, programs, or activities, including health care, and denial of reasonable accommodations and failing to modify policies and practices contrary to the ADA;

B.      Declaring that Defendants' denial of adequate medical care for the treatment of gender dysphoria through the enforcement of AG37 and their GD Committee's practices violates the Eighth Amendment to the U.S. Constitution and the ADA;

C.      Entering injunctive relief requiring Defendants Mr. Garcia, Ms. D'Amico, Ms. Gruber, Dr. Bank, and Dr. Wisner to provide Plaintiffs Ms. Tucker, Ms. Dombroski, and Ms. Phillips with adequate medical care including medically necessary hormone therapy for their gender dysphoria under the prevailing clinical guidelines and to individually assess Mr. Grunwald and Ms. Morrigan for surgical interventions as treatment for their gender dysphoria;

D.      Enjoining Defendants UDC and DHHS and their agencies, agents, employees, instrumentalities, successors, contractors, and all persons in active concert or participation with it from discriminating against Plaintiffs who have or are regarded as having the disability of gender dysphoria;

E.      Ordering Defendants UDC and DHHS to adopt or revise policies to ensure that transgender people with gender dysphoria who are incarcerated at USCF are afforded meaningful access and an equal opportunity to participate in and benefit from all of Defendant UDC's and Defendant DHHS's services, programs and activities, including healthcare services, and the interactive process;

F.      Ordering Defendants UDC and DHHS to reasonably modify their policies, practices, and procedures for Plaintiffs and other transgender persons with gender dysphoria to

avoid discrimination on the basis of disability, a record of a disability or being regarded as having a disability and ensure that they have equal access to all of UDC's and DHHS's services, programs and activities, including healthcare services, through the interactive process;

G.    Ordering Defendants UDC and DHHS to train and educate all the UDC and DHHS staff, contractors, and agents on the ADA Title II;

H.    Ordering Defendants UDC and DHHS to designate one or more employees to coordinate UDC's overall efforts and DHHS' overall efforts to comply with the ADA Title II and employees, contractors, and agents at each UDC facility, including assignment of ADA coordinators, and to coordinate that facility's ADA compliance efforts regarding incarcerated people with gender dysphoria, or who are regarded as having gender dysphoria, or who have a record of having gender dysphoria;

I.    Ensuring that Plaintiffs are properly evaluated and to the extent evaluations have or are necessary, Defendants UDC and DHHS should bear those costs;

J.    Awarding Plaintiffs their reasonable attorney fees and costs under the 42 U.S.C. § 1988, the ADA, and other applicable laws; and

K.    Ordering such other appropriate relief as the interests of justice may require.

Respectfully submitted December 9, 2025,

Jacqueline A. Domenella*
Diane O'Connell*
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606-6361
Telephone: 312-876-8000
Email: jacqui.giannini@dentons.com
Email: diane.oconnell@dentons.com

Evan Wolfson*
Hannah Rochford*
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone: 212-768-6700
Email: evan@freedomtomarry.org
Email: hannah.rochford@dentons.com

/s/ David W. Tufts
David W. Tufts (Bar No. 8736)
DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111
Telephone: 801-415-3000
Email: david.tufts@dentons.com

Jason M. Groth (Bar No. 16683)
Abigail Cook (Bar No. 19781)
Tom Ford (Bar No. 19795)
ACLU OF UTAH FOUNDATION, INC.
311 South State St., Suite 310
Salt Lake City, UT 84111
Telephone: 801-521-9862
Email: jgroth@acluutah.org
Email: acook@acluutah.org
Email: tford@acluutah.org

Sonja D. Kerr*
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Telephone: 610-675-7192
Email: skerr@lambdalegal.org

Richard Saenz*
Whit Washington*
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: 212-809-8585
Email: rsaenz@lambdalegal.org
Email: wwashington@lambdalegal.org

*Counsel for Plaintiffs*

*\*Pro hac vice* application forthcoming