David W. Tufts (Bar No. 8736)
DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111
Telephone: 801-415-3000
Email: david.tufts@dentons.com
*Counsel for Plaintiffs*

Additional Counsel on next page

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| VIRGINIA TUCKER, STEPHANIE DOMBROSKI, SANDY PHILLIPS, DAKOTA GRUNWALD, and AMBERLI K. MORRIGAN<br><br>        Plaintiffs,<br><br>v.<br><br>UTAH DEPARTMENT OF CORRECTIONS; JARED GARCIA, EXECUTIVE DIRECTOR OF THE UTAH DEPARTMENT OF CORRECTIONS, *in his official capacity*; SHARON D'AMICO, WARDEN OF THE UTAH STATE CORRECTIONAL FACILITY, *in her official capacity*; UTAH DEPARTMENT OF HEALTH AND HUMAN SERVICES; TRACY GRUBER, EXECUTIVE DIRECTOR OF THE UTAH DEPARTMENT OF HEALTH AND HUMAN SERVICES, *in her official capacity*; DR. STACEY BANK, EXECUTIVE MEDICAL DIRECTOR OF CLINICAL SERVICES UTAH DEPARTMENT OF HEALTH AND HUMAN SERVICES, *in her official capacity; and* DR. MARCUS WISNER, DIRECTOR OF CORRECTIONAL HEALTH SERVICES, UTAH DEPARTMENT OF HEALTH AND HUMAN SERVICES, *in his official capacity.*<br><br>        Defendants. | Case No. 2:25-cv-01108-TC<br><br>**PLAINTIFFS' MOTION AND MEMORANDUM OF LAW IN SUPPORT OF A PRELIMINARY INJUNCTION**<br><br>(ORAL ARGUMENT REQUESTED)<br><br>Judge Tena Campbell |

## TABLE OF CONTENTS

STATEMENT OF RELIEF REQUESTED AND GROUNDS ................................................. 1

BACKGROUND ................................................................................................................. 3

    A.    Gender Dysphoria Is a Serious Medical Condition. ............................................... 3

    B.    Hormone Replacement Therapy is an Evidence-Based Treatment for Gender
         Dysphoria. .............................................................................................................. 3

    C.    UDC's Policy AG37 Utilized Before the Implementation of H.B. 252. ................. 5

    D.    The U.S. Department of Justice's 2024's Letter of Findings of Defendants'
         Delays, and Denials of Medically Necessary Care for Gender Dysphoria. ............ 6

    E.    Utah's Enactment of H.B. 252 and Defendants' Categorical Denial of
         Hormone Therapy Regardless of Individual Medical Need ................................... 7

    F.    The Devastating and Predictable Impact on Plaintiffs of Defendants' Prior
         Policies Combined with Passage of H.B. 252 ....................................................... 8

         1.    Virginia Rose Tucker ................................................................................. 8

         2.    Stephanie Dombroski .............................................................................. 10

         3.    Sandy Phillips .......................................................................................... 12

LEGAL STANDARD ...................................................................................................... 13

ARGUMENT ................................................................................................................... 14

    A.    Plaintiffs Have Made a Strong Showing of a Substantial Likelihood of
         Success Under the Eighth Amendment. ............................................................... 14

         1.    Plaintiffs' gender dysphoria is an objectively serious medical need. ....... 16

         2.    Defendants are deliberately indifferent to Plaintiffs' serious medical
             need despite their knowledge of the substantial risk to Plaintiffs in denying
             care. ......................................................................................................... 18

    B.    Plaintiffs Will Continue to Suffer Irreparable Harm Absent a Preliminary
         Injunction. ........................................................................................................... 22

    C.    The Balance of Harms Strongly Favors Plaintiffs and the Injunction is in the
         Public Interest. .................................................................................................... 23

    D.    No Security Should Be Required ......................................................................... 25

CONCLUSION ................................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Al-Turki v. Robinson*,
    762 F.3d 1188 (10th Cir. 2014) ...................................................................15, 16

*Benjamin v. Oliver*,
    No. 25- 04470 (N.D. Ga.), ECF No. 94 ...............................................................21

*Benjamin v. Oliver*,
    No. 25-04470, 2025 WL 2542072 (N.D. Ga. Sept. 4, 2025) ........................... *passim*

*Brown v. Zavaras*,
    63 F.3d 967 (10th Cir. 1995) .................................................................................18

*Cordellione v. Comm'r, Indiana Dep't of Correction*,
    No. 23-00135, 2024 WL 4333152 (S.D. Ind. Sept. 17, 2024) ..........................17, 19

*De'lonta v. Johnson*,
    708 F.3d 520 (4th Cir. 2013) .................................................................................17

*E. High Sch. Prism Club v. Seidel*,
    95 F. Supp. 2d 1239 (D. Utah 2000).....................................................................24

*Edmisten v. Werholtz*,
    287 F. App'x 728 (10th Cir. 2008) .......................................................................21

*Edmo v. Corizon, Inc.*,
    935 F.3d 757 (9th Cir. 2019) ............................................................................3, 17

*Estelle v. Gamble*,
    429 U.S. 97 (1976).....................................................................................2, 15, 18

*Evans v. Utah*,
    21 F. Supp. 3d 1192 (D. Utah 2014).....................................................................24

*Farmer v. Brennan*,
    511 U.S. 825 (1994)...................................................................................2, 15, 18

*Fields v. Smith*,
    653 F.3d 550 (7th Cir. 2011) .................................................................................20

*Free the Nipple-Fort Collins v. City of Fort Collins*,
    916 F.3d 792 (10th Cir. 2019) ..........................................................................23

*Hardeman v. Smith*,
    764 Fed. Appx. 658 (10th Cir. 2019) ...............................................................17

*Hicklin v. Precynthe*,
    No. 16-01357, 2018 WL 806764 (E.D. Mo. Feb. 9, 2018)................................20

*Hunt v. Uphoff*,
    199 F.3d 1220 (10th Cir. 1999) ........................................................................15

*Johnson v. Sanders*,
    121 F.4th 80 (10th Cir. 2024) ..........................................................................17

*Keohane v. Fla. Department of Corrections Secretary*,
    952 F.3d 1257 (11th Cir. 2020) ........................................................................17

*Lamb v. Norwood*,
    899 F.3d 1159 (10th Cir. 2018) .....................................................................5, 17

*Lucas v. Turn Key Health Clinics, LLC*,
    58 F.4th 1127 (10th Cir. 2023) ........................................................................16

*Mata v. Saiz*,
    427 F.3d 745 (10th Cir. 2005) ..........................................................................21

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*,
    389 F.3d 973 (10th Cir. 2004) (en banc) ..........................................................13

*Ortega v. Grisham*,
    148 F.4th 1134 (10th Cir. 2025) ..................................................................22, 23

*Robinson v. Labrador*,
    747 F. Supp. 3d 1331 (D. Idaho 2024) .............................................17, 20, 23, 24

*RoDa Drilling Co. v. Siegal*,
    552 F.3d 1203 (10th Cir. 2009) ...................................................................13, 25

*Rosati v. Igbinoso*,
    791 F.3d 1037 (9th Cir. 2015) (per curiam).......................................................20

*S. Utah Drag Stars v. City of St. George*,
    677 F. Supp. 3d 1252 (D. Utah 2023)........................................................22, 24, 25

*Sealock v. Colorado*,
    218 F. 3d 1205 (10th Cir. 2000) ...................................................................15, 21

*Supre v. Ricketts*,
    792 F.2d 958 (10th Cir. 1986) .....................................................................17, 18

*Szymakowski v. Utah High Sch. Activities Ass'n, Inc.*,
    756 F. Supp. 3d 1238 (D. Utah 2024)...................................................................25

**Other Authorities**

Coleman et al., *Standards of Care for the Health of Transgender and Gender
    Diverse People*, *Version 8*, 23 Int J. Transgend Health S1 (2022) at S106,
    https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644 ...............................4

Fed. R. Civ. P. Rule 65 ..........................................................................13, 25

H.B. 252, 2025 Gen. Session (Utah 2025), codified in Utah Code Ann. 26B-4-903 ............ *passim*

U.S. CONST. AMEND VIII ...........................................................................15

## STATEMENT OF RELIEF REQUESTED AND GROUNDS

Plaintiffs Virginia Rose Tucker, Stephanie Dombroski, and Sandy Phillips (the "Plaintiffs")[1] are transgender women incarcerated in the Utah State Correctional Facility ("USCF"), a facility under the control of the Defendant Utah Department of Corrections ("UDC"). The Plaintiffs suffer from gender dysphoria, a serious medical condition. Ms. Tucker, Ms. Dombroski, and Ms. Phillips live daily with intense psychological and physical distress due to the failure of Defendants UDC and Utah Department of Health and Human Services ("DHHS") and their officials Mr. Garcia, Ms. Gruber, Ms. D'Amico, Dr. Bank, and Dr. Wisner (collectively, "Defendants") to provide medically necessary care to treat Plaintiffs' gender dysphoria, namely, hormone replacement therapy ("hormone therapy"). Although Defendants' own diagnostic and treatment policy recognizes the importance of individualized treatment for gender dysphoria, and Defendants have previously provided hormone therapy when medically necessary for the treatment of gender dysphoria, Defendants have acted with deliberate indifference by refusing to provide these Plaintiffs with hormone therapy.

The Plaintiffs move this Court pursuant to Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction enjoining Defendants from enforcing Utah House Bill 252 ("H.B. 252")—the recently enacted blanket ban on the initiation of hormone therapy as treatment for gender dysphoria in Utah state prisons—and Defendants' policies and practices that have caused serious delays and denials in care causing Plaintiffs substantial harm, and requiring that they

---

[1] For purposes of this motion, Plaintiffs refers only to Plaintiffs Tucker, Dombroski, and Phillips. The Plaintiffs are transgender. In keeping with their gender identity, judicial practice, and accepted medical standards, Plaintiffs request that the Court use their chosen names. For identification purposes, Virgina Tucker's UDC ID number is 243055; Stephanie Dombroski's UDC ID number is 252408; and Sandy Phillips' UDC ID number is 133168.

provide Plaintiffs with hormone therapy. The Eighth Amendment requires prison officials to provide humane conditions of confinement including adequate medical care and a prison official's deliberate indifference to an individual's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Estelle v. Gamble*, 429 U.S. 97, 103-104 (1976).

This Court should grant the requested injunction because the Plaintiffs are likely to succeed on the merits of their Eighth Amendment claim. Courts in this Circuit and across the country have repeatedly found that gender dysphoria is a serious medical condition within the meaning of the Eighth Amendment. Defendants' continued failure to provide adequate medical care including medically necessary hormone replacement therapy to the Plaintiffs establishes deliberate indifference in the face of overwhelming evidence of their need for such treatment, the risks associated with denying such treatment, and Defendants' knowledge of same.

Further, violation of the Plaintiffs' constitutional rights constitutes irreparable harm standing alone, but these Plaintiffs also suffer immediate and irreparable tangible harms warranting the Court's intervention as the case proceeds. Without medically necessary care, the Plaintiffs will continue to suffer negative health outcomes including significant psychological distress, self-harm, and risk of suicidality. (Ex. 4, Declaration of Dr. Ryan Nicholas Gorton ("Gorton Decl.") ¶¶ 72, 96, 112, 114; Ex 5, Declaration of Dr. Rachel Golden ("Golden Decl.") ¶¶ 26, 31, 37.) And finally, the balance of equities favors an injunction, and an injunction is in the public interest.

Accordingly, the Court should issue an Order preliminarily enjoining Defendants from enforcing H.B. 252, and their pre-existing policies and practices that have delayed and denied medically necessary treatments for gender dysphoria and requiring that Defendants provide the

Plaintiffs with adequate medical care, including hormone therapy.

## BACKGROUND

**A.      Gender Dysphoria Is a Serious Medical Condition.**

Gender dysphoria is a serious diagnosable medical condition, caused by the incongruence between a person's gender identity and their birth-assigned sex that results in clinically significant distress. (Gorton Decl. ¶¶ 29, 34; Golden Decl. ¶¶ 11–12.) A gender dysphoria diagnosis is made, like other psychiatric diagnoses, using objective criteria set forth in the American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders: DSM-5-TR. 5th ed. American Psychiatric Publishing, 2022 ("DSM-5"); *see also* Complaint at ¶ 38 (listing diagnostic criteria). Gender dysphoria is a neurobiological condition with clinically significant physical impacts on multiple body systems including the endocrine, hematological, musculoskeletal, gastroenterological, and reproductive systems. (Gorton Decl. ¶ 32.) Brain scans and genetic differences indicate that gender dysphoria has a biological foundation. (*Id*. ¶¶ 31–33; Golden Decl. ¶ 2.) As explained in more detail below, each of the Plaintiffs have been diagnosed with gender dysphoria. (Gorton Decl. ¶¶ 66, 89, 107; Golden Decl. ¶¶ 16, 27, 32.)

**B.      Hormone Replacement Therapy is an Evidence-Based Treatment for Gender Dysphoria.**

Treatment for gender dysphoria is well-established and has been provided for decades using evidence-based clinical guidelines. (Compl. ¶¶ 41–52; Gorton Decl. ¶¶ 37–39; Golden Decl. ¶¶ 9–11.) The World Professional Association for Transgender Health ("WPATH") Standards of Care, Version 8 ("WPATH Standards of Care" or "SOC8") and the Endocrine Society Clinical Guidelines provide the foremost framework for the care of transgender and gender-diverse people. (Compl. ¶ 43; Gorton Decl. ¶ 39; Golden Decl. ¶ 48.) *See also, e.g., Edmo v. Corizon, Inc.*, 935

F.3d 757, 788 n.16 (9th Cir. 2019) (calling WPATH guidelines "the gold standard on this issue"); *Benjamin v. Oliver*, No. 25-04470, 2025 WL 2542072, at *4 (N.D. Ga. Sept. 4, 2025) (discussing the Endocrine Society Clinical Guidelines). Over 20 U.S. health professional associations have policy statements affirming that medical and surgical treatments for gender dysphoria are medically necessary health care, including the WPATH Standards of Care, which provides that "access to gender-affirming hormone therapies should be provided in a timely fashion when indicated for a [transgender] resident [diagnosed with gender dysphoria], in both carceral and non carceral institutional environments." SOC8 at S106[2]; Gorton Decl. ¶¶ 17, 37, 39; Golden Decl. ¶ 59. Consistent with these accepted guidelines and policy statements, the National Commission on Correctional Healthcare ("NCCHC") recommends decisions regarding hormone treatment for transgender individuals be made "based on individual medical need" and applying "accepted standards of care." (Gorton Decl. ¶ 17 n. 9 (quoting the NCCHC Position Statement).)

The goal of gender dysphoria treatment is to eliminate the patient's distress by aligning their body and presentation with their gender identity. (Gorton Decl. ¶ 38; Golden Decl. ¶ 49.) The Tenth Circuit has recognized that treatment for gender dysphoria includes the following:

- [c]hanges in gender expression and role (which may involve living part time or full time in another gender role, consistent with one's gender identity);

- [h]ormone therapy to feminize or masculinize the body;

- [s]urgery to change primary and/or secondary sex characteristics (e.g., breasts/chest, external and/or internal genitalia, facial features, body contouring);

---

[2] Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People*, *Version 8*, 23 Int J Transgend Health S1 (2022), at S106, https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644 ("SOC8").

- [p]sychotherapy (individual, family, or group) for purposes such as exploring gender identity, role, and expression; addressing the negative impact of gender dysphoria and stigma on mental health; alleviating internalized transphobia; enhancing social and peer support; improving body image; and promoting resilience.

*Lamb v. Norwood*, 899 F.3d 1159, 1161 (10th Cir. 2018) (alterations in original); *see also* Gorton Decl. ¶¶ 38–43; Golden Decl. ¶¶ 12, 49. As detailed below, hormone therapy is medically necessary and not contraindicated for all three Plaintiffs. (Gorton Decl. ¶¶ 66, 71, 89, 94, 107, 111; Golden Decl.¶¶ 17, 20, 29.)

Those whose care is denied or delayed often suffer clinically significant distress, including anxiety, depression, suicidal thoughts, and impairment of functioning in their daily lives. (Gorton Decl. ¶ 36.) The longer a person goes without appropriate treatment for gender dysphoria, the greater the risk of severe harm to their health or well-being. (*Id.* ¶ 18.) For many transgender adults with gender dysphoria, access to comprehensive gender-affirming medical care is lifesaving, as it reduces suicidality, self-harm, depression, and improves multiples measures of quality of life. (*Id.* ¶¶ 18, 42, 49.)

## C.    UDC's Policy AG37 Utilized Before the Implementation of H.B. 252.

Like all people in UDC custody, the Plaintiffs receive all of their health care through the Division of Correctional Health Services ("CHS"), which is controlled by Defendant DHHS. (Compl. ¶ 24.) While UDC previously provided this care directly, as of July 1, 2023, DHHS, through CHS, assumed joint responsibility for ensuring health care for people in the custody of Defendant UDC including adequate health and mental health services for Plaintiffs. (*Id.*)

For the past eight years, prior to the implementation of H.B. 252, UDC's official policy was to "appropriately diagnose and treat offenders with gender dysphoria in a humane and safe

correctional environment" as set forth in UDC Policy AG37 entitled "Diagnosis & Treatment of Offenders with Gender Dysphoria," which became effective December 19, 2018 ("AG37") (Ex. 2). The policy outlines the procedures for the individual identification, diagnosis, and determination of treatment of people who present with gender dysphoria. (*See* Compl. ¶¶ 53–79.)

AG37 states that a diagnosis of gender dysphoria must be based on the DSM-5 criteria. (AG37 § 02.03; Compl. ¶ 65.) But unlike the DSM-5 criteria, AG37 fails to recognize the distress *from* the incongruence that people with gender dysphoria experience. (AG37 §1.05.) AG37 establishes a "Gender Dysphoria Committee" ("GD Committee") responsible for overseeing the evaluation and treatment of people who self-identify as transgender and who request a mental health evaluation. (AG37 § 2.02.) The GD Committee can refer individuals to a psychologist contracted by UDC who interviews, diagnoses, and recommends treatment plans for individuals based on the DSM-5. (AG37 §§ 2.02, 2.03.) The Director of Clinical Services is to consider the recommendation of the psychologist when making a treatment plan, which may include treatment with hormones. (AG37 § 2.04.) However, the GD Committee and, in particular, its Director of Clinical Services has the ultimate say about the diagnosis and course of treatment. (AG37 §§ 2.02, 2.04.) This includes overriding opinions and recommendations of medical providers.

**D.    The U.S. Department of Justice's 2024's Letter of Findings of Defendants' Delays, and Denials of Medically Necessary Care for Gender Dysphoria.**

In March 2024, following an investigation, the Department of Justice ("DOJ") issued a Letter of Findings and Conclusions ("DOJ Letter of Findings") to UDC finding that UDC failed to provide an incarcerated transgender woman[3] with meaningful access to healthcare for her gender

---

[3] The complainant that was the subject of the DOJ findings was Ms. Amberli Morrigan, one of the Plaintiffs in this action. (Compl. ¶ 80.)

dysphoria. (Ex. 3, DOJ Letter of Findings; *see also* Compl. ¶¶ 80–94.) The DOJ found that the

UDC's application of AG37 imposed unnecessary eligibility criteria for assessment and treatment

for gender dysphoria that it does not require for other requests for medical care for other conditions,

with the GD Committee serving as "the gatekeeper for care" in an "unnecessarily protracted

multistep process." (Ex. 3 at 2, 3.) The DOJ also found that some members of the GD Committee

were reluctant to prescribe medically appropriate treatment for gender dysphoria. (*Id.* at 3.) This

practice of delay and denial of treatment for gender dysphoria was occurring even prior to the

passage and implementation of H.B. 252 and continues today.

**E.      Utah's Enactment of H.B. 252 and Defendants' Categorical Denial of Hormone Therapy Regardless of Individual Medical Need**

In March 2025, the Utah Legislature passed H.B. 252 and it went into effect on May 7,

2025. (Ex. 1.)[4] H.B. 252 states in relevant part:

> (1) The department may not initiate any of the following procedures or treatments for an inmate:
>
>> (a) a cross-sex hormone treatment;
>> (b) a primary sex characteristic surgical procedure; or
>> (c) a secondary sex characteristic surgical procedure.
>
> (2) Subject to Subsection (1) and Section 63-14-45, to treat an inmate's gender dysphoria and any co-occurring mental health disorder, the department may provide psychotherapy, mental health care, or any other necessary and appropriate treatment.

The provision further defines "cross-sex hormone treatment" as the following:

> (2) "Cross-sex hormone treatment" means administering, prescribing, or supplying for effectuating or facilitating an individual's attempted sex change:

---

[4] H.B. 252, 2025 Gen. Session (Utah 2025), codified in Utah Code Ann. 26B-4-903.

(a) to an individual whose biological sex at birth is female, a dose
of testosterone or other androgens at levels above those normally
found in an individual whose biological sex at birth is female; or
(b) to an individual whose biological sex at birth is male, a dose of
estrogen or a synthetic compound with estrogenic activity or effect
at levels above those normally found in an individual whose
biological sex at birth is male.

H.B. 252 is a "blanket ban" on hormone therapy as treatment for gender dysphoria for

transgender people in UDC custody. Since H.B. 252's passage, Defendants have told all three

Plaintiffs that they are prohibited from starting hormone therapy as treatment for gender dysphoria

due to the new law. (Ex. 6, Declaration of Virginia Rose Tucker ("Tucker Decl.") ¶ 27; Ex. 7,

Declaration of Stephanie Dombroski ("Dombroski Decl.") ¶ 21; Ex. 9, Declaration of Sandy

Phillips ("Phillips Decl.") ¶¶ 14–17.)

## F.    The Devastating and Predictable Impact on Plaintiffs of Defendants' Prior Policies Combined with Passage of H.B. 252

H.B. 252's blanket ban on hormone therapy inflicts grave, life-threatening harm on

transgender people with gender dysphoria in the UDC system, exacerbating further the existing

delays and denials of AG37 and its GD Committee. Ms. Tucker, Ms. Dombroski and Ms. Phillips

have each been diagnosed with gender dysphoria and are terrified of and at risk of serious bodily

harm and mental health consequences because H.B. 252 (1) bans this medically necessary care

regardless of their individual needs; and (2) grossly deviates from clinical guidelines, which

require that providers employ medical judgment.

### 1.    Virginia Rose Tucker

Virginia Rose Tucker is a 25-year-old transgender woman housed in the male side of USCF.

(Tucker Decl. ¶¶ 2–4; *see also* Compl. ¶¶ 119–151.) Ms. Tucker identified as a girl from a very

young age, but because she knew she would not be accepted as female, she learned to hide her

gender identity well. (Tucker Decl. ¶ 6.) Ms. Tucker's distress at not being able to live as her authentic self has been persistent, resulting in a long history of self-harm and suicide attempts since age 13. (*Id*. ¶¶ 7, 9.)

When Ms. Tucker first requested hormone therapy in April 2022, she was informed by a UDC nurse that she could not receive hormone therapy without a gender dysphoria diagnosis. (*Id*. ¶ 10.) Despite her repeated requests, Ms. Tucker was not evaluated for gender dysphoria for several years, all while she continued to exhibit severe mental distress, including a November 2023 attempted overdose which left her hospitalized for weeks and impaired her ability to walk. (*Id*. ¶¶ 11–15.) As a result of her inadequately treated gender dysphoria, Ms. Tucker has attempted suicide over 40 times, often requiring significant medical attention by UDC healthcare providers. (*Id*. ¶¶ 9, 30.)

Ms. Tucker did not receive an evaluation for gender dysphoria until December 2024. (*Id*. ¶ 21.) Medical records confirm that Ms. Tucker was diagnosed with gender dysphoria by a UDC/DHHS provider by January 2025 at the latest.[5] (*Id*. ¶ 22; Gorton Decl. ¶ 52.) Defendants then referred her to an interdisciplinary case staffing team, which she understood to be the GD Committee. (Tucker Decl. ¶ 23; Compl. ¶ 132.) Following her diagnosis in early 2025, Ms. Tucker made multiple requests for medical care, including filing a Level 2 Grievance. (*Id*. ¶ 27.) In

---

[5] Although AG37 refers to gender dysphoria and requires diagnoses to be made according to the DSM-5, Defendants oftentimes use the outdated term "gender identity disorder" ("GID"). The diagnosis of gender dysphoria replaced the previous diagnosis of GID in the DSM-5 and is a distinct diagnosis. (Gorton Decl. ¶ 30.) The current gender dysphoria diagnosis recognizes that incongruence between a person's identity and birth sex is not the problem in need of treatment—the clinically significant distress associated with that incongruence is. (*Id*.) While Plaintiffs' records may show the outdated diagnosis of GID, Plaintiffs and their experts use the medically-appropriate term gender dysphoria herein. (*Id*. ¶ 35.)

response to her Level 2 Grievance, Ms. Tucker was told in June 2025 that she could not receive hormone therapy due to H.B. 252. (*Id.* ¶ 27.) Despite many requests for assistance, she is also without access to adequate mental health services for her gender dysphoria, and reports only seeing mental health specialists every six to eight weeks for fifteen to thirty minutes. (*Id.* ¶ 28.)

Ms. Tucker meets all diagnostic criteria for gender dysphoria. (Golden Decl. ¶¶ 16–17; Gorton Decl. ¶¶ 51, 66.) Ms. Tucker is currently experiencing increased levels of depression, anxiety, self-harm, and suicidal tendencies as a result of being denied hormone therapy, which she informed Defendants of in July 2025 when appealing the denial of her ADA request. (Tucker Decl. ¶ 28.) She fears for her personal well-being and safety considering her lengthy history of self-harm during her incarceration. (*Id.* ¶¶ 28–30.)

Ms. Tucker's untreated gender dysphoria adversely impacts her psychological needs, her ability to socialize and concentrate and causes her significant ongoing harm on a daily basis. (Gorton Decl. ¶¶ 61–62, 72.) Significantly, Ms. Tucker is chronically suicidal and at risk of Non-Suicidal Self Injury or performing Self Surgery. (Gorton Decl. ¶ 69.) Defendants' denial of gender-affirming medical care to Ms. Tucker exacerbates these mental health symptoms which will only be ameliorated by access to hormone therapy. (Gorton Decl. ¶ 69; Golden Decl. ¶ 26.) There is no evidence that substantiates an informed medical judgment individualized to Ms. Tucker as to the denial of hormone therapy. (Gorton Decl. ¶ 71; Golden Decl. ¶ 19.)

### 2. Stephanie Dombroski

Stephanie Dombroski is a 49-year-old transgender woman incarcerated in the male side of USCF. (Dombroski Decl. ¶¶ 2–4; *see also* Compl. ¶¶ 152–170.) A UDC or DHHS provider diagnosed Ms. Dombroski with gender dysphoria in June 2024. (Dombroski Decl. ¶ 12; Compl.

¶ 157.) However, the following month, DHHS records show that the GD Committee overruled the provider's diagnosis of gender dysphoria and denied her request for hormone therapy. (Dombroski Decl. ¶ 13.) Ms. Dombroski was then informed that she did not meet the criteria for hormone therapy because she had not been living long enough as a woman, despite the fact that she had been living as a woman to the fullest extent she was able to in the prison without access to feminine clothes and makeup. (*Id*. ¶¶ 14–16.)

In response to a complaint submitted by Ms. Dombroski to DHHS requesting hormone therapy, she was informed in June 2025 that she could not receive hormone therapy as she was not diagnosed with gender dysphoria prior to May 7, 2025, despite her initial diagnosis of gender dysphoria in June 2024. (*Id*. ¶ 21; Ex 8.) Defendants have also failed to provide Ms. Dombroski with access to adequate mental health care, forcing her to wait six to eight weeks just for an appointment with a provider who lacks experience in treating gender dysphoria. (Dombroski Decl. ¶ 19.)

Ms. Dombroski meets all diagnostic criteria for gender dysphoria. (Golden Decl. ¶¶ 27–30; Gorton Decl. ¶ 89.) Defendants' failure to provide Ms. Dombroski with medically necessary healthcare, including hormone therapy, has caused her to fear for her safety given her history of depression and suicidality. (Dombroski Decl. ¶ 18.) Ms. Dombroski reports that thoughts about her gender dysphoria and lack of treatment occupies almost every second of every day, and that in some ways, the distress around her gender dysphoria surpasses the level of stress she experienced when she was deployed in Iraq. (Gorton Decl. ¶ 87.) Ms. Dombroski's gender dysphoria symptoms cause her physical and mental harm daily. (*Id*. ¶¶ 95–96; Golden Decl. ¶ 29)

Continuing to deny Ms. Dombroski access to medically necessary care will exacerbate her overall distress related to her gender dysphoria which includes elevating symptoms of depression,

11

anxiety, such as hopelessness, helplessness, sadness and others. (Golden Decl. ¶ 31.) There is no evidence that substantiates an informed medical judgment individualized to support a denial of hormone therapy for Ms. Dombroski. (Gorton Decl. ¶ 94.)

### 3. Sandy Phillips

Sandy Phillips is a 53-year-old transgender woman incarcerated in the male side of USCF. (Phillips Decl. ¶¶ 2–4; *see also* Compl. ¶¶ 171-189.) Ms. Phillips first requested transgender care in mid-2023 and made repeated requests for hormone therapy in the fall of 2024. (Phillips Decl. ¶¶ 10–13.) A provider from Defendant DHHS evaluated Ms. Phillips in November 2024 and diagnosed her with gender dysphoria in January 2025. (*Id*. ¶¶ 14–16.) Despite the diagnosis in early 2025, Defendants did not start Ms. Phillips on hormone therapy prior to H.B. 252 taking effect on May 7, 2025, a decision which confused and frustrated Ms. Phillips. (*Id*. ¶¶ 16–19.) Ms. Phillips has since been orally told by Defendants that she will not be able to start hormone therapy due to the change in law. (*Id*. ¶ 17.) Defendants have also failed to provide Ms. Phillips with adequate mental health treatment for her gender dysphoria, forcing her to wait weeks to see a mental health provider. (*Id*. ¶ 21.)

Defendants' failure to provide medically necessary hormone therapy has left Ms. Phillips distressed, frustrated, and confused. (*Id*. ¶¶ 19–20.) Related to her ongoing frustrations caused by the denial of hormone therapy, Ms. Phillips feels more irritable, which led to an argument that resulted in expulsion from her prison job for about three months. (*Id*.)

Ms. Phillips meets all diagnostic criteria for gender dysphoria. (Golden Decl. ¶¶ 32–33; Gorton Decl. ¶¶ 97, 107.) Because of the lack of access to medically necessary treatment for her gender dysphoria, and the gender dysphoria itself, Ms. Phillips often feels distracted and has

difficulty concentrating. (Gorton Decl. ¶ 105.) She reports that thoughts about her gender dysphoria and lack of treatment occupies about half of her thoughts day to day but that she tries to focus on the future. (*Id*.) Continuing to deny medically necessary gender-affirming care to Ms. Phillips will certainly amplify her distress related to her dysphoria about her body, as well as her overall distress related to being invalidated and denied care. (Golden Decl. ¶ 37.) There is no evidence that substantiates an informed medical judgment individualized to support a denial of hormone therapy for Ms. Phillips. (Gorton Decl. ¶ 111.)

## **LEGAL STANDARD**

The Plaintiffs' motion for a preliminary injunction meets all four factors considered in the Tenth Circuit: "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); Fed. R. Civ. P. Rule 65.

There are three forms of injunctions that are "specifically disfavored": (1) those that alter the status quo; (2) "mandatory" preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc). When seeking a disfavored injunction, the movant must make a "strong showing" both on the likelihood of success on the merits and on the balance of the harms. *Id.* at 976. As demonstrated below, the Plaintiffs easily meet this standard.

## ARGUMENT

The Plaintiffs respectfully urge this Court to grant injunctive relief barring the enforcement of H.B. 252, directing Defendants to provide Plaintiffs adequate medical care including medically necessary hormone therapy for their gender dysphoria, and enjoining Defendants from enforcing the policies, customs, or practices that have caused constitutional violations. Plaintiffs are likely to succeed on the merits of their Eighth Amendment claim because Defendants' actions constitute deliberate indifference to a serious medical condition. Because H.B. 252 bans an entire category of medical care, without regard to individual circumstances such as medical necessity, it is thus facially unconstitutional and as-applied to the Plaintiffs.

The violation of Plaintiffs' constitutional rights is *per se* sufficient to show likelihood of immediate and irreparable harm in the absence of injunctive relief. In addition, Plaintiffs face the physical and mental health risks of inadequately treated gender dysphoria and the known and predictable risk of Defendants' policies of delaying and denying such care and their implementation of blanket bans on medically necessary hormone therapy. The balance of equities tips in favor of injunctive relief because the threat to Plaintiffs is immense and the public interest is best served by protecting Plaintiffs' constitutional rights. Having made the requisite showing, the Injunctive Plaintiffs respectfully request the Court grant preliminary injunctive relief.

**A.    Plaintiffs Have Made a Strong Showing of a Substantial Likelihood of Success Under the Eighth Amendment.**

Defendants' blanket ban on access to hormone therapy to adequately treat Plaintiffs' gender dysphoria and their pre-existing pattern and practice of delaying and denying that treatment violates the Eighth Amendment's prohibition on cruel and unusual punishment. The Eighth Amendment requires prison officials to "provide humane conditions of confinement" including

14

"adequate ... medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *see* U.S. CONST. AMEND.

VIII. To state an Eighth Amendment claim for failure to provide proper medical care, "a prisoner

must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious

medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). These claims involve both an

objective and substantive prong. To meet the objective requirement of the deliberate indifference

standard, an incarcerated person must demonstrate the existence of a serious medical need. *Id.* at

104. Gender dysphoria is clearly a serious medical need.

Under the second prong, a movant must show "deliberate indifference" to the medical need,

by showing that a prison official "acted or failed to act despite his knowledge of a substantial risk

of serious harm." *Farmer*, 511 U.S. at 842. This standard may be met through "inference from

circumstantial evidence." *Id.* As the Tenth Circuit explained in *Sealock v. Colorado*, there are two

types of conduct that meet the deliberate indifference standard: (1) if prison officials fail to treat

the person properly; or (2) if prison officials are "gatekeeping" or preventing a person from

receiving treatment including denying him access to medical personnel capable of evaluating the

person's need for treatment. 218 F. 3d 1205, 1211 (10th Cir. 2000); *see also Al-Turki v. Robinson*,

762 F.3d 1188, 1195 (10th Cir. 2014) (finding that "Defendant violated clearly established law by

choosing to ignore Plaintiff's repeated complaints of severe abdominal pain and requests for

medical assistance, thus completely denying him any medical care[.]"); *Hunt v. Uphoff*, 199 F.3d

1220, 1224 (10th Cir. 1999) (deliberate indifference can be met by prison officials' "intentionally

delaying or denying access to medical care that has been prescribed"). "[I]t is possible to have

some medical care and still state a claim under the gatekeeper theory" as the standard is whether

the care provided is "still evaluated ...for sufficiency and whether it is the functional equivalent to

a complete denial of care." *Lucas v. Turn Key Health Clinics*, *LLC*, 58 F.4th 1127, 1138–39 (10th Cir. 2023). "[D]oing nothing in the face of serious medical needs is obviously sufficient to state a claim under both theories." *Id.* at 1139. A delay in medical treatment is actionable if it causes "substantial harm," including "an intermediate injury, such as the pain experienced while waiting for treatment and analgesics." *Al-Turki*, 762 F.3d at 1193.

As set forth below, Plaintiffs have shown both (1) that they have a serious medical need in their gender dysphoria given the clinical distress it causes and (2) that Defendants have been deliberately indifferent to those needs through their delays and denials of care (under AG37) and implementation of H.B. 252, despite Defendants' awareness of the substantial harm Plaintiffs have and will experience as a result of Defendants' refusal of care.

### 1.    Plaintiffs' gender dysphoria is an objectively serious medical need.

A "medical need is considered sufficiently serious to satisfy the objective prong if the condition 'has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Al-Turki*, 762 F.3d at 1192–93 (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)). Here, Ms. Tucker, Ms. Dombroski, and Ms. Phillips can establish a serious medical need because they have all been diagnosed with gender dysphoria by a medical professional contracted by Defendants. (Tucker Decl. ¶¶ 21–22; Dombroski Decl. ¶ 12; and Phillips Decl. ¶ 16.) Plaintiffs' experts have also concluded that each meets the criteria for gender dysphoria. (Gorton Decl. ¶¶ 66, 89, 107; Golden Decl. ¶¶ 17, 29, 33.) Gender dysphoria is a medical condition included in the DSM-5. Treatment of gender dysphoria is set forth in various clinical guidelines including WPATH Standards of Care and the Endocrine Society Guidelines (Compl. ¶ 43; Gorton Decl. ¶ 39; Golden Decl. ¶ 50) which

16

"are the internationally recognized guidelines for the treatment of individuals with gender dysphoria." *Edmo*, 935 F.3d at 769 (internal quotations omitted) (collecting cases).

Like other circuit and district courts, the Tenth Circuit has repeatedly treated gender dysphoria as a "serious medical need" for the purposes of the Eighth Amendment. *Johnson v. Sanders*, 121 F.4th 80, 89 (10th Cir. 2024) (collecting cases).[6] The Court of Appeals has explained that some treatment is required to meet the needs of incarcerated transgender persons suffering from gender dysphoria, and acknowledged that hormone therapy is within the type of treatments that can be available. *Supre v. Ricketts,* 792 F.2d 958 (10th Cir. 1986); *Hardeman v. Smith*, 764 Fed. Appx. 658, 663 (10th Cir. 2019); *Lamb*, 899 F.3d at 1161.

Without treatment for the Plaintiffs' gender dysphoria, they are at risk of worsening gender dysphoria symptoms, including clinically significant distress, anxiety, depression, suicidal thoughts, and impairment of functioning in their daily lives. (Gorton Decl. ¶¶ 72, 96, 112; Golden Decl. ¶¶ 26, 31, 37.) These risks have become a reality for Plaintiffs who are experiencing mental and physical harm. (Tucker Decl. ¶¶ 28-30; Dombroski Decl. ¶¶ 18, 24; and Phillips Decl. ¶¶ 19-21.)

---

[6] *See*, *e.g.*, *Edmo*, 935 F.3d at 785–786 (recognizing that gender dysphoria is a sufficiently serious medical need to implicate the Eighth Amendment) (collecting cases); *De'lonta v. Johnson*, 708 F.3d 520, 525 (4th Cir. 2013) (holding that the distress suffered by plaintiff because of her GID leading to a desire to engage in self-surgery is a serious medical need); *Keohane v. Fla. Department of Corrections Secretary*, 952 F.3d 1257, 1266 (11th Cir. 2020) (finding that there is no debate that "Keohane's gender dysphoria constitutes a 'serious medical need.'"); *Robinson v. Labrador*, 747 F. Supp. 3d 1331, 1340 (D. Idaho 2024) (noting that "there is no dispute that Gender Dysphoria is a serious medical need."); *Cordellione v. Comm'r, Indiana Dep't of Correction*, No. 23-00135, 2024 WL 4333152, at *16 (S.D. Ind. Sept. 17, 2024) ("There is no dispute that gender dysphoria is a serious medical condition under the objective prong."); *Benjamin v. Oliver*, No. 25-04470, 2025 WL 2542072, at *12 (N.D. Ga. Sept. 4, 2025) (holding that plaintiffs' established a "likelihood of success on the merits that gender dysphoria is a serious medical need").

     **2.**      **Defendants are deliberately indifferent to Plaintiffs' serious medical need despite their knowledge of the substantial risk to Plaintiffs in denying care.**

Plaintiffs are likely to succeed in demonstrating Defendants' deliberate indifference under both the failure to treat and gatekeeper theories. A movant "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842. In evaluating prison officials' failure to provide medically necessary care, the court's inquiry turns on whether the incarcerated person received constitutionally adequate care. *Estelle*, 429 U.S. at 103–06.

First, there is no dispute that Defendants have failed to provide hormone therapy treatment—or any other adequate or effective treatment—for the Plaintiffs' gender dysphoria. The Tenth Circuit has criticized the *total absence* of gender affirming care for people with gender dysphoria, finding that an incarcerated person stated a claim for Eighth Amendment violation when he "ha[d] not been offered *any treatment at all*[.]" *Brown v. Zavaras*, 63 F.3d 967, 970 (10th Cir. 1995); *see also Supre*, 792 F.2d at 963 (noting that some form of therapy was necessary to treat plaintiff). Here, Defendants have failed to provide *any* adequate treatment for the Plaintiffs' gender dysphoria. Not only have the Plaintiffs been denied medically necessary hormone therapy, but they have also failed to receive adequate mental health treatment for their gender dysphoria. (Tucker Decl. ¶ 28; Dombroski Decl. ¶ 19; and Phillips Decl. ¶ 21.) This complete failure to provide adequate treatment constitutes deliberate indifference in violation of the Eighth Amendment.

Defendants have been aware since at least March 12, 2024 of the deficiencies in their care for people experiencing gender dysphoria through the DOJ findings letter, which stated on the first page that "[l]eft untreated, individuals with gender dysphoria can experience significant adverse

health outcomes, including risk of suicide and surgical self-mutilation." (DOJ Letter, Ex. 3.) They not only ignored these health risks but increased them by implementing H.B. 252's blanket ban.

Defendants' own AG37 policy acknowledges that hormone therapy may be medically necessary treatment for gender dysphoria. Yet Defendants have been deliberately indifferent by denying that treatment despite the diagnoses by their own practitioners. *See Cordellione*, 2024 WL 4333152, at *18 (S.D. Ind. Sept. 17, 2024) (finding that ban on gender-affirming surgery "evinces deliberate indifference" considering "IDOC had previously recognized that gender-affirming surgery was medically necessary care for some individuals with gender dysphoria.").

Defendants' pattern of delay and denial had already deprived Plaintiffs of medically necessary treatment and subjected them to significant ongoing harm prior to the passage of H.B. 252, but the bill's blanket ban on hormone therapy has mandated Defendants' disregard for Plaintiff's serious medical needs. Although Defendants' application of AG37 resulted in its own unconstitutional deprivation of Plaintiffs' long needed treatments for gender dysphoria, *see infra*, at a minimum the policy prescribed individualized assessments to determine when hormone therapy is or was medically necessary treatment. Now, by categorically barring medically necessary treatment without any individualized assessment and arbitrarily selecting to provide only ineffective and inadequate mental health services, Defendants are not exercising any medical judgment regarding care for gender dysphoria and denying medically necessary treatment in obvious violation of the Eighth Amendment.

Defendants are also aware of the specific, significant risks of harm that Ms. Tucker, Ms. Dombroski, and Ms. Phillips face and are presently suffering from untreated or inadequately treated gender dysphoria. Plaintiffs were each diagnosed with gender dysphoria by a medical

professional *contracted by UDC* through its own AG37 policy. (Tucker Decl. ¶¶ 21–22; Dombroski Decl. ¶ 12; and Phillips Decl. ¶¶ 14, 16.) Plaintiffs each repeatedly, and unsuccessfully, requested hormone therapy from Defendants. (Tucker Decl. ¶¶ 10, 14, 16, 23–28; Dombroski Decl. ¶¶ 11–14; and Phillips Decl. ¶¶ 10–17.) Defendants were further made aware of the harm Plaintiffs faced through (1) prior acts of self-harm or mental health episodes; (2) repeated complaints to medical and corrections staff; (3) grievances; and (4) an ADA request. (Tucker Decl. ¶¶ 10–28; Dombroski Decl. ¶¶ 11, 17; and Phillips Decl. ¶¶ 10, 13.)

Blanket bans on categories of treatment are at odds with the Eighth Amendment because they do not account for the individual medical needs of the incarcerated person. *See Fields v. Smith*, 653 F.3d 550, 556–58 (7th Cir. 2011) (affirming permanent injunction enjoining statute that banned hormone therapy and gender-affirming surgery because "[a]lthough Act 105 permits DOC to provide plaintiffs with some treatment, the evidence at trial indicated that plaintiffs could not be effectively treated without hormones"); *Rosati v. Igbinoso*, 791 F.3d 1037, 1039–40 (9th Cir. 2015) (per curiam) (holding transgender plaintiff sufficiently alleged deliberate indifference where prison denied gender-affirming surgery because of a blanket policy); *Hicklin v. Precynthe,* No. 16-01357, 2018 WL 806764, at *11 (E.D. Mo. Feb. 9, 2018) (granting preliminary injunction to transgender plaintiff who was denied medically necessary hormone therapy based solely on a blanket policy banning initiation of hormone therapy in violation of the Eighth Amendment); *Robinson v. Labrador*, 747 F. Supp. 3d 1331, 1340-43 (D. Idaho 2024) (granting preliminary injunction against statute that bans hormone therapy for transgender inmates); *Benjamin*, 2025 WL 2542072, at *14 (granting preliminary injunction; holding that the "state's categorical ban on receiving hormone therapy is in tension with case law recognizing that, in appropriate circumstances, hormone therapy

20

can be medically necessary for gender dysphoria.)[7] Like these cases, H.B. 252's blanket ban on hormone therapy for the treatment of transgender adults with gender dysphoria without regard to individual need is quintessential deliberate indifference and is thus facially unconstitutional.

Second, as to the gatekeeper theory, Defendants improperly delegated the decision whether Plaintiffs were eligible for hormone replacement therapy to the GD Committee, thereby delaying treatment prior to the enactment of H.B. 252 causing substantial harm and leading to the ultimate denial of treatment after the enactment of H.B. 252 and its blanket ban. For Ms. Tucker, the use of the GD Committee delayed the approval of her request for hormone therapy such that she was unable to start treatment even prior to the enactment of H.B. 252. (Tucker Decl. ¶¶ 23–26; Compl. ¶ 132.) A delay in treatment that causes substantial harm can be sufficient to establish deliberate indifference. *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005). For Ms. Dombroski, the GD Committee resulted in not just delay, but outright denial when it overruled the provider's diagnosis of gender dysphoria, preventing her from receiving hormone therapy altogether. (Dombroski Decl. ¶ 13.) "[W]hen prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment," they may be liable for deliberate indifference. *Sealock*, 218 F.3d at 1211; *Edmisten v. Werholtz*, 287 F. App'x 728, 733 (10th Cir. 2008) (holding that "defendants' intentional interference with prescribed or recommended treatment, delay in providing medical care, and failure to fulfill a gatekeeper role, if proven, satisfy the test for deliberate indifference under the Eighth Amendment.").

---

[7] The *Benjamin* Court subsequently entered a permanent injunction, holding that "the Court requires healthcare decisions for prisoners to be made dispassionately, by physicians, based on individual determinations of medical need, and for reasons beyond the fact that the prisoners are prisoners." *Benjamin v. Oliver*, No. 25- 04470 (N.D. Ga.), ECF No. 94 at 22.

Based on the above, the Plaintiffs are likely to succeed on the merits of their claim that Defendants' refusal to provide hormone therapy—based on H.B. 252's blanket ban on treatment and Defendants' serious delays and denials of care under AG37—violates their Eighth Amendment rights. The blanket ban demonstrates the lack of an informed medical judgment since no individualized medical assessment can result in the provision of hormone therapy. Enforcement of H.B. 252 results in—indeed requires—deliberate indifference to a substantial risk of serious harm to incarcerated people like the Plaintiffs whose gender dysphoria is not adequately addressed without hormone therapy.

**B.    Plaintiffs Will Continue to Suffer Irreparable Harm Absent a Preliminary Injunction.**

If Defendants are not enjoined from denying medically necessary treatment for Plaintiffs' gender dysphoria, including through their implementation of H.B. 252, Plaintiffs will continue to suffer serious and irreparable harm, both constitutional and tangible, with no adequate remedy at law. "When a plaintiff is asserting an injury in the form of a violated constitutional right, [courts] presume that the injury will be irreparable if it exists." *Ortega v. Grisham*, 148 F.4th 1134, 1142 (10th Cir. 2025); *S. Utah Drag Stars v. City of St. George*, 677 F. Supp. 3d 1252, 1293 (D. Utah 2023) (citation omitted) ("when an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). Because Plaintiffs have shown that they are likely to succeed on their Eighth Amendment claim, irreparable injury is presumed.

Additionally, the substantial risk of serious harm to Plaintiffs' health and wellbeing will continue absent injunctive relief. Clinical guidelines including but not limited to the WPATH SOC and Endocrine Society Guidelines detail the grave risks of untreated or undertreated gender dysphoria ranging from "depression, anxiety, suicidality, and surgical self-treatment risks." SOC8

at S106; *see also* Gorton Decl. ¶¶ 18, 36. This harm is far from speculative. Plaintiffs have experienced a total absence of adequate treatment for their gender dysphoria, including being deprived of hormone therapy and the results have been catastrophic and substantial—their mental health has suffered, they have lost the ability to perform normal day-to-day activities, and some have made suicide attempts. (Tucker Decl. ¶¶ 10, 14–15, 30; Dombroski Decl. ¶¶ 17–22; Phillips Decl. ¶¶ 19–21; Golden Decl. ¶¶ 16, 28, 32; Gorton Decl. ¶¶ 72, 96, 112, 114.)

This is exactly the type of harm that cannot be remedied by monetary damages. *Robinson*, 747 F. Supp. 3d at 1342 (finding that "a likely increase in emotional stress and a likely decrease in sense of well-being if [plaintiffs] lose access to hormone therapy" is irreparable harm); *Benjamin*, 2025 WL 2542072, at *16 (finding that plaintiffs "who are being refused consideration for hormone therapy face irreparable injury").

Accordingly, this factor also weighs in favor of granting a preliminary injunction.

**C.     The Balance of Harms Strongly Favors Plaintiffs and the Injunction is in the Public Interest.**

The final two factors—the balance of harms and the public interest—"merge" when the government is the opposing party. *Ortega*, 148 F.4th at 1142. "Under the heightened disfavored-injunction standard, the Plaintiffs need to make a strong showing that the balance of harms tips in their favor." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019).

These factors are easily satisfied given Plaintiffs' likelihood of success on their Eighth Amendment claim. "When a constitutional right hangs in the balance, though, even a temporary loss usually trumps any harm to the defendant." *Id.* (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012)). This is especially true when the movant challenges a law as unconstitutional because government entities have "no interest in keeping an unconstitutional law on the books."

*Id.*; *Evans v. Utah*, 21 F. Supp. 3d 1192, 1210 (D. Utah 2014) ("[I]f the moving party establishes a likelihood of success on the merits, the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional.") (citations omitted). Moreover, "[p]rotection of a party's constitutional rights against governmental action that violate those rights is always in the public interest. And the public interest is served by the same protection of rights." *S. Utah Drag Stars*, 677 F. Supp. 3d at 1294; *see also E. High Sch. Prism Club v. Seidel*, 95 F. Supp. 2d 1239, 1251 (D. Utah 2000) (holding that enjoining violation of constitutional rights is not adverse to the public interest).

Defendants have no interest in implementing an unconstitutional law and will not be harmed by an order requiring them to provide medically necessary treatments for gender dysphoria including hormone therapy. Here, Defendants have provided hormone therapy since at least 2018 and continue to provide such care since the implementation of H.B. 252 to those incarcerated people with gender dysphoria who were receiving the care prior to May 7, 2025. *Robinson*, 747 F. Supp. 3d at 1342 (D. Idaho 2024) (noting that where "IDOC's own medical care policy prior to enactment of the Act expressly recognized hormone therapy as a valid form of treatment for some individuals with Gender Dysphoria . . . continued compliance with that policy pending the outcome of this litigation would not impose any major burden" on defendants").

Plaintiffs, in stark contrast, will continue to be denied adequate and medically necessary care absent an injunction. Because H.B. 252 has caused serious harms to Plaintiffs—and violates their constitutional rights—it must outweigh whatever interest Defendants have in prohibiting medically necessary care for incarcerated people. The balance of equities are firmly in Plaintiffs'

favor. And the public has an exceedingly strong interest in preserving constitutional rights.

**D.    No Security Should Be Required**

Plaintiffs respectfully request the Court find that no security is required. Trial courts possess "wide discretion under Rule 65(c) in determining whether to require security." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009); Fed. R. Civ. P. 65(c). "When a preliminary injunction enforces fundamental constitutional rights against the government, waiving the security requirement best accomplishes the purposes of Rule 65(c)." *S. Utah Drag Stars*, 677 F. Supp. 3d at 1294 (internal citation omitted) (finding that no bond was required where the constitutional right of free speech was at issue); *Szymakowski v. Utah High Sch. Activities Ass'n, Inc.*, 756 F. Supp. 3d 1238, 1263 (D. Utah 2024) (granting temporary restraining order without need for a bond). Because Plaintiffs' constitutional right to be free from cruel and unusual punishment is at issue, and Defendants will not suffer any cognizable harm if the injunction is issued, a bond would not serve the interest of Rule 65(c). Additionally, Plaintiffs are unable to pay a bond under their current circumstances, which should not be a bar to relief.

<u>CONCLUSION</u>

Plaintiffs respectfully request that the Court make the necessary findings under the Prison Litigation Reform Act, 18 U.S. Code § 3626(a)(2), and issue injunctive relief barring Defendants from implementing H.B. 252 because it is unconstitutional on its face and as-applied to Plaintiffs, directing Defendants to provide Plaintiffs adequate medical care including medically necessary hormone therapy for their gender dysphoria, and enjoining Defendants from enforcing the policies, customs, or practices that have caused constitutional violations by denying the Plaintiffs individualized medically necessary treatment contrary to clinical guidelines.

Respectfully submitted this 16th day of January, 2026.

/s/ David W. Tufts

Jacqueline A. Domenella (*Pro Hac Vice*)
Diane O'Connell (*Pro Hac Vice*)
Dentons US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606-6361
Telephone: 312-876-8000
Email: jacqui.giannini@dentons.com
Email: diane.oconnell@dentons.com

Evan Wolfson (*Pro Hac Vice*)
Hannah Rochford*
Dentons US LLP
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone: 212-768-6700
Email: evan@freedomtomarry.org
Email: hannah.rochford@dentons.com

David W. Tufts (Bar No. 8736)
Dentons Durham Jones Pinegar P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111
Telephone: 801-415-3000
Email: david.tufts@dentons.com

Jason M. Groth (Bar No. 16683)
Abigail Cook (Bar No. 19781)
Tom Ford (Bar No. 19795)
ACLU of Utah Foundation, Inc.
311 South State St., Suite 310
Salt Lake City, UT 84111
Telephone: 801-521-9862
Email: jgroth@acluutah.org
Email: acook@acluutah.org
Email: tford@acluutah.org

Sonja D. Kerr (*Pro Hac Vice*)
Lambda Legal Defense
And Education Fund, Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Telephone: 610-675-7192
Email: skerr@lambdalegal.org

Richard Saenz (*Pro Hac Vice*)
Whit Washington (*Pro Hac Vice*)
Lambda Legal Defense
And Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: 212-809-8585
Email: rsaenz@lambdalegal.org
Email: wwashington@lambdalegal.org

*Counsel for Plaintiffs*

**Pro hac vice* application forthcoming

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of January, 2026, a true and correct copy of the

foregoing was served on Defendants via ECF.

<u>/s/ *David W. Tufts*</u>
Counsel for Plaintiffs