# EXHIBIT 4

# Redacted

David W. Tufts (Bar No. 8736)
DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111
Telephone: 801-415-3000
Email: david.tufts@dentons.com
*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| VIRGINIA TUCKER, et al.<br><br>Plaintiffs,<br><br>v.<br><br>UTAH DEPARTMENT OF CORRECTIONS, et al.<br><br>Defendants. | Case No. 2:25-cv-01108-TC<br><br>**DECLARATION OF DR. RYAN NICHOLAS GORTON**<br><br>Judge Tena Campbell |

## DECLARATION OF DR. RYAN NICHOLAS GORTON

I, Nick Gorton, M.D., declare as follows based on my personal knowledge:

## INTRODUCTION

1.      I have been retained by counsel for Plaintiffs Virginia Tucker, Stephanie Dombroski, and Sandy Phillips. The purpose is to evaluate them, determine if a diagnosis of Gender Dysphoria ("GD") is present, and offer my expert opinion as to what treatment is medically necessary to address their GD, including medically necessary treatments such as hormone therapy, social transition, medications, counseling, and surgery.

2.      I offer all of my opinions based on my evaluation of the three Plaintiffs and review of their available medical records. Ms. Tucker, Ms. Dombroski, and Ms. Phillips all have

1

Gender Dysphoria based on the diagnostic criteria in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders – Fifth Edition* ("DSM-5".)[1]. They all suffer clinically significant gender dysphoria that requires treatment including hormone replacement therapy ("HRT"). Each day that they are denied this medically necessary care by the Utah Department of Corrections ("UDC") and Utah Department of Health and Human Services ("DHHS"), they experience significant harm from inadequately treated gender dysphoria. The Departments' failures to provide these medically necessary treatments causes significant and ongoing harm to each woman's physical and mental health.

### QUALIFICATIONS

3.    I am a physician licensed in California. I received my medical degree from the University of North Carolina School of Medicine in 1998 and completed my residency and chief residency in emergency medicine at Kings County Hospital in Brooklyn, New York. A copy of my Curriculum Vitae is attached. (Attachment A).

4.    In addition to working as an Emergency Medicine physician at Sutter Davis Hospital, since 2005 I have also served as a primary care physician at Lyon-Martin Community Health ("Lyon-Martin") in San Francisco where I have provided primary care and transition-related care to more than 1,000 transgender patients. I provide medical assessments including the diagnosis of Gender Dysphoria, initiate and monitor hormonal treatment, and both provide and refer for mental health treatments. I also determine whether and when patients are appropriate for referral for Gender Affirming surgeries, provide pre-operative preparation and clearance, and provide post-operative care in consultation with the appropriate surgeon.

---

[1] Am. Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* (5th ed., 2013)

5.      I have treated transgender patients who are under the control of the California Department of Corrections and Rehabilitation ("CDCR"), who are on parole, and in fact my clinic shares a building with the CDCR San Francisco Northern Reginal Parole Unit[2] which improves both adherence with parole requirements and medical appointments for our transgender patients currently in the CDCR parole system. I have also been consulted by medical providers caring for my patients (or other Lyon-Martin patients) who are incarcerated at the San Francisco County Jail.

6.      I supervise Nurse Practitioners and Physician Assistants treating transgender patients at Lyon-Martin, one of just a handful of sites in the United States that train medical students, residents, and fellows to provide transgender primary care, and I have been a primary clinical instructor for these trainees. I have provided extensive clinical instruction to over 100 trainees.

7.      I also serve as lead clinician and clinical consultant for TransLine, a national transgender medical consultation service for clinicians needing expert advice about the care of their individual patients.

8.      I serve on the institutionalized persons committee of the World Professional Association for Transgender Health ("WPATH") and am a WPATH GEI Certified Practitioner.

9.      I have also lectured extensively and have co-authored numerous publications addressing transgender health.

---

[2] https://www.cdcr.ca.gov/parole/northern-region-directory/

3

**INFORMATION UTILIZED AND METHODOLOGY**

10.     I have been provided with correctional, medical, and mental health records from the Utah Department of Corrections for Ms. Tucker, Ms. Dombroski, and Ms. Phillips, the texts of AG37 and H.B. 252, and the *Tucker, et al. v. Utah Department of Corrections, et al.* Complaint.

11.     On September 24, 2025, I evaluated Ms. Dombroski and Ms. Phillips. On September 29, 2025, I evaluated Ms. Tucker. These evaluations were approximately 3-4 hours in length and conducted via a video/audio platform.

12.     The mental health and medical records I received were incomplete and had many notable gaps and inconsistencies that suggest some records were missing, destroyed, or not maintained in accordance with HIPAA and other laws by the UDC and DHHS. This report is based on information available to me at this time, and I reserve the right to supplement or amend it should other information become available.

13.     The evaluations I performed include the same type of evaluation I perform on patients initially presenting for transgender care at my clinic. However, given I typically have a great deal more records to go through in prisoner evaluations, I have more detail to go over than the "average" new patient that I see in clinic. In addition, since these are typically single visit evaluations, I merge into my single evaluations what I would typically go over through multiple shorter evaluations in my clinical practice. I also administer diagnostic questionnaires and screeners to transgender patients I evaluate in prison more often than patients in my clinical practice. Since I usually only have one visit, these screeners provide a more objective assessment

4

but also may flag additional hints to aspects of the individual's Gender Dysphoria that merit further exploration in the interview portion of the evaluation.

14.     The diagnostic evaluation instruments I typically use for Gender Dysphoria which I used for all three Plaintiffs included the (assigned male at birth) Gender Identity/Gender Dysphoria Questionnaire for Adults and Adolescents ("GIDYQ-AA")[3] and the Utrecht Gender Dysphoria Scale (Male to Female version).[4] I also administered the Patient Health Questionnaire-9 (PHQ-9) and Generalized Anxiety Disorder Scale (GAD-7) which are very common primary care screeners used to screen for depression and anxiety respectively. I also sometimes use additional diagnostic tools or screeners based on individual issues that I flag from the review of individual medical records.

15.     For diagnostic criteria, I utilize the DSM-5 Gender Dysphoria diagnosis which I have used in my practice since DSM-5 replaced DSM IV-TR in 2013. Prior to 2013, I utilized the Gender Identity Disorder ("GID") diagnostic criteria for 8 years in my clinical practice so I

---

[3] The GIDYQ-AA is a 27-item questionnaire that is a validated measure of gender identity and gender dysphoria including multiple indicators (gender identity, social dysphoria, physical dysphoria, and psychological dysphoria) over the preceding 12 months. It is scored from 1 to 5, with 1 being most dysphoric and 5 essentially having no gender dysphoria. Using a cutoff of 3 for diagnosis the measure has high sensitivity (90.4%) and excellent specificity (99.7%). Joseph J. Deogracias, et al., *The gender identity/gender dysphoria questionnaire for adolescents and adults*, 44 J. Sex Rsch. 370 (2007), https://pubmed.ncbi.nlm.nih.gov/18321016/; Devita Singh, et al., *The gender identity/gender dysphoria questionnaire for adolescents and adults: further validity evidence*, 47 J. Sex Rsch. 49 (2010), https://pubmed.ncbi.nlm.nih.gov/19396705/.
[4] The Utrecht Gender Dysphoria Scale which should be considered a reflection of the severity of the patient's baseline gender dysphoria is a 12 item diagnostic questionnaire that focuses more on bodily dysphoria, identity, and gender role. It is a validated measure that has an excellent sensitivity of 88.3% and specificity of 99.5% for those assigned male at birth. Thomas D. Steensma, et al., *Chapter 3: The Utrecht Gender Dysphoria Scale: a Validation Study* in *From gender variance to gender dysphoria: Psychosexual development of gender atypical children and adolescent*, Archives Sexual Behav. 41, 42 (2013), https://research.vumc.nl/ws/files/354253/hoofdstuk%2003.pdf.

am quite familiar with both diagnoses and their criteria. With regards to treatment criteria and recommendations, I have practiced using WPATH Standards of Care for the Health of Transgender and Gender Diverse People ("SOC") versions 6, 7, and currently 8. As an experienced provider I do not base my independent medical assessment and recommendations for care solely on the SOC, but given the improvements in SOC8, I would say that in almost all cases my assessment and WPATH SOC8 recommendations align. I also utilize SOC8's criteria because many private and public insurers depend on these for utilization management.

16.     In addition to medical and other carceral records for each individual, I reviewed UDC's policies as well as the text of Utah law H.B. 252. With regards to H.B. 252, firstly it is internally inconsistent. It states that the department will create policies and procedures for providing comprehensive health care to inmates;"[5], yet it also states that "The department may not initiate any of the following procedures or treatments for inmates: (a) a cross-sex hormone treatment; (b) a primary sex characteristic surgical procedure; or (c) a secondary sex characteristic surgical procedure."[6] It is impossible to provide comprehensive health care to inmates with gender dysphoria and preclude the primary treatments for that condition.

17.     Gender-affirming care that is outlawed in H.B. 252 is not fringe or experimental treatments. Over 20 US health professional associations including the American Medical

---

[5] Utah Code § 26B-4-1002(1)(b)
[6] Utah Code § 26B-4-1004(1)

Association[7], the American Psychiatric Association[8], the National Commission on Correctional Health Care[9], the American College of Obstetricians and Gynecologists[10] have policy statements affirming that medical and surgical treatments for GD are medically necessary and supported by the current consensus of the medical evidence. Hormonal and surgical care for transgender individuals is well supported by the medical literature and major medical organizations, H.B. 252's precluding medically necessary care for inmates with GD is as contradictory as saying that

---

[7] The AMA policy Clarification of Evidence-Based Gender-Affirming Care H-185.927 states "Our American Medical Association recognizes that medical and surgical treatments for gender dysphoria and gender incongruence, as determined by shared decision making between the patient and physician, are medically necessary as outlined by generally-accepted standards of medical and surgical practice." https:// policysearch.ama-assn.org/policyfinder/detail/*?uri=%2FAMADoc%2FHOD-185.927.xml

[8] APA Policy Statement on Affirming Evidence-Based Inclusive Care for Transgender, Gender Diverse, and Nonbinary Individuals, Addressing Misinformation, and the Role of Psychological Practice and Science not only supports the medical necessity of medical and surgical treatments for GD, but specifically opposes "state bans on gender-affirming care, which are contrary to the principles of evidence-based healthcare" https://www.apa.org/about/policy/transgender-nonbinary-inclusive-care.pdf

[9] The NCCHC Position Statement on Transgender and Gender Diverse Health Care in Correctional Settings states "The clinical decision making to initiate or advance hormone medication treatment or candidacy for surgical interventions while incarcerated or upon release needs to be based on individual medical need, risks and benefits, analysis of alternatives, ruling out contraindications, accepted standards of care, and a thorough informed-consent process". https://www.ncchc.org/wp-content/uploads/Transgender-and-Gender-Diverse-Health-Care-in-Correctional-Settings-2020.pdf

[10] ACOG's Committee Opinion Health Care for Transgender and Gender Diverse Individuals (Number 823) states "The American College of Obstetricians and Gynecologists makes the following conclusions and recommendations regarding health care for transgender and gender diverse individuals: The American College of Obstetricians and Gynecologists opposes discrimination on the basis of gender identity, urges public and private health insurance plans to cover necessary services for individuals with gender dysphoria, and advocates for inclusive, thoughtful, and affirming care for transgender individuals." https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2021/03/health-care-for-transgender-and-gender-diverse-individuals

UDC provides comprehensive healthcare for inmates but does not provide insulin for diabetic inmates or antidepressant medications to inmates with major depressive disorder.

18.  In addition to being internally contradictory H.B. 252 also singles out transgender prisoners with Gender Dysphoria specifically. For example, it would allow testosterone or estrogen treatment for inmates who are not transgender and do not have Gender Dysphoria as the indication for treatment – thus it specifically targets this population for deprivation of medically necessary care because of the specific diagnosis carried by transgender inmates. Moreover, given that untreated Gender Dysphoria has a significant morbidity and mortality and that treatment with hormonal and surgical interventions reduces suicidality, self-harm, depression, and improves multiple measures of quality of life, prohibiting these treatments places inmates with Gender Dysphoria at high risk of these negative outcomes.[11] In addition, such negative

---

[11] Brendan J. Nolan, et al., *Early Access to Testosterone Therapy in Transgender and Gender-Diverse Adults Seeking Masculinization: A Randomized Clinical Tria,*. 6 JAMA Network Open e2331919 (2023), https://doi.org/10.1001/jamanetworkopen.2023.31919; Anthony N. Almazan & Alex S. Keuroghlian, *Association Between Gender-Affirming Surgeries and Mental Health Outcomes*, 156 JAMA Surgery 611 (2021), https://doi.org/10.1001/jamasurg.2021.0952; Rachel H. Park, et al., *Long-Term Outcomes After Gender-Affirming Surgery: 40-Year Follow-Up Study*. 89 Annals of Plastic Surgery 431 (2022), https://doi.org/10.1097/sap.0000000000003233. Lucas Foster Skewis, et al., *Short-Term Effects of Gender-Affirming Hormone Therapy on Dysphoria and Quality of Life in Transgender Individuals: A Prospective Controlled Study*, 12 Frontiers in endocrinology 717766 (2021), https://doi.org/10.3389/fendo.2021.717766; Eliane D. Silva, et al., *Physical and Sociodemographic Features Associated with Quality of Life Among Transgender Women and Men Using Gender-Affirming Hormone Therapy*, 12 Frontiers in psychiatry 621075 (2021), https://doi.org/10.3389/fpsyt.2021.621075; Şenol Turan, et al.,*The effects of gender-affirming hormone therapy and mastectomy on psychopathology, body image, and quality of life in adults with gender dysphoria who were assigned female at birth*, 33 Quality of Life Research 1937 (2024), https://doi.org/10.1007/s11136-024-03664-6; Alexandra D. Fisher, *Cross-Sex Hormone Treatment and Psychobiological Changes in Transsexual Persons: Two-Year Follow-Up Data*, 101 J. of Clinical Endocrinology & Metabolism 4260 (2016), https://doi.org/10.1210/jc.2016-1276; Jack L. Turban, et al., *Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults*, 17 PLoS One e0261039 (2022), https://doi.org/10.1371/journal.pone.0261039.

consequences are cumulative over time. That is, the longer a patient with GD is denied medically necessary care, the risk of adverse outcomes is cumulative.

19.    H.B. 252's prohibition on treatment places transgender prisoners with Gender Dysphoria at a distinctly higher risk. For example, many of my patients prior to 2011 (when medical and surgical treatments became available through MediCal (the California Medicaid program)) suffered even more substantially because they felt that surgery would never be possible for them. While I could provide these patients hormonal treatment, they suffered substantially and some took their own lives or chose to undergo self-surgery with often disastrous consequences. However, when care became widely included in insurance care, I saw profound changes in my patients' mental and physical health. Just knowing that the care they needed was *realistically achievable* for them was enough to diminish suicidality, non-suicidal self-injury, and improve mental health and quality of life. There is anticipatory improvement in many mental health indicators and quality of life for patients who know there is a potential solution to their suffering that is available if delayed. H.B. 252 takes this away from transgender inmates for both medical and surgical care – especially those with very long sentences – and thus places them at higher risk of these life-threatening adverse outcomes.

20.    With regards to UDC's policy prior to enaction of H.B. 252, AG37 "Diagnosis & Treatment of Offenders with Gender Dysphoria"[12] ("AG37"), it is similarly contradictory: While it commits "to provide adequate healthcare and mental health services to all offenders in its custody" it specifically states that while medical treatments *may* be available, surgical treatment

---

[12] UDC, *Department Manual, Volume: Operational Procedures: General, Chapter: AG37 Diagnosis & Treatment of Offenders with Gender Dysphoria* (2018)

is precluded absolutely – so even in cases where it would be medically necessary. Given that both medical and surgical treatment of GD provide substantial benefits, the prior policy providing at least HRT was less dangerous than the current law which allows neither.

21.     In the records that I have received and discussion with Plaintiffs it does seem apparent that there is some (though not extensive) clinical experience with some front-line providers in the UDC health system. However, I am very concerned that the individuals making the ultimate clinical decisions about referral to a mental health provider for diagnosis and subsequently whether or not transgender prisoners with GD in UDC are prescribed HRT may lack sufficient expertise to diagnose and plan treatments for patients with GD.

## **TERMINOLOGY**

22.     **Gender Identity** is the internal sense of oneself as a male, female, intersex, or a gender residing between these points on the spectrum.

23.     **Hormone Replacement Therapy ("HRT")** is the provision of sex hormones (and sometimes sex hormone antagonists) to change the body of transgender people to better reflect their gender identity.

24.     **Non-Suicidal Self Injury (NSSI)** is intentionally harming one's physical body which is generally intended to get psychological relief from a painful emotional state by converting the emotional pain into physical pain. This is the classic "cutting" to relieve emotional distress and is best compared to a coping mechanism. Patients exhibiting this behavior have no intent to commit suicide by their self-harm although NSSI and suicidal behavior can be found in the same individual.

25.    **Self-Surgery** like NSSI also has no intent to end one's life but the motivation is distinctly different from NSSI. With self-surgery, the individual is attempting to provide a necessary surgical treatment to themselves that is otherwise unobtainable. Self-surgery has been well documented in transgender patients including transgender women in prison and is a serious risk to these women when they are not provided medically necessary treatment. In the case of self-surgery, the end goal is to achieve an appropriate surgical result rather than to directly cope with emotional distress.

26.    **Misgendering** is when transgender people are addressed either accidentally or intentionally with the wrong pronoun, gendered salutation, or with the patient's prior name (generally their birth name). This action causes significant negative mental health consequences for transgender people and can worsen their gender dysphoria. In adolescent and young adult transgender patients, use of their chosen name and the correct pronoun significantly decrease depression, suicidal ideation, and suicide attempts.[13]

27.    I refer above to medical necessity. By this I mean treatment that is 1) clinically appropriate for a given patient, 2) evidence based using the best available medical evidence, and 3) likely to produce meaningful and patient centered improvements that outweigh risks of treatment. This is medical necessity based on an individual perspective. There can be variable definitions when made on a systems level (taking cost into consideration).[14] As I described

---

[13] Stephen T. Russell ,et al. *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior among transgender youth*. 63 J.of Adolesc. Health 503 (2018), https://doi.org/10.1016/j.jadohealth.2018.02.003.

[14] For example the US Institute of Medicine when asked to define medical necessity for purposes of the Affordable Care Act declined to provide a singular definition for all circumstances but stated that "The criteria used for medically necessary services or services that conform to medical necessity are medical services that are (1) clinically appropriate for the individual

11

above, the best available evidence supports the provision of hormonal, surgical, and mental health care to transgender patients diagnosed with Gender Dysphoria. The literature also documents the significant improvements in mental health and quality of life as well as decreased mortality in patients provided appropriate care. Clinical appropriateness is generally determined by providers with expertise in the area evaluating patients and formulating an individualized treatment plan.

28.     In the case of Ms. Tucker, Ms. Dombroski, and Ms. Phillips based on my expertise in transgender health, both clinical and familiarity with the medical literature, my individual evaluations, and review of what records I was provided, it is clinically appropriate and medically necessary that all three be immediately assessed for and provided hormonal treatment for their Gender Dysphoria.

### BACKGROUND AND ETIOLOGY OF GENDER DYSPHORIA

29.     Gender Dysphoria is a medical condition in the DSM-5. Individuals with GD experience incongruence between their gender identity and birth-assigned sex and distress as a result.

30.     The diagnosis of GD replaced the previous diagnosis of Gender Identity Disorder ("GID") in DSM-IV and DSM-IV-TR and is a distinct diagnosis. While many of the people who were previously diagnosed with GID were subsequently diagnosed with GD after DSM-5 was released, the change represented a fundamental shift in the diagnostic focus. The diagnosis GID

---

patient, (2) based on the best scientific evidence, taking into account the available hierarchy of medical evidence, and (3) likely to produce incremental health benefits relative to the next best alternative that justify any added cost." John K. Iglehart, *Defining essential health benefits—the view from the IOM Committee*, 365 New England J. of Medicine, *365*(16), 1461, (2011), https://doi.org/10.1056/nejmp1109982.

centered the patient's gender identity as the disorder, while GD rightly places the diagnostic and treatment focus not on the patient's identity, but on the dysphoria that occurs due to the "marked incongruence between one's experienced/expressed gender and assigned gender."[15] That is, in the GID diagnosis the primary identified problem was the identity. In GD, the problem is the adverse mental health symptoms that result from a conflict between one's gender identity and how that interacts with the patient's body and their interpersonal and societal interactions based on their birth assigned or perceived gender.

31.     The etiology of transgender identities and gender dysphoria is, like many uncommon conditions incompletely described. However data from twin studies suggest that there is a definite genetic component to gender dysphoria.[16,17] A review of the literature estimated the heritability ranged between 30-60%.[18] A study of karyotyping in transgender individuals showed a higher incidence of chromosomal aberrations than in cisgender individuals.[19] Overall 2.5% of transgender patients had a chromosomal aberration (which is less than 1% in cisgender individuals). Numerous small studies of brain neuroanatomy have provided suggestions that transgender patient's brain morphology is different than cisgender patients. A

---

[15] DSM-5, supra, at 452

[16] Gunter Heylens, et al., *Gender Identity Disorder in Twins: A Review of the Case Report Literature*, 9 J. of Sexual Medicine, 751, (2012), https://doi.org/10.1111/j.1743-6109.2011.02567.x

[17] Frederick L. Coolidge, Linda L. Thede & Susan E. Young, *The Heritability of Gender Identity Disorder in a Child and Adolescent Twin Sample*, 32 Behavior genetics251 (2002), https://doi.org/10.1023/a:1019724712983

[18] Tinca J. C. Polderman, et al., The Biological Contributions to Gender Identity and Gender Diversity: Bringing Data to the Table. 48 Behavior genetics95, (2018), https://doi.org/10.1007/s10519-018-9889-z.

[19] Adrien Inoubli, et al., *Karyotyping, is it worthwhile in transsexualism?*8 J. of Sexual Medicine 475, (2011), https://doi.org/10.1111/j.1743-6109.2010.02130.x

recent larger and more robust study demonstrated this more definitively.[20] This study demonstrated that transgender people seem to have "unique neurobiological phenotypes". Like many other health conditions this data is not sufficient for us to have a simple blood or imaging test to definitely diagnose transgender patients, but it is sufficient when taken together to demonstrate that gender dysphoria is a neurobiological condition which (as I described above) results in significant adverse mental health outcomes including a dangerously high risk of suicide if not adequately treated.

32.    Gender Dysphoria can be accurately and scientifically described as being a neurobiological condition, from a clinical standpoint it is best understood as a neuropsychiatric condition with clinically important impacts on multiple other body systems, for example the endocrine, hematological, musculoskeletal, gastroenterological, and reproductive systems.[21]

---

[20] Sven C. Mueller, et al., *The Neuroanatomy of Transgender Identity: Mega-Analytic Findings From the ENIGMA Transgender Persons Working Group.* 18 J. of Sexual Medicine 1122 (2021), https://doi.org/10.1016/j.jsxm.2021.03.079

[21] Treatment of GD with HRT has fairly obvious effects on the endocrine system by the addition of sex steroid hormones. This also causes changes in the hematologic system in that in transgender women blood count decreases and in transgender men it increases. In the musculoskeletal system, not only is muscle mass decreased in transgender women and increased in transgender men, but it also changes bone density. The GI system is impacted in that the uptake and metabolism of not only hormonal medications, but other medications by the GI tract and in the liver. The reproductive system is altered therapeutically to avoid menstruation in transgender men. In transgender women it causes decreased erections and atrophy of the testicles. However, gender dysphoria even before HRT is started or surgery is undertaken, can have serious adverse physical consequences. Perhaps the most obvious ones are the consequences of suicide, NSSI, and self-surgery – which are all more common in patients with GD before they are appropriately treated. In addition to the consequences of high rates of suicide attempts, transgender people have higher rates of eating disorders and their adverse physical consequences. Transgender people who socially transition before HRT or surgery may have adverse consequences of the physical means by which they present in the new gender role: for example, transgender men's binders can cause pulmonary restriction, and skin problems. Gaffs (commercial or makeshift) for transgender women can cause urinary tract infections and skin problems. Moreover, before *any* treatment is undertaken, transgender men have a higher rate of

33.    Neuropsychiatric is a term that generally refers to conditions of the brain that manifest in ways that include psychiatric symptoms. Examples of common neuropsychiatric disorders include autism spectrum disorder, bipolar disorder, schizophrenia, and post-traumatic stress disorder. [22] The defining characteristic of such conditions are that they have known significant biological abnormalities in the central nervous system such as dysfunction of glial cells, alteration of the blood brain barrier, immune system dysregulation within the brain, etc. Additionally, there is also evidence of hormonal differences in individuals with Gender Dysphoria. For example, in transgender men with GD the expression of the Oxytocin Receptor Gene was different compared with cisgender women.[23] Similarly, transgender women with GD are more likely to have mutations in the androgen and estrogen gene receptors.[24]

34.    The diagnostic criteria for GD in the DSM-5 for adults are:

1)    A marked incongruence between one's experiences/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:[25]

---

elevated blood androgens and irregular menstruation. This is likely due to the higher rate of genetic abnormalities in transgender patients. *See* Hartmut A.G. Bosinski, et al., *A higher rate of hyperandrogenic disorders in female-to-male transsexuals*, 22 Psychoneuroendocrinology 361 (1997), https://doi.org/10.1016/s0306-4530(97)00033-4; Andreas Mueller, et al., *Prevalence of Polycystic Ovary Syndrome and Hyperandrogenemia in Female-to-Male Transsexuals.* 93 J. of Clinical Endocrinology & Metabolism, 1408 (2008), https://doi.org/10.1210/jc.2007-2808

[22] Rohan Gupta, et al., *Dissecting the Relationship Between Neuropsychiatric and Neurodegenerative Disorders*, 60 Molecular Neurobiology 6476 (2023), https://doi.org/10.1007/s12035-023-03502-9.

[23] Majid Dastorani, et al., *Elevated oxytocin levels and oxytocin receptor gene expression in female-to-male transgender individuals*, 15 Scientific Reports 42729 (2025), https://doi.org/10.1038/s41598-025-26845-w

[24] Madeline Foreman, et al., *Genetic Link Between Gender Dysphoria and Sex Hormone Signaling*, 104 J. of Clinical Endocrinology & Metabolism 390 (2018), https://doi.org/10.1210/jc.2018-01105

[25] Not all 6 are required reflecting the range of clinical needs of transgender people diagnosed with gender dysphoria. For example, a transgender woman who was treated in adolescence might

a)      A marked incongruence between ones experienced/expressed gender and primary and/or secondary sex characteristics (or in younger adolescents, the anticipated secondary sex characteristics).

b)      A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in younger adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).

c)      A strong desire for the primary and/or secondary sex characteristics of the other gender.

d)      A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).

e)      A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

f)      A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).[26]

2)      The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

35.     I am uncertain why UDC and DHHS providers use in their diagnosis/problem lists on the patient's records the old diagnosis of GID for individuals newly diagnosed in the past 5 years while their AG37 policy refers to patients with GD. Though since all three women meet the criteria for the current GD diagnosis and prior GID diagnosis, while there are subtle but important differences between the two distinct diagnoses (and not all patients meet the criteria for both), since these women all meet the criteria for both diagnoses, I will use GD throughout the rest of this report.

## CLINICAL GUIDELINES FOR THE TREATMENT OF GENDER DYSPHORIA REQUIRES INDIVIDUALIZED MEDICAL TREATMENT

---

not have developed the secondary sex characteristics due to early treatment with hormone blockers before they could develop.

[26] DSM-5, supra, at 452

36.     Individuals with GD, if not treated, often suffer clinically significant distress, including anxiety, depression, suicidal thoughts, and impairment of functioning in their daily lives. Especially if untreated a significant proportion become suicidal, with many attempting and completing suicide. [27]

37.     Numerous medical and mental health professional associations affirm that transgender patients should have access to appropriate care for their gender dysphoria including: the American Medical Association[28], the American Nurses Association[29], the American College of Obstetricians and Gynecologists[30], the American Academy of Physician Assistants[31], the

---

[27] Jaclyn M. W. Hughto, et al*., Social and Medical Gender Affirmation Experiences Are Inversely Associated with Mental Health Problems in a US Non-Probability Sample of Transgender Adults*, 49 Archives of Sexual Behavior2635 (2020), https://doi.org/10.1007/s10508-020-01655-5; Kirstin J. Hainey, *Mental Health Outcomes in Transgender and Nonbinary People: An Umbrella Review*, 82 JAMA Psychiatry 1142 (2025), https://doi.org/10.1001/jamapsychiatry.2025.1850

[28] Am. Med. Assoc., *Clarification of Evidence-Based Gender-Affirming Care H-185.927* (2024), https://policysearch.ama-assn.org/policyfinder/detail/%22Clarification%20of%20Evidence-Based%20Gender-Affirming%20Care%22?uri=%2FAMADoc%2FHOD-185.927.xml; Am. Med. Assoc., *Transgender prisoners have fundamental right to appropriate care* (May 17, 2019), https://www.ama-assn.org/delivering-care/population-care/transgender-prisoners-have-fundamental-right-appropriate-care.

[29] Am. Nurses Assoc., American Nurses Association Opposes Restrictions on Transgender Healthcare and Criminalizing Gender-Affirming Care (Oct. 26, 2022), https://www.nursingworld.org/news/news-releases/2022-news-releases/american-nurses-association-opposes-restrictions-on-transgender-healthcare-and-criminalizing-gender-affirming-care/.

[30] Am. Coll. of Obstetricians and Gynecologists, *Health Care for Transgender and Gender Diverse Individuals* (Mar. 2021), https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2021/03/health-care-for-transgender-and-gender-diverse-individuals.

[31] Am. Acad. of Physician Assistants, et al., *Letter to Secretary Azar, U.S. Department of Health and Human Services* (May 24, 2019), https://www.aapa.org/download/50101/.

17

American College of Physicians[32], the American Psychiatric Association[33], the American Heart Association[34], the American Urological Association[35], the Endocrine Society (who also promulgate medical treatment protocols)[36], the National Association of Social Workers[37], and the National Commission on Correctional Health Care.[38]

38.    The accepted medical protocols for treatment of people with Gender Dysphoria involve interventions to assist patients to live in accordance with their gender identity. Medically necessary treatment for GD often includes social transition, hormone therapy (medical transition), Gender Affirming Surgical Therapy, and mental health care. Treatment plans are individualized based on the needs of the patient; however in the majority of patients who meet the clinical criteria (unless contraindications exist), treatment plans generally include all four

---

[32] Am. Coll. Of Physicians, *Attacks on Gender-Affirming and Transgender Health Care* (Aug. 28, 2025), https://www.acponline.org/advocacy/state-health-policy/attacks-on-gender-affirming-and-transgender-health-care

[33] Am. Psychiatric Assoc., *Frontline Physicians Oppose Legislation That Interferes in or Criminalizes Patient Care* (Apr. 02, 2021), https://www.psychiatry.org/newsroom/news-releases/frontline-physicians-oppose-legislation-that-interferes-in-or-criminalizes-patient-care; Am. Psychiatric Assoc., *Position Statement on Access to Care for Transgender and Gender Diverse Individuals* (2018), https://www.psychiatry.org/getattachment/d3ef4763-8a0e-4da3-ab01-efe932ca9478/Position-2018-Access-to-Care-for-Transgender-and-Gender-Diverse-Individuals.pdf.

[34] Am. Heart Assoc., *Comment on FR Doc # 2019-11512*, Dep't of Health and Hum. Servs. (Sept. 7, 2019), https://www.regulations.gov/document/HHS-OCR-2019-0007-147945.

[35] Am. Urological Assoc., *Transgender Care* (Aug. 2022), https://www.auanet.org/about-us/aua-statements/transgender-care.

[36] Endocrine Soc'y, *Position Statements: Transgender Health* (Dec. 16, 2020), https://www.endocrine.org/advocacy/position-statements/transgender-health.

[37] Nat'l Assoc. of Soc. Workers, *Gender-Affirming Health Care Saves Lives* (Mar. 28, 2023), https://www.socialworkers.org/News/News-Releases/ID/2642/Gender-Affirming-Health-Care-Saves-Lives;  Nat'l Assoc. of Soc. Workers, *Transgender and Gender Identity Issues* (2009), https://transhealthproject.org/documents/10/NASW_transgender_policy_statement.pdf.

[38] Nat'l Comm. on Corr. Health Care, *Transgender and Gender Diverse Health Care in Correctional Settings (2020)* (2020), https://www.ncchc.org/position-statements/transgender-and-gender-diverse-health-care-in-correctional-settings-2020/.

types of treatment (with the exception of patients not judged by evaluating providers to need psychotherapy). With treatment, many patients with GD adjust very well to transition and no longer have GD that meets a level of clinical significance.

39.     The widely accepted standards of care in the U.S. and internationally are the Standards of Care for the Health of Transgender and Gender Diverse People published by the World Professional Association for Transgender Health ("WPATH SOC") now in its eighth version.[39] There are also numerous other resources providing guidance for treatment including protocols for medical treatment of transgender patients including University of California San Francisco ("UCSF")  Guidelines for the Primary and Gender-Affirming Care of Transgender and Gender Nonbinary People[40], TransLine Clinical Consultation Service Guidelines[41], Johns Hopkins Guidelines[42],  Callen-Lorde Guideline[43], American Academy of Family Physicians[44], American College of Obstetricians and Gynecologists[45], and the Endocrine Society[46]. The medical protocols described apply to incarcerated persons.[47]

---

[39] https://wpath.org/publications/soc8/; JAMA provides a Clinical Guidelines Synopsis of the WPATH Standards of Care: https://jamanetwork.com/journals/jama/fullarticle/2805345
[40] https://transcare.ucsf.edu/guidelines
[41] https://transline.zendesk.com/hc/en-us/articles/229373288-TransLine-Hormone-Therapy-Prescriber-Guidelines
[42] https://www.hopkinsmedicine.org/-/media/center-for-transgender-health/documents/tgd-gaht-quick-guide.pdf
[43] https://ceitraining.org/documents/Callen-Lorde-TGNC-Hormone-Therapy-Protocols.pdf
[44] https://www.aafp.org/pubs/afp/issues/2023/1200/practice-guidelines-transgender-gender-diverse.pdf
[45] https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2021/03/health-care-for-transgender-and-gender-diverse-individuals
[46] https://www.endocrine.org/clinical-practice-guidelines/gender-dysphoria-gender-incongruence
[47] See E. Coleman, et al., *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7*, 13 Int'l J. Transgenderism 1, 67 (2012) ("SOC7"); E. Coleman, et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgenderism S1, S104 (2022) ( "SOC8"); Mattia Marchi, et al., *Mental*

19

40.     Social transition is the process by which the patient lives their life in the gender role that corresponds with their gender identity. This typically involves adopting a new name, changing name and gender markers on identity documents, dressing and grooming appropriate to the patient's gender identity, using pronouns and other markers of their gender, and using restrooms and other sex-segregated spaces congruent with their gender identity.

41.     Medical transition (generally in the form of hormone replacement therapy) in transgender women results in development of female secondary sex characteristics such as breast development, redistribution of body fat to a more female distribution, decreased muscle mass, decreased density and speed of growth of body hair, softening of skin and changes in sebum production and odor, changes in mood, decreased testicular size and decreased sperm production, emotional and some subtle neuropsychological changes. In transgender men it results in development of secondary sexual characteristics such as deepening of the voice, facial hair and secondary sexual hair growth, increased muscle mass and a change in body fat distribution to a more masculine type, and usually cessation of menses.

42.     With both transgender men and women, HRT results in diminished gender dysphoria (the symptom), diminished depression and anxiety, improved sense of wellbeing and improved measures of quality of life. Generally, HRT in transgender men is simply the provision of testosterone (by injection, implanted pellets, and transdermal most often) although

---

health of transgender people in prison: a systematic review and metaanalysis, 36 Int'l Rev. Psychiatry 714 (2023), https://doi.org/10.1080/09540261.2023.2287680; Nat'l Comm. on Corr. Health Care, Transgender and Gender Diverse Health Care in Correctional Settings (2020) (2020), https://www.ncchc.org/position-statements/transgender-and-genderdiverse-health-care-in-correctional-settings-2020/.

infrequently other medication may be needed if menses are not fully suppressed on testosterone. In transgender women, it is necessary to both add feminizing hormones (estrogen and sometimes progesterone) as well as adding one or more of several types of medication used to suppress testosterone such as spironolactone, dutasteride, bicalutamide, or GnRH agonists. All of the medications in both groups have a common use among cisgender patients with different diagnoses.

43.    Surgical transition with gender affirming surgeries is individualized, and the surgeries needed are dependent on individual patient needs and how well GD is addressed with other treatments. While it is common for GD to improve with social and medical transitions and with mental health care, most often, surgery is needed to adequately and sufficiently address the dysphoria. In transgender women, surgery can include genital reconstructions (generally vaginoplasty which is the construction of a vagina, labia, and clitoris using the penis and scrotum, along with removal of the testicles), mammoplasty, facial and neck feminization surgery, vocal surgery, and other surgeries aimed at feminizing the body.

44.    Mental health care can include individual or group counseling. This often focuses on two broad categories. Firstly, it can directly focus on direct management of GD, the primary symptom as well as name of the condition. Secondly it can focus on supporting the patient throughout the medical, social, and surgical transitions. While mental health treatment (therapy and medications) can be a useful adjunct, it is no substitute for medical and surgical transition. Moreover, there are significant adverse mental health consequences in patients deprived of medically necessary care.

21

45.     In SOC8, WPATH recognized that primary care providers with sufficient experience providing medical and mental health care to transgender individuals could provide reliable diagnoses of GD appropriate for them to formulate plans for care including HRT and referral for additional care including surgery. Even before SOC8, it was well recognized and fairly common in the US that experienced primary care providers assessed and diagnosed patients and formulated treatment plans (and provided HRT) without the initial assessment of a mental health professional. In SOC7 and before, the pathway was that a patient is evaluated and diagnosed by a mental health provider, then referred to a medical provider for evaluation and determination (and provision of) a treatment plan - most often initially HRT and referral to other health care providers such as surgeons. However, the most important quality of individuals who diagnose (whether it is a medical or mental health provider) and formulate and prescribe treatment plans for patients with GD (medical providers) and referral to surgery is that they have appropriate knowledge and experience (or for those initially beginning to provide this care, some didactic training and consultation or supervision with more experienced providers).

## EXPERT OPINIONS ON UTAH'S S.B. 252; HARMS OF DENIAL OF HORMONE REPLACEMENT THERAPY

46.     H.B. 252 places the health and lives of transgender inmates with Gender Dysphoria at serious risk. It directly conflicts with numerous well accepted clinical guidelines and professional organization policy statements that medical care for transgender people with GD must be individualized based on the patient's clinical circumstances and need. Such blanket bans targeted at populations with specific diagnoses completely prevent providers within UDC from adequately treating their patients. This is qualitatively different from decisions such as

whether to carry certain medications or choosing between several medically appropriate treatments.

47.     H.B. 252 does not say that UDC will only provide injectable testosterone because it is less costly than transdermal testosterone. It offers no treatment options at all based on not just the guidelines and professional organization policy statements I cited above but based on the actual care that is delivered to transgender adults in the United States.

48.     Additionally, a study looking at transgender people who were incarcerated in US states with correctional policies providing more care to transgender inmates versus those incarcerated in states where care was prohibited. Among those incarcerated for short terms, there was no statistically significant difference in lifetime suicidality between states that provided higher versus lower levels of care. However, with those incarcerated for longer terms, there was a statistically significant difference between those in states with higher versus lower levels of care. The lifetime risk of suicide attempt in those in states with higher levels of care was 49% compared with those in states with lower levels of care who had a 77% lifetime risk of suicide attempt.[48]

49.     A review of 42 studies published between 1997 and 2016 among American and Canadian transgender inhabitants showed 55% of transgender adults had experienced suicidal ideations and 29% had attempted suicide in their lifetimes.[49] Moreover studies have demonstrated that transgender individuals who have appropriate access to comprehensive

---

[48] Leah Drakeford, *Correctional Policy and Attempted Suicide Among Transgender Individuals*, 24 J. of Corr. Health Care 171 (2018), https://doi.org/10.1177/1078345818764110
[49] Noah Adams, Maaya Hitomi & Cherie Moody, *Varied Reports of Adult Transgender Suicidality: Synthesizing and Describing the Peer-Reviewed and Gray Literature*, 2 Transgender health 60 (2017), https://doi.org/10.1089/trgh.2016.0036

transgender healthcare, suicidality rates decrease after treatment. A study of American Veterans demonstrated lower suicidal ideation in veterans who had been able to access more transition related treatment.[50] A study published in 2025 demonstrating the efficacy for telehealth provision of gender affirming medical treatment showed that after initiating treatment patients demonstrated a statistically and clinically significant reduction of mental health symptoms, and of those who had suicidal ideation at baseline, 60% had no suicidal ideation at 3 month follow up after initiating treatment.[51]

50.     Prior to the enactment of H.B. 252, it is apparent that at least in some instances, UDC and DHHS mental health and medical providers were able to make the diagnosis of GD for some inmates and use their independent medical judgement to determine the diagnosis and what appropriate medical treatment in the form of HRT was for individual patients. Thus H.B. 252 obviously interferes with the independent medical judgement of UDC and DHHS providers.

### FACTS REGARDING INDIVIDUAL PLAINTIFFS DENIED MEDICALLY NECESSARY HORMONE REPLACEMENT THERAPY

**I. VIRGINIA TUCKER**

51.     Ms. Tucker is a transgender woman with Gender Dysphoria. She meets the criteria for this diagnosis in the DSM-5. While she also would have met the diagnosis of GID in

---

[50] Raymond P. Tucker, et al., *Hormone therapy, gender affirmation surgery, and their association with recent suicidal ideation and depression symptoms in transgender veterans*, 48 Psychological Medicine 2329 (2018) , https://doi.org/10.1017/s0033291717003853.

[51] Jae Downing Corman, et al., *Mental Health Changes in US Transgender Adults Beginning Hormone Therapy Via Telehealth: Longitudinal Cohort Study*, 27 J. of Medical Internet Research e64017 (2025), https://doi.org/10.2196/64017.

DSM-IV-TR, it is more accurate and reflects current standards of care to describe her as having Gender Dysphoria.

52. ███████████████████████████████████████████████

███████████████████████████████████████

### A. Background

53. Ms. Tucker was born in 2000 and she was assigned male at birth. Her first sense that she was actually a female inside a male body was around age 12-13 but she did not learn that there were other transgender people like herself (and that there was a possibility to transition) until she was approximately 16 years old.

54. ███████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

### B. Gender Dysphoria

55. ████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

56. With regards to social transition, she reports significant dysphoria at not being identified by UDC as a woman and by her chosen name. The fact that her prison scrubs show her birth name significantly exacerbates her dysphoria during all of her waking hours. She would like to be able to dress and groom herself as a similarly situated cisgender woman but realizes

that were she given the red scrubs that women in UDC custody have, she would be targeted for abuse and harassment.

57.    She also reports that misgendering (when she is addressed with he/him pronouns, called Mr., or by her legal name) significantly exacerbates her GD. In addition to the constant reminder of her birth name on her scrubs, Ms. Tucker reports that corrections officers almost always misgender her and that the health care providers often do. She reports one specific example of the egregious treatment: Ms. Tucker had a visit with a Mental Health provider, Amanda, who Ms. Tucker states is the "head mental health person" and is on the GD committee. At that first visit after having reviewed her records Amanda said "it's so good to see you again Mr. Ricks." Ms. Tucker told her that she goes by Virginia and uses she/her pronouns. But less than a month later she responded to Ms. Tucker in a grievance and addressed her as "Mr Ricks." It is harmful to Ms. Tucker that a trained mental health provider, aware of a patient's gender identity and their diagnosis of GD would misgender a prisoner.

58.

---

[52] A gaff is an undergarment worn by transgender women to flatten the groin area by tucking the genitals against the body, creating a feminine silhouette.



61.    In addition, because of her inadequately treated gender dysphoria and misgendering she experiences, she avoids certain situations and will just stay in her cell rather than risk worsening her gender dysphoria. For example, she stopped going to chapel for religious services, crochet classes, or music passes. This represents the types of decreased quality of life

and social interactions I described above that transgender people without access to care suffer. Not everything transgender people suffer is purely mental anguish – it also adversely effects their activities of daily living.

62.    Due to misgendering and the lack of medically necessary treatment for her Gender Dysphoria, and her gender dysphoria itself, Ms. Tucker has difficulty concentrating: "anytime that I start getting into super GD I get stuck in my thoughts and I start spiraling fast."

63.    ████████████████████████████████████

64.    ████████████████████████████████████

**C.    Patient Goals and Clinical Assessment**

65.    ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

66.    According to the DSM-5 criteria for Gender Dysphoria (302.85)[53], Ms. Tucker easily meets both criteria A and B. Criteria A is marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, manifest in 2 of 6 possible signs and symptoms of gender incongruence (of which Ms. Tucker meets all 6).[54] Criteria B is that the condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

67.    I administered several diagnostic instruments to assess Ms. Tucker's current mental health, including the GIDYQ-AA and the Utrecht Gender Dysphoria Scale (Male to Female version). The results affirmed her diagnosis of Gender Dysphoria and indicate that she has been suffering significant gender dysphoria for the last 12 months that the score assesses.

68.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[53] DSM-5, supra, at 452

[54] These criteria are manifest in a myriad of ways described above, but for example in her gender identity being incongruous with her sex assigned at birth and beliefs about herself as a woman (1 and 6), desire to transition hormonally and surgically (criteria 2-4), her social transition to the extent it has been permitted by UDC and repeated requests to be treated as a female inmate (5 and 6).

29



71.     She has no medical contraindications for treatment with HRT.

72.     Lack of medically necessary HRT is directly causative of her symptoms and risks (including suicidality, gender dysphoria, depression). In addition, these symptoms significantly impair multiple major life activities, for example: work, interacting and communicating with others, eating, sleeping, and concentrating. For this reason, I strongly recommend that Ms. Tucker be evaluated for and promptly started on HRT to prevent further suicidality, diminish

30

gender dysphoria, depression, and to improve her ability to complete her activities of daily living.

## II.   STEPHANIE DOMBROSKI

73.   Ms. Dombroski is a transgender woman with Gender Dysphoria. She meets the criteria for this diagnosis in the DSM-5. While she also would have met the diagnosis of GID in DSM-IV-TR, it is more accurate and reflects current standards of care to describe her as having Gender Dysphoria.

74.   ████████████████████████████████████████████████

████████████████████████████████████████

### A.   Background

75.   Ms. Dombroski was born in 1976 and she was assigned male at birth. She reports from a very young age not wanting to be a boy, but wanting to be a girl, and that dress-up with her sister was the first time she dared to wear any girls' clothes at around age 13.

76.   She is a Navy veteran, beginning her service in 1998 through her incarceration in 2019 and was discharged in 2024 having achieved the rank of Senior Chief Petty Officer.

77.   Ms. Dombroski reports that she has been living full time as a woman since 2023 to the extent allowed by the carceral environment.

78.   ████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

31

**B.      Gender Dysphoria**

79.      ███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

80.      With regards to social transition, she reports significant dysphoria at not being identified by UDC as a woman, "being able to live as a woman" by which she means having the same clothes as a similarly situated cisgender woman in UDC (women's issue undergarments, shoes, and the red scrubs that female prisoners are issued). She also reports that misgendering (when she is addressed with he/him pronouns, called Mr., or by her legal first name) significantly exacerbates her GD.

81.      ███████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

████████████

82.      ███████████████████████████████████████████

███████████████████████████████████████████████

32



83.    With regards to coping mechanisms for her GD and her other mental health challenges, Ms. Dombroski reports that she focuses on working (11-11.5 hours/day), after which she often works out to exhaustion.

84.    R

85.



86.    In the month following, Ms. Dombroski continued to ask for an appointment with Leslie Forbush and to request treatment. Her diagnosis was placed on her problem list but she has not received hormone therapy or other requested treatment for her Gender Dysphoria.

87.

She reports that it in some ways surpasses the level of stress she experienced when she was deployed in Iraq during Operation Enduring Freedom.

C.    **Patient Goals and Clinical Assessment**

88.    ████████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████

89.    According to the DSM-5 criteria (302.85)[55] Ms. Dombroski easily meets both criteria A and B. Criteria A is marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, manifest in 2 of 6 possible signs and symptoms of gender incongruence (of which Ms. Dombroski meets all 6).[56] Criteria B is that the condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

90.    I administered several diagnostic instruments to assess Ms. Dombroski's current mental health, including the GIDYQ-AA and the Utrecht Gender Dysphoria Scale (Male to Female version). The results affirmed her diagnosis of Gender Dysphoria and indicate that she has been suffering significant gender dysphoria for the last 12 months that the score assesses.

91.    In addition to the above questionnaires, during my discussion with Ms. Dombroski, my clinical gestalt is that her gender dysphoria is severe, and treatment is medically necessary. ███████████████████████████████████████

███████

92.    ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

---

[55] DSM-5, supra, at 452

[56] These criteria are manifest in a myriad of ways described above, but for example in her gender identity being incongruous with her sex assigned at birth and beliefs about herself as a woman (1 and 6), desire to transition hormonally and surgically – particularly with regards to breast development (criteria 2-4), her social transition to the extent it has been permitted by UDC, and the importance of her access to makeup, and repeated requests to be treated as a female inmate (5 and 6).



93.

94.    She has no medical contraindications for treatment with HRT.

95.    Lack of medically necessary HRT directly causes her symptoms and risks.  The symptoms of Gender Dysphoria significantly impair multiple major life activities for her, including work activities, interacting and communicating with others, sleeping, and concentrating.

96.    Denying Ms. Dombroski HRT causes harm and poses serious risks to her physical and mental health.



.[57]

## II.   SANDY PHILLIPS

97.   Ms. Phillips is a transgender woman with Gender Dysphoria. She meets the criteria for this diagnosis in the DSM-5. While she also would have met the diagnosis of GID in DSM-IV-TR, it is more accurate and reflects current standards of care to describe her as having Gender Dysphoria.

98.   ██████████████████████████████████████████████
███████████████████████████████████

### A.   Background

99.   Ms. Phillips was born in 1972 and she was assigned male at birth. Ms. Phillips reports that her Gender Identity is female. With regards to consistency of this identity, she reports that her feelings have always been female but that her decision to pursue this was in 2024 after many discussions with her mother and with friends in prison.

100.   ██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[57] Siaw Cheok Liew & Thidar Aung, *Sleep deprivation and its association with diseases-a review*, 77 Sleep medicine 192 (2021), https://doi.org/10.1016/j.sleep.2020.07.048

██████████████████████████████████████████████████████████████

███████████████████.

**B.    Gender Dysphoria**

101.    ████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████

102.    Ms. Phillips is allowed to purchase some women's clothing and makeup on the

commissary, although not all of the items that cisgender women prisoners can purchase. ████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████

103.    ██████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████



104.    Ms. Phillips has not received HRT and reports that with regards to mental health care she has received "little to none." She states that she met with mental health "from time to time" but that this did not include much of anything about her gender dysphoria.

105.    Because of both the effects of misgendering, lack of access to medically necessary treatment for her Gender Dysphoria, in addition to the gender dysphoria itself, Ms. Phillips often feels distracted and has difficulty concentrating: "I try not to think about it much but is hard, but I try to focus on what I'm doing, but it's still there in the back of my mind, I can't totally get rid of it." She is anxious and frustrated that she is denied access to care that other prisoners receive. She reports that thoughts about her GD and lack of treatment occupy about half of her thoughts day to day but that she tries to focus on the future.

C.    **Patient Goals and Clinical Assessment**

106.    ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████

107.    According to the DSM-5 criteria (302.85)[58], Ms. Phillips easily meets both criteria A and B. Criteria A is marked incongruence between one's experienced/expressed

---

[58] DSM-5, supra, at 452

gender and assigned gender, of at least 6 months' duration, manifest in 2 of 6 possible signs and symptoms of gender incongruence (of which Ms. Phillips meets all 6)[59]. Criteria B is that the condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

108.    I administered several diagnostic instruments to assess Ms. Phillips's current mental health, including the GIDYQ-AA and the Utrecht Gender Dysphoria Scale (Male to Female version). The results affirmed her diagnosis of Gender Dysphoria and indicate that she has been suffering significant gender dysphoria for the last 12 months that the score assesses.

109.    In addition to the above questionnaires, during my discussion with Ms. Phillips, my clinical gestalt is that she has Gender Dysphoria that is moderately severe and that this is in large part due to her inadequately treated GD because she has been denied medically necessary treatments to help ameliorate her GD. Ms. Phillips has no significant mood disorders that interact with her Gender Dysphoria. ███████████████████████████

███████████████████████████████████████████

███████████████████████████████

110.    ███████████████████████████████████████

███████████████████████████████████████████ She understands that a law has been passed in Utah that does not allow her to access HRT but allows

---

[59] These criteria are manifest in a myriad of ways described above, but for example in her female gender identity being incongruous with her male sex assigned at birth, and seeing herself as a woman (1 and 6), desire to transition hormonally and surgically – with specific goals for both (criteria 2-4), her social transition to the extent it has been permitted by UDC and repeated requests to be treated as a female inmate in all ways where it would not impair her safety (5 and 6).

those treated before prison or before the law was enacted to get that care. She states that she does not understand why the law operates this way and it feels like it is targeting her because she is a transgender woman.

111.    She has no medical contraindications for treatment with gender affirming HRT.

112.    ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████ In addition, these symptoms significantly impair multiple major life activities, for example: work activities, interacting and communicating with others, and concentrating.

## CONCLUSIONS

113.    All three individuals described above are transgender women with Gender Dysphoria. That they are diagnosed with this does not seem to be in dispute as they were all evaluated by UDC and found to have the 302.85 diagnosis.

114.    After evaluating them I concur with UDC's assessment of the diagnosis. It is also my medical opinion that all three have no significant medical contraindications that would prevent them from receiving medically necessary HRT. In all three cases these women suffer significant mental health consequences that impair multiple of their major life activities. ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████

115.    H.B. 252 has interfered with the independent medical judgement of their UDC and DHHS health care providers and has prevented them from accessing medically necessary

41

HRT. Because Ms. Tucker, Ms. Dombroski, and Ms. Phillips all have been denied treatment for their gender dysphoria, they are suffering daily and have cumulative adverse physical and mental effects, such as increasing the risk of suicide, self-harm, and the mental health consequences of untreated GD.

43

Pursuant to 28 U.S.C § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 9, 2026.

_____
Dr. Ryan Nicholas Gorton, M.D.

# EXHIBIT A

**Ryan Nicholas Gorton, MD, DABEM**
901 Douglass Ave, Davis CA 95616
(504) 261-8379 (mobile)
nickgorton@gmail.com

### Professional Practice

| | |
|---|---|
| February 2005 – Current | Emergency Medicine Physician<br>Sutter Davis Hospital<br>Davis, CA<br>Chairman, Quality and Patient Safety Committee 2009 to Current |
| September 2009 – Current | Chairman, Quality and Patient Safety Committee<br>Sutter Davis Hospital<br>Davis, CA<br>Responsible for monitoring hospital performance on state, federal, and Joint Commission quality measures/performance and implementing performance improvement primarily using the LEAN process (for example FMEA, SBAR, and root cause analysis). |
| July 2002 – February 2005 | Emergency Medicine Physician<br>St Tammany Parish Hospital<br>Covington, LA |

### Professional Practice: Volunteer Activities

| | |
|---|---|
| March 2005 – Current | Primary Care Provider and Clinical Instructor<br>Lyon-Martin Community Health<br>San Francisco, CA. |
| August 2005 – February 2006 | Acting Medical Director<br>Lyon-Martin Community Health<br>San Francisco, CA. |
| September 2023 – Current | Acting Medical Director<br>Lyon-Martin Community Health<br>San Francisco, CA. |
| September 2008 – Current | Executive Committee Member and Lecturer<br>Project HEALTH  http://www.project-health.org/<br>San Francisco, CA. |
| January 2011 – Current | Lead Clinician TransLine National Clinical Consultation Line |
| Medical-Legal Consultant: | Sylvia Rivera Law Project, New York, NY<br>Lambda Legal Defense and Education Fund, Inc., New York, NY<br>Transgender Law Center, San Francisco, CA |

National Center for Lesbian Rights. San Francisco, CA
Northwest Justice Project, Seattle, WA
The Legal Aid Society, New York, NY
National Center for Transgender Equality, Washington, DC
TGI Justice Project, Oakland, CA.
ACLU Florida

## Post Graduate Training

June 2001 – June 2002    Chief Resident, Department of Emergency Medicine
Kings County Hospital Center/SUNY Downstate
Brooklyn, NY

July 1998 – June 2002    Emergency Medicine Residency
Kings County Hospital Center/SUNY Downstate
Brooklyn, NY

## Education

August 1994 – May 1998    Doctor of Medicine
University of North Carolina School of Medicine
Chapel Hill, NC

August 1988 – August 1991    Bachelor of Science in Biochemistry, Summa Cum Laude
North Carolina State University
Raleigh, NC

## Professional Affiliations

World Professional Association for Transgender Health (formerly HBIGDA)
- ◆ WPATH GEI Certified Practitioner
- ◆ Institutionalized Persons Committee
- ◆ Instructor WPATH Health Plan Provider Training program

University of California at San Francisco Center of Excellence for Transgender Health
- ◆ Medical Advisory Board 2010-2013 (during initial development of original Primary Care Protocols)

American Medical Association
- ◆ GLBT Advisory Committee 2009-2011

Gay and Lesbian Medical Association
- ◆ LGBT Medical Experts Panel

## Licensure/Certification

Nov 2003 – Present    Diplomate American Board of Emergency Medicine
Nov 2004 – Present    CA State Medical License A89440
Feb 2002 – 2009    LA State Medical License 14466R
June 2001 – 2010    NY State Medical License 221808

## Publications and Papers

Gorton, R and Grubb, M. (2022), General, Sexual, and Reproductive Health, In Erickson-Schroth, L (Ed) *Trans Bodies, Trans Selves: A Resource for the Transgender Community*. New York, NY: Oxford University Press.

Gorton, R, and Berdahl, C. *Improving the Quality of Emergency Care for Transgender Patients. Annals of emergency medicine*. 71(2): 189-192. 2018.

Gorton, R, and Erickson-Schroth, L. *Hormonal and Surgical Treatment Options for FTMs*. Psychiatric Clinics of North America. Psychiatric Clinics of North America. 40(1): 79-97. 2017.

Gorton, R, and Jaffe, J.M., *Transline Medical Consultation Service: Four Years of Clinician Support*. USPATH Poster Presentation: February, 2017.

Ingram, N., Pratt V., and Gorton, R. *Counting trans\* patients: A Community Health Center Case Study*. TSQ: Transgender Studies Quarterly. 2(1): 136-147. 2015.

Gorton, R and Grubb, M. (2014), General, Sexual, and Reproductive Health,  In Erickson-Schroth, L (Ed) *Trans Bodies, Trans Selves: A Resource for the Transgender Community*. New York, NY: Oxford University Press.

Gorton R. Transgender as Mental Illness: Nosology, Social Justice, and the Tarnished Golden Mean. In Stryker S and Aizura A (Eds.), *The Transgender Studies Reader, Vol 2*. New York, NY Taylor and Francis. 2013.

Ehrbar R, Gorton R, and Winters K. Sugerencias para la revisión de los diagnósticos relacionados con el genero en el DSM y el CIE. In Miquel Missé and Gerard Coll-Planas (Eds.), *El Género Desordenado - Críticas en torno a la patologización de la transexualidad*. Madrid: EGALES. 2010.

Ehrbar R, and Gorton R. *Exploring Provider Treatment Models in Interpreting the Standards of Care*. International Journal of Transgenderism, 12(4):198-210. 2010.

Pittsburgh Transgender Health Research Summer Institute: *A Review and Guidance for Future Research—Proceedings from the Summer Institute at the Center for Research on Health and Sexual Orientation, University of Pittsburgh t*. International Journal of Transgenderism, 12(4):211-229. 2010.

Haraldsen I, Ehrbar R, Gorton R, and Menvielle E. *Recommendations for Revision*

*of the DSM Diagnosis of Gender Identity Disorder in Adolescents.* International Journal of Transgenderism, 12(2):75-79. 2010.

Gorton R. *Transgender Health Benefits: Collateral Damage in the Resolution of the National Health Care Financing Dilemma.* Sexuality Research and Social Policy: Journal of NSRC. 4(4):81-91. Dec 2007.

Gorton R. *Health Care and Insurance Issues for Transgender Persons.* American Family Practitioner. 74(12):2022. December 2006. https://www.aafp.org/afp/2006/1215/p2022.html

Gorton R. *Current Summary of the Medical Knowledge Base and Current Clinical Standards Surrounding the Treatment of Patients with Gender Identity Disorder.* Report prepared for the Lambda Legal Defense Fund. May 2005.

Gorton R, Buth J, and Spade D. *Medical Therapy and Health Maintenance for Transgender Men: A Guide For Health Care Providers.* Lyon-Martin Women's Health Services. San Francisco, CA. 2005. ISBN 0-9773250-0-8 ([www.nickgorton.org](www.nickgorton.org))

Gorton R. *A Critical Analysis of the Hayes Report: "Sex Reassignment Surgery and Associated Therapies for Treatment of GID."* Report prepared for the Lambda Legal Defense Fund. May 2005.

*Greenberg's Text Atlas of Emergency Medicine*, Michael Greenberg Ed. Lippincott Williams & Wilkins. ISBN 0-7817-4586-1 2004. Contributing Author: Chapter 4 – Eyes/Ophthalmic.

Gorton R. "Toward a Resolution of GID, the Model of Disease, and the Transgender Community." MAKE. March 2005. http://www.makezine.org/giddisease.htm https://web.archive.org/web/20080524033311/http://www.makezine.org/giddisease.htm

Sinnert R, et al, Gorton R. "The ratio of ionized calcium to magnesium modifies the bronchodilatory effects of magnesium therapy in acute asthma." Aced Emerg Med 2002 9(5) 436-437.

Morris D, Rosamond W, Hinn A, Gorton R. "Time delays in accessing stroke care in the emergency department." Acad Emerg Med 1999 Mar; 6(3) 218-23.

Rosamond W, Gorton R, Hinn A, Hohenhaus S, Morris D. "Rapid response to stroke symptoms: the Delay in Accessing Stroke Healthcare (DASH) study." Acad Emerg Med 1998 Jan; 5(1) 45-51.

**Selected Conference Presentations and Invited Talks**

Gorton, R. Sexual Health Services for TG/NG/GNC clients. California Department of Public Health. STD Prevention and Control Local Capacity Building Webinar Series. November 2021

Gorton, R. Transgender Medicine. Touro University College of Osteopathic Medicine. March 2021.

Gorton, R. LGBTIQ in the Emergency Department. WellSpan Department of Emergency Medicine, Grand Rounds. York, PA. February 2021.

Del Rios, M, Ennis, K, Gorton, R, Kass, D, Moreno-Walton, L, & Purakal, J. The Other Public Health Emergency How Inherent Bias Affects Healthcare. ACOEP Scientific Assembly. October 2020

Gorton, R, Gruberg, S, Tobin, Harper Jean. Plenary IV: Fighting for LGBT Health Policy Protections: Health Providers' Crucial Role in Advocacy. GLMA 2019. New Orleans, LA, September 2019.

Gorton, R. Genital Gender Affirming Surgery for the Transgender Patient: A Didactic and Hands-on Fresh Cadaver-Based Course: "Hormone Replacement for Transgender Patients". American Urological Association 2018. San Francisco, CA. May, 2018.

Gorton, R, Jaffe, JM, Tescher, J, and Baker, K.  "Mini-Symposium: As California Goes, So Goes the Nation (Hopefully)". USPATH. February, 2017.

Gorton, R. Session Moderator. USPATH Symposium. San Francisco CA. February, 2017.

Gorton, R. "Acute and Long Term Complications of Silicone Pumping: Primary, Secondary, and Tertiary Prevention". WPATH Symposium. Amsterdam, The Netherlands. June, 2016.

Gorton, R, Ettner, R, Brown, G, Bermudez, F, Orthwein, J and Mazur, T. "Orange isn't the New Black (Yet)". WPATH Symposium. Amsterdam, The Netherlands. June, 2016.

Gorton R. "Transgender Patient Care in the Emergency Department". American Academy of Emergency Medicine Scientific Assembly. Las Vegas, Nevada. February 2016.

Gorton R. "Transgender Patients in the Emergency Department". Stanford University Department of Emergency Medicine SimWars. Stanford, CA. February 2016.

Gorton R. "History of Transgender Medicine". UCSF School of Medicine Transgender Health elective. San Francisco, CA. February 2016.

Gorton R. "Free Silicone Complications and Management". National Transgender Health Summit. Oakland, CA. April 2015.

Gorton R. "History of Transgender Medicine". UCSF School of Medicine Transgender Health elective. San Francisco, CA. March 2015.

Gorton R. "Transgender Healthcare". UC Davis School of Medicine. Sacramento, CA. December 2015.

Gorton R. "Engaging and Retaining Transgender Patients in Ongoing Primary Care". National Association of Community Health Centers Health Institute and Expo. San Diego, CA. August 2014.

Gorton R. "Sexual and Reproductive Health: A Focus on Transgender Patients". California Family Health Council. Webinar. March 2014.

Gorton, R, Green, J and Tescher, J. "California Dreaming: Two Decades of Change in Health Insurance Law and Policy". WPATH Symposium. Bangkok, Thailand. February, 2014.

Gorton, R and Chung, C. "From Grassroots Health Advocacy to Expanding Clinician Competency: Project HEALTH (Harnessing Education, Advocacy & Leadership for Transgender Health)". WPATH Symposium. Bangkok, Thailand. February, 2014.

Gorton, R and Tescher, J. "Minding the Gap: Development and Implementation of a Clinical Rotation in Transgender Health". WPATH Symposium. Bangkok, Thailand. February, 2014.

Gorton R and Keenan C. "LGBT Sexual and Reproductive Health Issues". California Family Health Council Women's Health Update. San Francisco, CA. April, 2013.

Gorton R. "Transgender Medicine". California AHEC Webinar. San Francisco, CA. April, 2013.

Gorton R. "Transgender Aging Issues". Institute on Aging Conference on LGBT Aging. San Francisco, CA. November, 2012.

Gorton R and Branning N. "Transgender Primary Care". California Academy of Physician Assistants Annual Conference. Palm Springs, CA. October, 2012.

Gorton R. "Primary care and Hormonal Treatment for Transgender Clients". Samuel Merritt University. Oakland, CA. June 2012.

Gorton R. "Primary care and Hormonal Treatment for Transgender Clients" Grand Rounds for the VA Medical Center. San Francisco, CA. June 2012.

Gorton R and Wertz K. "Transgender Health Care" Webinar for the California Family Health Council. San Francisco, CA. June, 2012.

Eichenbaum J, Gorton R and May A. "Transgender Health, the VA, and Barriers to Care." San Francisco Veterans Administration Mental Health Services Grand Rounds. San Francisco, CA. May, 2012.

Gorton R and Wertz K. "Working With GLBT Clients" California Family Health Council Webinar. Los Angeles, CA. May, 2011.

Gorton R. "Improving Access to Transgender Health Care: Outcomes from Project HEALTH" World Professional Association for Transgender Health. Atlanta, GA. September, 2011.

Gorton R and Wertz K. "Trailblazing for Transgender Health" Southern Comfort Conference. Atlanta, GA. September, 2011.

Gorton R. "Nuts and Bolts of Transgender Primary Care" Gay and Lesbian Medical Association Annual Conference. Atlanta, GA. September, 2011.

Gorton R. "Transgender Medicine and Cultural Competency" Kaiser Department of OB/Gyn Grand Rounds. San Francisco, CA. April, 2011.

Gorton R. "Evidence Based Transgender Medicine" Opening Plenary UCSF National Transgender Health Summit. San Francisco, CA. January, 2011.

Green J and Members of the Center of Excellence for Transgender Health Medical Advisory Board. "Primary Care Protocols" Morning Plenary UCSF National Transgender Health Summit. San Francisco, CA. January, 2011.

Freshel K, Gorton R, Hansom C and Barnes A. "Communities Working Together to Become Culturally Competent" California State Rural Health Association Conference. Sacramento, CA. November, 2010.

Gorton R, Spade D and Wilkinson W. "Transposium: Healthcare Access and Quality For Transgender Individuals" Shaking the Foundations: The West Coast Conference on Progressive Lawyering, Primary Care Associate Program, Stanford School of Law. Stanford CA. October, 2010.

Gorton R. "Improving Access to Transgender Healthcare: Outcomes from Project HEALTH (Harnessing Education, Advocacy, and Leadership for Transgender Health)" Gay and Lesbian Medical Association Annual Conference. San Diego, CA. September 2010.

Gorton R, Gould D and Wertz K. "Trailblazing for Transgender Health" National Gay and Lesbian Task Force Creating Change Conference. March 2010.

Gorton R. "Grand Rounds: Transgender Medicine" Highland General Hospital Department of Internal Medicine. Oakland, CA. January, 2010.

Gorton R. "Grand Rounds: Transgender Medicine" Kaiser Permanente Department of Internal Medicine. San Francisco, CA. December, 2009.

Keatley J and Gorton R. "Transgender Health Care Issues in California Today" Equality California and the California LGBT Legislative Caucus Briefing on LGBTI Health Care Issues. Sacramento, CA. December 2009.

Ehrbar R, Winters K, and Gorton R. "Revision Suggestions for Gender Related Diagnoses in the DSM and ICD" WPATH XXI Biennial Symposium. Oslo, Norway. June, 2009.

Gorton R. "A Place at the Table" American College Health Association Annual Meeting. San Francisco, CA. May, 2009.

Famula M, Hall A, Pardo S, Gorton R. "Providing Trans-Specific Health Care to Transgender Students in the College Setting." American College Health Association Annual Meeting. San Francisco, CA. May, 2009.

Gorton R. "Transgender Health" American Medical Student Association: Regional Conference. Lubbock, TX. March, 2009.

Gorton R. "Medical Ethics and Evidence Based Transgender Medicine" Equality and Parity II: A Statewide Action for Transgender HIV Prevention and Care. Los Angeles, CA, January 2009.

Gorton R. "Transgender Medicine 101" AMSA Regional Conference. Lubbock, TX. December, 2008.

Gorton R, Djordjevic M, and Brownstein M. "Female to Male (FTM) Health Update" (Provider Session) The 7th Annual Mazzoni Center Trans-Health Conference. Philadelphia, PA. May 2008.

Gorton R. "FTM Hormones 201." (Community Session) The 7th Annual Mazzoni Center Trans-Health Conference. Philadelphia, PA. May 2008.

Green J, Gorton R, Razza R, and Tamar-Mattis A, "Healthcare and Access Issues Panel." University of California Hastings College of the Law Transposium Conference. April 2008.

Arkles G, Gorton R, Sanchez D, Suarez C. "Trans Issues in Health Care Panel." Harvard Law School Lambda Legal Advocacy Conference. February 2008.

Gorton R, Thaler C, and Keisling M. "Drawing the Curtain: An Overview of Medical Privacy Protections and Risks for Transgender Patients and Providers." WPATH Symposium, 2007, Chicago.

Gorton R. "Transgender Medicine 2007: A Medical Ethics and Evidence Based Paradigm Shift." (Provider Session) The 6th Annual Mazzoni Center Trans-Health Conference. Philadelphia, PA. April 2007.

Gorton R. "FTM Hormones 201." (Community Session) The Sixth Annual Mazzoni Center Trans-Health Conference. Philadelphia, PA. April 2007.

Gorton R. "Medical Ethics and Evidence Based Transgender Medicine." FORGE Forward. Milwaukee WI. March 2007.

Gorton R. "FTM Hormonal Treatment: Beyond 101." FORGE Forward. Milwaukee WI. March 2007.

Gorton R. "Transgender Healthcare in 2007: Its Time to Take it Seriously." Humboldt State University 13th Annual Diversity Conference and Education Summit. Arcata CA. March 2007.

Spade D, Gehi P, Arkles G, and Gorton R. "Barriers to health care access for transpeople." UCLA School of Law, Williams Institute Annual Update. Los Angeles, CA. February 2007.

Marksamer J and Gorton R. "Legal Support and Advocacy for Transgender Youth and Their Families." Gay and Lesbian Medical Association Annual Conference. San Francisco, CA. October 2006.

Gorton R. "Hormone Therapy 101." FTM-Gender Odyssey 2006. Seattle, WA. September 2006.

Gorton R. "Hormone Therapy 201." FTM-Gender Odyssey 2006. Seattle, WA. September 2006.

Gorton R. "Transgender Medicine." California Department of Health Early Intervention Program Statewide Conference. May 2006.

Gorton R. "Primary Care and Hormonal Therapy for Transgender Males." (Provider Session) The 5th Annual Mazzoni Center Trans-Health Conference. Philadelphia, PA. March 2006.

Gorton R. "Health Maintainence for Transgender Men." (Community Session) The 5th Annual Mazzoni Center Trans-Health Conference. Philadelphia, PA. March 2006.

Gorton R. "Primary Care and Hormonal Therapy for Transgender Males." The

23rd Annual Conference of the Gay and Lesbian Medical Association. Montreal, Canada. September, 2005.

Spade, D, and Gorton R. "Medical-Legal Policy Update in the Quest for Trans Health Care and Justice." The 23rd Annual Conference of the Gay and Lesbian Medical Association. Montreal, Canada. September, 2005.

Arkles Z, and Gorton R. "Medical-legal Collaboration in the Quest for Trans Health Care and Justice" The 19th Biennial Symposium of the Harry Benjamin International Gender Dysphoria Association. Bologna, Italy. April, 2005.

## Professional Advocacy

Supported as physician member of the American Medical Association for adoption of inclusive language for transgender people within AMA policy. "Recommendations to Modify AMA Policy to Ensure Inclusion for Transgender Physicians, Medical Students and Patients." Accepted by the AMA Board of Delegates July 2007. See "AMA Meeting: Anti-discrimination policy extended to transgendered." AMA News July 16, 2007. http://www.ama-assn.org/amednews/2007/07/16/prsk0716.htm. Policy amendment available at: http://www.ama-assn.org/ama1/pub/upload/mm/467/bot11a07.doc

Authored and proposed with Vernon A, and Maxey K. *Resolution to amend the American College of Emergency Physicians 'Code of Ethics for Emergency Physicians.'* Accepted as policy October 2005. Now reads (amended language underlined): "Provision of emergency medical treatment should not be based on gender, age, race, socioeconomic status, <u>sexual orientation, real or perceived gender identity</u>, or cultural background."

## Awards

Claire Skiffington Vanguard Award. Transgender Law Center. San Francisco, CA. 2012.

# EXHIBIT B

**Documents Reviewed**

| Client | Document | Bates Range |
|--------|----------|-------------|
| | 000216-000220 - Utah-DOC-AG37-Diagnosis-Treatment-of-Offenders | 000216-000220 |
| Dombroski, Stephanie | Stephanie Dombroski #252408 medical records | SD000001 - SD0001192 |
| Dombroski, Stephanie | Dombroski #211700374 Minutes - Stephanie Dombroski | SD001199 - SD1200 - 252408 |
| Dombroski, Stephanie | Dombroski, Stephen 990929031-Clothing Laundry Redacted | SD001201 - SD001206 |
| Dombroski, Stephanie | Dombrowski, Stephen Staff Inmate Relations Redacted | SD001209 - SD001213 |
| Dombroski, Stephanie | Stephanie Dombroski CAP | SD001224 - SD001226 0 |
| Dombroski, Stephanie | Stephanie Dombroski Class Enrollment | SD001227 |
| Dombroski, Stephanie | Stephanie Dombroski Class History | SD001228 |
| Dombroski, Stephanie | Stephanie Dombroski MD1 Redacted | SD001230-SD001234 |
| Dombroski, Stephanie | Stephanie Dombroski MD2 Redacted | SD001235 |
| Dombroski, Stephanie | Stephanie Dombroski Supervision C-Notes Redacted | SD001236 - SD001240 |
| Dombroski, Stephanie | Stephanie DOMBROSKIs.L2.9090930350.resolved Redacted | SD001241 - SD001243 |
| Dombroski, Stephanie | 7.1.25 Stephanie Dombroski UDC Response | SD001244-SD001247 |
| Dombroski, Stephanie | Dombroski Navy Records | SD001252-SD002263 |
| Phillips, Sandy | Phillips, Sandy __133168_01-01-15_to_05-22-25_medical_records | SP000001 - SP000285 |
| Phillips, Sandy | Phillips, Sandy Class Hx | SP000290 - SP000293 |
| Phillips, Sandy | Phillips, Sandy MD1 Redacted - ICR Reports | SP000294 - SP000316 |
| Phillips, Sandy | Phillips, Sandy MD2 Redacted - Disciplinary Findings | SP000317 - SP000322 |
| Tucker, Virginia | (Virginia Tucker) Ric. Dow. Rel 162397889 EMR | VR003496 - VR003926 |
| Tucker, Virginia | V. Ricks - 25.04.15 Medical Records, Grievance(s), ADA | VT000001 - VT000031 |
| Tucker, Virginia | 25.08.19 Virginia Ricks - Grievances | VT000032 - VT000050 |
| Tucker, Virginia | Virginia Ricks - 0463_001 | VT000051 - VT000065 |
| Tucker, Virginia | Ricks Medical Records 08-08-19_to_08-26-25 (Part_1) | VT000072-VT002907 |
| Tucker, Virginia | Ricks Medical Records 08-08-19_to_08-26-25 (Part_2) | VT002908-VT003137 |
| Tucker, Virginia | Dowlin_Ricks_MD1_Redacted | VT003141 - VT003397 |
| Tucker, Virginia | Dowlin_Ricks_MD2_Redacted | VT003398 - VT003448 |
| Tucker, Virginia | Dowlin_Ricks_Prior_Program_Hx | VT003451 |
| Tucker, Virginia | Grievances_Redacted | VT003452-VT003494 |
| | 2025.12.09 DKT 001 Complaint | |