David W. Tufts (Bar No. 8736)
DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111
Telephone: 801-415-3000
Email: david.tufts@dentons.com

*Counsel for Plaintiffs*
[Additional Counsel on Following Page]

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| VIRGINIA TUCKER, STEPHANIE DOMBROSKI, SANDY PHILLIPS, DAKOTA GRUNWALD, and AMBERLI K. MORRIGAN<br><br>    Plaintiffs,<br><br>v.<br><br>UTAH DEPARTMENT OF CORRECTIONS; JARED GARCIA, EXECUTIVE DIRECTOR OF THE UTAH DEPARTMENT OF CORRECTIONS, *in his official capacity*; SHARON D'AMICO, WARDEN OF THE UTAH STATE CORRECTIONAL FACILITY, *in her official capacity*; UTAH DEPARTMENT OF HEALTH AND HUMAN SERVICES; TRACY GRUBER, EXECUTIVE DIRECTOR OF THE UTAH DEPARTMENT OF HEALTH AND HUMAN SERVICES, *in her official capacity*; DR. STACEY BANK, EXECUTIVE MEDICAL DIRECTOR OF CLINICAL SERVICES UTAH DEPARTMENT OF HEALTH AND HUMAN SERVICES, *in her official capacity; and* DR. MARCUS WISNER, DIRECTOR OF CORRECTIONAL HEALTH SERVICES, UTAH DEPARTMENT OF HEALTH AND HUMAN SERVICES, *in his official capacity.*<br><br>    Defendants. | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Civil Case No.: 2:25-cv-01108-TC<br><br>Judge Tena Campbell |

Jacqueline A. Domenella*
Diane O'Connell*
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606-6361
Telephone: 312-876-8000
Email: jacqui.domenella@dentons.com
Email: diane.oconnell@dentons.com

Evan Wolfson*
Hannah Rochford*
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone: 212-768-6700
Email: evan@freedomtomarry.org
Email: hannah.rochford@dentons.com

Anna Isernia*
DENTONS US LLP
1900 K Street NW
Washington, DC 20006
Telephone: 202-496-7500
Email: anna.isernia@dentons.com

Jason M. Groth (Bar No. 16683)
Abigail Cook (Bar No. 19781)
Tom Ford (Bar No. 19795)
Masami T. Kanegae (Bar No. 20270)
ACLU OF UTAH FOUNDATION, INC.
311 South State St., Suite 310
Salt Lake City, UT 84111
Telephone: 801-521-9862
Email: jgroth@acluutah.org
Email: acook@acluutah.org
Email: tford@acluutah.org
Email: MKanegae@acluutah.org

Sonja D. Kerr*
Elizabeth P. Dankers*
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Telephone: 610-675-7192
Email: skerr@lambdalegal.org
Email: ldankers@lambdalegal.org

Richard Saenz*
Whit Washington*
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: 212-809-8585
Email: rsaenz@lambdalegal.org
Email: wwashington@lambdalegal.org

*Counsel for Plaintiffs*

*Pro hac vice* granted by the Court.

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................................ 1

II.   ARGUMENT ..................................................................................................................... 2

    A.  Plaintiffs Have Demonstrated a Strong Likelihood of Success on Their Eighth Amendment Claim ................................................................................................................ 2

        i.    Defendants Do Not Seriously Contest the Gender Dysphoria is a Serious Medical Condition and Concede that Plaintiffs Each Have Gender Dysphoria. ................................. 3

        ii.   Defendants' Categorical Prohibition on Providing Medically Necessary Hormone Therapy Constitutes Deliberate Indifference. ........................................................................ 4

            a)    Hormone Therapy is a Widely Accepted and Evidence-Based Treatment for Gender Dysphoria and, for Some, It Is Medically Necessary. ......................................................... 4

            b)    Defendants Mischaracterize Tenth Circuit Precedent ................................................. 7

            c)    H.B. 252 and GEN-29.00 Prevent the Provision of Adequate Medical Care by Overriding Providers' Independent Judgment. ................................................................... 10

            d)    Defendants Continue to Deny Adequate Medical Care. ........................................... 11

            e)    Defendants' Subjective Deliberate Indifference Is Longstanding and Readily Apparent. ............................................................................................................................ 15

    B.  Plaintiffs Continue to Suffer Irreparable Harm in the Absence of Adequate Medical Care 16

    C.  The Public Interest and Balance of Equities Favor Plaintiffs ......................................... 18

    D.  Plaintiffs' Requested Injunctive Relief is Proper ........................................................... 18

    E.  Defendants' Motions Should be Denied ......................................................................... 20

III.  CONCLUSION ................................................................................................................. 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Benjamin v. Oliver*,
No. 25-04470, 2025 WL 2542072 (N.D. Ga. Sept. 4, 2025).......................................................7

*Blake v. Wallace*,
No. 22-3163, 2024 WL 5087805 (10th Cir. Dec. 12, 2024)........................................................5

*Brown v. Plata*,
563 U.S. 493 (2011)....................................................................................................................19

*Brown v. Zavaras*,
63 F.3d 967 (10th Cir. 1995) ........................................................................................................8

*Clement v. California DOC*,
364 F.3d 1148 (9th Cir. 2004) ....................................................................................................19

*Colwell v. Bannister*,
763 F.3d 1060 (9th Cir. 2014) ....................................................................................................10

*Cordellione v. Comm'r, Indiana Dep't of Corr.*,
No. 23-00135, 2024 WL 4333152 (S.D. Ind. Sept. 17, 2024).....................................................4

*De'lonta v. Johnson*,
708 F.3d 520 (4th Cir. 2013) ......................................................................................................14

*Edmo v. Corizon, Inc.*,
935 F.3d 757 (9th Cir. 2019) ........................................................................................................7

*Est. of Cole by Pardue v. Fromm*,
94 F.3d 254 (7th Cir. 1996) ..........................................................................................................5

*Estelle v. Gamble*,
429 U.S. 97 (1976)........................................................................................................................2

*Farmer v. Brennan*,
511 U.S. 825 ...............................................................................................................................15

*Fields v. Smith*,
653 F.3d 550 (7th Cir. 2011) .................................................................................................14, 19

iv

*Hardeman v. Smith*,
764 F. App'x 658 (10th Cir. 2019) ........................................................................12

*Hicklin v. Precynthe*,
No. 16-01357, 2018 WL 806764 (E.D. Mo. Feb. 9, 2018).......................................18

*Johnson v. Sanders*,
121 F.4th 80 (10th Cir. 2024) .......................................................................3, 9, 11

*Jordan v. Pugh*,
No. 02-01239, 2007 WL 2908931 (D. Colo. 2007)................................................19

*Lamb v. Norwood*,
899 F.3d 1159 (10th Cir. 2018) ...................................................................6, 7, 8, 9

*Loughrin v. United States*,
573 U.S. 351 (2014)................................................................................................19

*Oakleaf v. Frawner*,
No. 15-0220, 2016 WL 10179304 (D.N.M. July 19, 2016) ...................................3, 8

*Qz'etax v. Ortiz*,
170 F. App'x 551 (10th Cir. 2006) ........................................................................10

*Supre v. Ricketts*,
792 F.2d 958 (10th Cir. 1986) .................................................................................8

*United States v. Skrmetti*,
605 U.S. 495 (2025)..................................................................................................7

**Statutes**

18 U.S.C. § 3626................................................................................................18, 19, 20

## I.    INTRODUCTION

Plaintiffs Virginia Tucker, Stephanie Dombroski, and Sandy Phillips[1] (collectively, the "Plaintiffs") have amply demonstrated the propriety and importance of a preliminary injunction enjoining Defendants from enforcing H.B. 252 and GEN-29.00's blanket ban on the initiation of medically necessary hormone replacement therapy ("hormone therapy" or "HRT") for the treatment of Plaintiffs' gender dysphoria, which violates Plaintiffs' Eighth Amendment rights.

*First*, Plaintiffs are likely to succeed on the merits of their Eighth Amendment claim because Defendants' blanket ban on the provision of medically necessary HRT constitutes deliberate indifference to Plaintiffs' serious medical need of gender dysphoria. Defendants' allegations of "controversy" surrounding HRT are a red herring, contradicted by leading medical standards and belied by Defendants' own actions in continuing to provide HRT to some incarcerated people who had been receiving it previously.

*Second*, each Plaintiff is suffering and will continue to suffer imminent and irreparable harm in the absence of a preliminary injunction. Plaintiffs' testimony, as supported by the record, demonstrates the severe psychological distress they experience and the very real risk of further harm, as indicated by past behavior, they face due to inadequate treatment for gender dysphoria.

---

[1] Plaintiffs respectfully note that the intentional or repeated misuse of a party's or witness's correct name and pronouns is inconsistent with the standards of professional conduct. (*See* ECF No. 81, Dr. Levine Report at ¶ 152 n.21; ECF No. 82-2, Dr. Levine Report at ¶ 13.) Attorneys are obligated to maintain civility, fairness, and respect in all interactions, and may not engage in, or permit those under their direction or control to engage in, conduct that is demeaning, harassing, or reflects ill will toward any person. Utah practice further contemplates that parties will be addressed in accordance with their stated names, honorifics, and pronouns. *See* Utah Standards of Professional Responsibility, UTAH STATE COURTS (Apr. 15, 2026), https://www.utcourts.gov/en/about/courts/appellate-courts/civility.html; *see also* Notice of Pronouns, UTAH STATE COURTS (Apr. 15, 2026), https://www.utcourts.gov/en/legal-help/legal-help/procedures/pro-se/pronouns.html.

*Third*, the balance of equities favors an injunction which is in the public interest because H.B. 252 and Defendants' policies are unconstitutional both facially and as applied to Plaintiffs, and Defendants do not raise any harms they will suffer if enjoined.

Plaintiffs request that the Court enjoin Defendants from enforcing H.B. 252, and their pre-existing policies and practices, that have delayed and denied medically necessary treatments for gender dysphoria and deprived Plaintiffs of individualized medically necessary treatments, and direct Defendants to provide the Plaintiffs with adequate medical care, including HRT.

## II.   ARGUMENT

### A.   Plaintiffs Have Demonstrated a Strong Likelihood of Success on Their Eighth Amendment Claim

Contrary to Defendants' attempt to narrow the constitutional question before the Court, fifty years of U.S. Supreme Court and Tenth Circuit precedent recognize an incarcerated person's right to challenge the denial of adequate medical care under the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97 (1976). Plaintiffs do not claim a right to any specific treatment, but challenge Defendants' prohibition on and failure to provide adequate medical care for the serious medical condition of gender dysphoria. Plaintiffs have met the two-pronged test for establishing a claim for failure to provide proper medical care, demonstrating both (i) the serious medical need of gender dysphoria—which Defendants do not seriously contest (nor could they)—and (ii) Defendants' deliberate indifference through their prior policies of delay and denial and their implementation of HB 252 and GEN-29.00's blanket ban on hormone therapy, which Defendants attempt to avoid by manufacturing controversy where there is consensus, misconstrue relevant case law, and ignore implications of their own policies and actions.

2

> **i.    Defendants Do Not Seriously Contest the Gender Dysphoria is a Serious Medical Condition and Concede that Plaintiffs Each Have Gender Dysphoria.**

As acknowledged in Defendants' Opposition (ECF No. 84, Opp. at 17 n.7), the Tenth Circuit treated gender dysphoria as a "serious medical need" in *Johnson v. Sanders*, 121 F.4th 80, 89 (10th Cir. 2024). While the *Johnson* Court "assume[d], without deciding" that gender dysphoria is a serious medical need, that is because it is almost always uncontested. *Id.* (collecting cases); *Oakleaf v. Frawner*, No. 15-0220, 2016 WL 10179304, at *6 (D.N.M. July 19, 2016) (noting that the Court has found zero cases brought by incarcerated transgender individuals in which the objective component was not met); *see also* ECF No. 35, Mot. for PI at 17 n. 6. Here, Defendants made no argument as to why gender dysphoria is not a serious medical need, and thus it should be considered conceded.

Similarly, Defendants concede that Plaintiffs each have gender dysphoria. (*See* Opp. at 11 (referring to allegedly available "resources for treating their gender dysphoria[.]").) Each was diagnosed with gender dysphoria by a provider contracted by UDC.[2] Further, Plaintiffs' experts confirm the diagnosis for all three Plaintiffs (ECF No. 39, Golden Decl. ¶¶ 16–17, 27–30, 32–33; ECF No. 38, Gorton Decl. ¶¶ 51, 66, 89, 97, 107), which Defendants' experts do not rebut.

---

[2] *See* ECF No. 87-16 (Ms. Tucker's 1/9/25 diagnosis); ECF No. 87-8 (grievance response acknowledging Ms. Dombroski's diagnosis); ECF No. 87-21 (Ms. Phillips' 11/27/24 evaluation and diagnosis). Ms. Phillips' records inexplicably reflect a diagnosis of Gender Identity Disorder despite Defendants' then-prevailing AG37 Policy which required evaluation and diagnosis of gender dysphoria based on the DSM-5 criteria. (ECF No. 36-2, AG37/2.03.)

3

### ii.   Defendants' Categorical Prohibition on Providing Medically Necessary Hormone Therapy Constitutes Deliberate Indifference.

#### a)   Hormone Therapy is a Widely Accepted and Evidence-Based Treatment for Gender Dysphoria and, for Some, It Is Medically Necessary.

Contrary to Defendants' unsupported claims, HRT is widely accepted as an effective and evidence-based treatment for gender dysphoria and, for some, it is medically necessary. (ECF No. 35 at 3-5.) Any supposed "controversy" regarding the use of HRT to treat adults with gender dysphoria is contradicted by Defendants' own actions and the evidence presented.

First, Defendants' erroneous claim that HRT is ineffective or "dangerous" is belied by their own policies and practices. Defendants' AG37, which was in effect until January 2025, specifically provided that "[t]reatment with hormones may be ordered[.]" (ECF No. 36-2, AG37/2.04.) Both H.B. 252 and GEN-29.00 allow the continuation of HRT if such treatment began prior to incarceration—or prior to the enactment of H.B. 252 and GEN-29.00. (ECF No. 36-1, H.B. 252; ECF No. 54-2, GEN-29.00.) Defendants cannot now contend that HRT is an inappropriate form of treatment when Defendants are currently providing HRT to other incarcerated people with gender dysphoria, including Plaintiffs Amberli Morrigan and Dakota Grunwald. (ECF No. 52, FAC ¶¶ 235, 258.) Indeed, Defendants have offered no evidence to show that HRT is safe and effective if initiated before May 7, 2025, but unsafe and ineffective for Plaintiffs to begin today. Any such suggestion is a farce. *Cordellione v. Comm'r, Indiana Dep't of Corr.*, No. 23-00135, 2024 WL 4333152, at *18 (S.D. Ind. Sept. 17, 2024) (finding ban on gender-affirming surgery "evinces deliberate indifference" considering "IDOC had previously recognized that gender-affirming surgery was medically necessary care for some individuals with gender dysphoria.").

4

Second, the weight of the evidence shows that HRT is a medically accepted treatment for adults with gender dysphoria. (ECF No. 35, Mot. for PI at 3-5; ECF No. 38, Gorton Decl. ¶¶ 37-39; ECF No. 39, Golden Decl. ¶¶ 9-11.) Defendants and their experts spend considerable space attacking the World Professional Association for Transgender Health ("WPATH") Standards of Care, Version 8 ("SOC8") and other guidelines endorsing the use of HRT to treat adults with gender dysphoria. Of course, Plaintiffs' Motion does not turn on the WPATH SOC8 or refer to it as the constitutional standard. Rather, the WPATH SOC8—like the Endocrine Society's Clinical Guidelines, National Commission on Correctional Healthcare Position Statement, and expert opinions—reflect the accepted professional standards for treating gender dysphoria and are persuasive evidence that gender dysphoria requires individualized medical treatment and that HRT can be medically necessary. *See*, *e.g*., *Est. of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996) (deliberate indifference can be inferred "when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment."); *Blake v. Wallace*, No. 22-3163, 2024 WL 5087805, at *4 (10th Cir. Dec. 12, 2024) (same).

Defendants do not dispute that numerous medical and mental health professional associations apart from WPATH and the Endocrine Society endorse HRT to treat gender dysphoria. Instead, to support the alleged "disagreement within the medical community" (ECF 82, Opp. at 4), Defendants resort to mischaracterizing inapplicable studies. For example, they rely on the Cass Review,[3] which is focused on children and young people under 18 and thus has little to

---

[3] Hilary Cass, *Independent Review of Gender Identity Services for Children and Young People: Final Report*, at 19, 20 https://webarchive.nationalarchives.gov.uk/ukgwa/20250310143933/ https://cass.independent-review.uk/home/publications/final-report/

5

no relevance to these Plaintiffs who are 25 (Ms. Tucker), 49 (Ms. Dombroski), and 53 (Ms. Phillips). In any event, with respect to adults, the Cass Review notes that hormone therapy "is a well-established practice that has transformed the lives of many transgender people" and "the physical costs are dramatically outweighed by the long-term benefits." *Id*. at 182.

Defendants also misinterpret the Baker Review (ECF No. 82-3), inaccurately claiming that the strength of evidence supporting the benefits of HRT to treat adults with gender dysphoria is "low." (ECF 82, Opp. at 6.) As Dr. Baker himself has explained, the "low" strength qualifier "does *not* mean that a body of evidence is deficient or unreliable but rather is a reflection of the type of study design available to, and employed by researchers in the field." Ex. 1, Brief of Dr. Kellan Baker, as Amicus Curiae, in Support of Plaintiffs-Appellees Seeking Affirmance at 26, *Benjamin v. Oliver*, No. 25-14263 (11th Cir. Mar. 27, 2026). The use of "low" quality studies is based on the lack of randomized controlled trials in the field—due to ethical and feasibility concerns—but "does not diminish the analytic weight or scientific value of the evidence." *Id*. at 26-33. Dr. Baker summarized the results of his review:

> The Baker Review concludes that hormone treatment is positively correlated with stability or improvement in measures of depression, anxiety, and quality of life among people with gender dysphoria. Among studies included in the Review, none showed that these treatments were associated with *decreases* in any health outcomes, nor did any conclude that hormone therapy causes harm.

*Id*. at 23. Defendants' criticisms and misinterpretations of Dr. Baker's review should be rejected.

Third, Defendants fail to grapple with the jurisprudence raised in Plaintiffs' opening brief in which courts across the country have routinely endorsed hormone therapy as an acceptable and medically necessary treatment for adults with gender dysphoria, including the Tenth Circuit. In *Lamb v. Norwood*, 899 F.3d 1159, 1161 (10th Cir. 2018), the Court recognized "[h]ormone therapy to

6

feminize or masculinize the body" as a form of treatment for adults with gender dysphoria. Other courts have found the same. *See*, *e.g*., *Edmo v. Corizon, Inc*., 935 F.3d 757, 769 (9th Cir. 2019) (citing to WPATH as the "internationally recognized guidelines for the treatment of individuals with gender dysphoria" and noting that treatment includes HRT); *Benjamin v. Oliver*, No. 25-04470, 2025 WL 2542072, at *4 (N.D. Ga. Sept. 4, 2025) (finding categorical ban on HRT "in tension with case law recognizing that, in appropriate circumstances, hormone therapy can be medically necessary for gender dysphoria"; collecting cases).

Defendants' only response was to take the Tenth Circuit's decision in *Lamb* out of context, as discussed below, and to cite repeatedly the U.S. Supreme Court's decision in *United States v. Skrmetti*, 605 U.S. 495 (2025). The *Skrmetti* decision is inapplicable. It rejected an Equal Protection challenge to a state statute regulating the practice of medicine exclusively for minors with gender dysphoria under a rational basis review that the Court deemed appropriate for classifications based on age and medical condition in the context of medical treatment for minors. *United States v. Skrmetti*, 605 U.S. 495, 511 (2025). *Skrmetti* did not address gender-affirming medical care for adults at all and certainly did not apply the constitutional frameworks applicable to an incarcerated adult population to whom the state owes an affirmative constitutional duty to provide adequate medical care. *Id.*

### b) Defendants Mischaracterize Tenth Circuit Precedent.

Defendants' journey through Tenth Circuit case law on the medical needs of incarcerated transgender people serves only to demonstrate the incredible strides made in the treatment of adults with gender dysphoria in the past four decades. None of these cases establishes that a state's blanket ban on the provision of medically necessary treatment passes constitutional muster.

First, the Tenth Circuit's forty-year-old decision in *Supre v. Ricketts*, 792 F.2d 958 (10th Cir. 1986), was issued long-before gender dysphoria entered into the DSM-V in 2013 (ECF 38, Gorton Decl. ¶ 15) and does not acknowledge the clinical distress associated with the condition. The Tenth Circuit's holding that defendants' failure to treat plaintiff with estrogen did not constitute deliberate indifference should be viewed in the context of then-prevailing medical standards. *Supre* does not stand for the proposition that HRT is never constitutionally required. Instead, under the *Supre* framework, the court must consider whether defendants made an "informed judgment as to the appropriate form of treatment" for gender dysphoria and the resulting clinical distress. 792 F.2d at 963. H.B. 252 and GEN-29.00 are unconstitutional blanket bans under this framework because they prevent Defendants from making an "informed judgment" as to Plaintiffs' medical needs.

Second, the Court's decision a decade later in *Brown v. Zavaras*, 63 F.3d 967 (10th Cir. 1995), did not independently consider the efficacy of HRT. The Court simply repeated its holding in *Supre* while remanding for consideration of whether Brown received adequate care based on her allegations that she had not been offered ***any treatment at all***. *Id*. at 970. Taken together, *Brown* and *Supre* provide the boundaries of an Eighth Amendment claim:

> [W]here prison officials have made an informed judgment about the treatment offered, an inmate's disagreement with that judgment does not violate the Constitution. On the other hand, however, prison officials may not entirely ignore the medical needs of transgendered inmates, refusing any treatment at all for an inmate's transgender condition.

*Oakleaf*, 2016 WL 10179304, at *4 (internal citations omitted).

Third, the *Lamb v. Norwood* decision is demonstrative of the evolving field of treatment for gender dysphoria in the more than 30 years since *Supre*. 899 F.3d 1159. In *Lamb*, the plaintiff

was already receiving "hormone treatment, testosterone-blocking medication, and weekly counseling sessions." 899 F.3d at 1161. The Tenth Circuit specifically identified hormone therapy as a treatment for adults with gender dysphoria and made no suggestion that it was "controversial." *Id*. In light of the multiple treatments being provided, the Court held that defendants were not deliberately indifferent by failing to authorize surgery or different hormone dosages. *Id*. at 1163. *Lamb* is a far cry from this case in which Plaintiffs receive no treatment for their gender dysphoria, save for occasional counseling not focused on treating their gender dysphoria.

*Lamb* is further distinguishable because the defendants' refusal to offer the treatment Lamb requested was based on "the course of treatment recommended by a licensed medical doctor like Dr. Corbier." *Id*. In contrast, H.B. 252 and GEN-29.00 do not allow for the consideration of medical providers' reasoned judgment but require Defendants to deny the initiation of hormone therapy without consideration of medical necessity.

Finally, Defendants' citation to *Johnson v. Sanders*, 121 F.4th at 84, is inapplicable because Johnson was found not to have gender dysphoria. Thus, defendants' discontinuation of Johnson's HRT was not considered deliberate indifference but rather a decision by a medical provider to change treatment. *Id*. at 90-91. *Johnson* says nothing of whether the denial of medically necessary HRT to an incarcerated person with gender dysphoria is a constitutional violation.

In short, Tenth Circuit precedent confirms that there is no exception to the Eighth Amendment framework for an incarcerated transgender person's request for HRT as treatment for gender dysphoria; Defendants' decision to withhold medically necessary treatment must be based on an informed medical judgment. Here, it was not.

### c) H.B. 252 and GEN-29.00 Prevent the Provision of Adequate Medical Care by Overriding Providers' Independent Judgment.

It is undisputed that H.B.252 and the current version of GEN-29.00 both act as blanket bans on the initiation of HRT for the treatment of gender dysphoria, regardless of any individual determination of medical necessity. (ECF No. 36-1, H.B. 252; ECF No. 54-3, GEN-29.00 at IV.C.3.) Plaintiffs cited numerous cases in their opening brief holding that similar blanket bans are unconstitutional. (ECF No. 35 Mot. for PI at 20-21; *see also* Pls.' Opp. to MTD, ECF No. 81 at 17-19.)[4] Defendants inexplicably fail to address this line of cases. Instead, Defendants dramatically overstate *Qz'etax v. Ortiz*, 170 F. App'x 551 (10th Cir. 2006), which (a) addressed gender identity disorder ("GID") rather than gender dysphoria, and (b) turned on the pro se plaintiff's failure to sufficiently state how the policy was deliberately indifferent to her GID. *Qz'etax* in no way blesses the constitutionality of blanket bans on HRT in general.

By contrast, as Defendants must concede, the decisions to deny HRT to Plaintiffs were not because of any medical judgment that hormones were not medically necessary; the prison's policies, which precluded or overrode informed medical judgments, were the sole reason for the denials. Ms. Tucker was denied HRT solely because ███████████████████ ███████████████████ (ECF No. 82-5, Audu Decl. ¶ 29.) The same is true for Ms.

---

[4] Blanket bans have also been found to constitute deliberate indifference in contexts besides gender dysphoria. *See*, *e.g.*, *Colwell v. Bannister*, 763 F.3d 1060, 1068 (9th Cir. 2014) (holding that denial of cataract surgery "not because it wasn't medically indicated . . . but because the policy" was not to treat plaintiff's condition "is the very definition of deliberate indifference."). Defendants rely on a denial of a preliminary injunction in a challenge to a state law's blanket ban on care from an out-of-circuit district court that is easily distinguishable. In *Marcum v. Crews*, unlike here, the court found that there was no indication that the plaintiff was formally diagnosed with gender dysphoria, thus not meeting the first prong of the Eighth Amendment analysis. 2025 WL 2630922, at *5 (E.D.Ky. Sept. 12, 2025).

10

Phillips. (*Id.* ¶ 61.) While Defendants contend that Ms. Dombroski was denied HRT due to

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ (*Id.* ¶¶ 44-46.)

It is clear under Tenth Circuit precedent that Defendants cannot escape liability by relying on an administrative policy to deny care in the absence of medical judgment. *Johnson*, 121 F.4th at 92 ("Where a defendant has subjective knowledge that a course of action or inaction required by policy creates or fails to address a serious risk to an inmate's health or safety, he may not escape constitutional liability by disregarding such risk in compliance with the policy.").

### d)  Defendants Continue to Deny Adequate Medical Care.

Defendants cannot evade responsibility for failing to provide medically-necessary HRT by providing substandard, inadequate remedies that are not targeted at treating the serious medical need of gender dysphoria. Plaintiffs dispute both the level of care provided as alleged by Defendants (Opp. at 11), and its constitutional adequacy. Defendants have not provided individual treatment plans for Plaintiffs' gender dysphoria.

**Virginia Tucker:** Defendants denied Ms. Tucker HRT and delayed evaluating her for gender dysphoria for years. Defendants incorrectly claim that Ms. Tucker first reported distress due to her gender on January 30, 2024. (ECF No. 82-6, Forbush Decl. ¶ 11.) Three years earlier, on June 22, 2021, Ms. Tucker submitted a letter ████████████████████████████ ████████ (ECF No. 87-14, State of Utah -014638.) While Ms. Forbush admits that Ms. Tucker wrote a letter to CHS on January 30, 2024, stating she had gender dysphoria (ECF No. 82-6, Forbush Decl. ¶ 11), her gender dysphoria assessment did not occur until December 18, 2024 (*id.* ¶ 13). Ms. Forbush's claim that Ms. Tucker did not discuss gender dysphoria during the interim

11

eleven months is inaccurate. (*Id*. ¶ 12.) Ms. Tucker submitted a request for a gender dysphoria diagnosis in March 2024 (Ex. 2 at State of Utah -012295) and November 2024 (*id*. at State of Utah -011981-82). Shortly thereafter, ███████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████ (ECF No. 56-2, State of Utah -015152-53; *see also* ECF 36-6, Tucker Decl. ¶ 19.) On December 11, 2024, she submitted another request stating ██

████████████████████████████████████ (Ex. 2 at State of Utah -011889.)

The records further demonstrate that Ms. Tucker has had limited access to mental health therapy since her January 2025 gender dysphoria diagnosis. In 2025, Ms. Tucker was seen only five times by mental health providers.[5]

**Stephanie Dombroski:** Ms. Dombroski sought care for gender dysphoria in February 2024. (ECF No. 87-17; ECF No. 87-18, Declaration of Stephanie Dombroski ¶ 2.) After repeated requests to speak to a medical professional about her gender dysphoria, Dr. Hoglund conducted an initial assessment on April 10, 2024, where Ms. Dombroski ████████████████████████████

████████████████████████████████████████████████████████████████████████

(Ex. 3 at State of Utah -001692.)

In June 2024, Dr. Karen Malm diagnosed Ms. Dombroski with gender dysphoria. (ECF No. 87-8; ECF No. 85, Ex. 17, Dombroski Decl. ¶ 4.) In July 2024, the GD "interdisciplinary

---

[5] March 4, 2025 (Ex. 2 at State of Utah -011753–011755), April 24, 2025 (*id*. at State of Utah -011639), May 15, 2025 (*id*. at State of Utah -011582), June 10, 2025 (*id*. at State of Utah -011521), and September 9, 2025 (*id*. at State of Utah -011321). Several of these sessions were conducted in the hallway and "do not rise to the level of "psychotherapy[.]" *Hardeman v. Smith*, 764 F. App'x 658, 663 (10th Cir. 2019) (questioning whether in-cell meetings rise to the level of "psychotherapy[.]").

team" ███████████████████████████████████

(ECF No. 87-19; ECF No. 87-8.) It took nearly three weeks for Ms. Forbush to inform Ms.

Dombroski of the denial, ███████████████████████████████████

███████████████████████████ (Ex. 3 at State of Utah -001533.) Ms. Forbush told Ms.

Dombroski that ███████████████████████████████████ (ECF No.

87-18, Dombroski Decl. ¶ 7.) After that, mental health providers saw Ms. Dombroski less than

even once a month.[6]

**Sandy Phillips:** Ms. Phillips first requested transgender care and HRT on September 8,

2024, ███████████████████████████████████

███████████████████████████ (Ex. 4 at State of Utah, -010348-51.) Ms. Phillips explained

that she was transgender on October 10, 2024, ███████████████████████████

████████ (Ex. 4 at State of Utah, -010335-36.) Ms. Phillips was evaluated by Dr. Paul Binks

on November 27, 2024, who formally diagnosed her with "gender identity disorder in adolescents

or adults." (*Id*. at State of Utah, -010302.) During the evaluation, Ms. Phillips █████████

███████████████████████████████████

███████████████████████████ (*Id*. at State of Utah -010300-01.) Further, Ms.

Phillips expressed ███████████████████████████████████

███████████████████████████████████ (*Id*. at State of

Utah -10301.)

---

[6] Ex. 3 at State of Utah -001499-501 (8/16/2024); -001389 (11/04/2024); -001377 (11/13/2024); -001312 (12/31/2024); -001254-55 (02/04/2025); -001042 (4/14/2025); -000951 (5/8/2025); -000702-03 (7/23/2025); -000240 (11/4/2025).

13

From September 24, 2024, to May 2, 2025, Ms. Phillips requested HRT multiple times,[7] asserting that ███████████████████████████████████████████ ██████████████████████ (Ex. 4 at State of Utah -010287, -010344-45.) In that same period, she requested to speak to Ms. Forbush or requested general mental health services related to transgender care nine times.[8] █████████████████████████████████ ███ (ECF No. 82-6, Forbush Decl. ¶¶ 40, 42, 43.) During the May 9, 2025 session, ███ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ (Ex. 4 at State of Utah -010228.)

For each Plaintiff, Defendants' provision of inconsistent psychotherapy not specific to treating gender dysphoria, when HRT is medically necessary, is not adequate care. The record demonstrates delayed, infrequent, and ineffective care. But even if the Court were to accept Defendants' representations about the scope and extent of treatment provided, Defendants have not produced evidence that such treatment "could be an adequate replacement for hormone therapy." *Fields v. Smith*, 653 F.3d 550, 556 (7th Cir. 2011). "Although [defendants] can provide psychotherapy as well as antipsychotics and antidepressants, defendants failed to present evidence rebutting the testimony that these treatments do nothing to treat the underlying disorder." *Id*.; *see also De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) (holding that "just because Appellees

---

[7] Ex. 4 at State of Utah -010228, -010287, -010234-35, -010244-45, -010254, -010259-61, -010335-36, -010348-49.

[8] Ex. 4 at State of Utah -010228-30, -010234-35, -010239-40, -010244-45, -010271-73, -010310, -010335-36, -010287, -010342-45.

have provided De'lonta with *some* treatment consistent with the GID Standards of Care, it does not follow that they have necessarily provided her with *constitutionally adequate* treatment.").

Dr. Gorton and Dr. Golden each explained why HRT is medically necessary to treat Plaintiffs' gender dysphoria. Dr. Gorton opined that "[w]hile mental health treatment (therapy and medications) can be a useful adjunct, it is no substitute for medical and surgical transition." (ECF No. 38, Gorton Decl. ¶¶ 38-44.) Dr. Golden similarly opined that "[m]ental health care, transitional supports, and gender-affirming environments alone are not effective in treating dysphoria related to incongruence[.]" (ECF No. 39, Golden Decl. ¶ 14.) After conducting individual evaluations, both experts recommended that each Plaintiff receive HRT to treat their gender dysphoria. (ECF No. 38, Gorton Decl. ¶¶ 72, 92, 112; ECF No. 39, Golden Decl. ¶¶ 20, 24-25, 29, 34.)

Notably, while Dr. Laidlaw and Dr. Levine attack hormone therapy, they do not offer opinions on whether the care Defendants provided Plaintiffs is adequate or consistent with prevailing medical standards and guidelines. This glaring omission speaks volumes.

### e) Defendants' Subjective Deliberate Indifference Is Longstanding and Readily Apparent.

Defendants ignore Plaintiffs' evidence demonstrating that Defendants "acted or failed to act despite [their] knowledge of a substantial risk of serious harm," constituting deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 842.

First, Defendants fail to address the March 12, 2024 DOJ Letter of Findings stating that "[l]eft untreated, individuals with gender dysphoria can experience significant adverse health outcomes, including risk of suicide and surgical self-mutilation." (ECF No. 36-3 at 1.) Defendants are aware of these findings and the resulting harm their inactions and policies have caused in delaying and denying medically necessary care.

Second, Defendants' own policies allow HRT so long as it was initiated outside the UDC or before May 7, 2025, with no logical reason for this bright-line rule. That Defendants currently provide HRT to some incarcerated people with gender dysphoria—including Mr. Grunwald and Ms. Morrigan—evidences their acknowledgement of its benefits and medical necessity.

Third, Defendants are aware that Plaintiffs face significant harm from untreated or inadequately treated gender dysphoria. Defendants were put on notice through (1) prior acts of self-harm or mental health episodes; (2) repeated complaints to medical and corrections staff; and (3) grievances and ADA requests.[9]

Based on the above, the Court should find that Plaintiffs meet their burden of making a strong showing on the likelihood of success as to their Eighth Amendment claim.

## B.     Plaintiffs Continue to Suffer Irreparable Harm in the Absence of Adequate Medical Care

Plaintiffs' irreparable harm falls into two categories: (1) violation of constitutional rights; and (2) physical and mental harm due to lack of adequate medical treatment. Defendants do not contest that a constitutional rights violation constitutes irreparable harm, although they deny any violation occurred. (ECF No. 82, Opp. at 31.) Thus, if the Court finds Plaintiffs are likely to succeed on their Eighth Amendment claim, irreparable harm is satisfied. (*See also* ECF No. 35, Mot. for PI at 22.) Additionally, Plaintiffs have established the substantial risk of serious harm to Plaintiffs' health and wellbeing that will continue absent injunctive relief. (*Id.* at 22-23.)

Defendants' contention that Ms. Tucker "has shown improvement" (ECF No. 82, Opp. at 11-13) is both inaccurate and legally insufficient to reject a finding of irreparable harm. ████

---

[9] ECF No. 36-6, Tucker Decl. ¶¶ 10-28; ECF No. 36-7, Dombroski Decl. ¶¶ 11, 17; ECF No. 36-9, Phillips Decl. ¶¶ 10, 13; ECF No. 82-5, Audu Decl. ¶¶ 12-14, 21, 26-28, 43, 46-47, 50, 59, 61.

s███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████▀ ███████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████ Defendants do not rebut this.

Ms. Dombroski continues to experience significant distress related to her gender dysphoria, which she reported to Defendants multiple times. █████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████

Ms. Phillips' declaration attributes her stress, anxiety, and irritability to the lack of adequate medical care for her gender dysphoria. (ECF No. 36-9, Phillips Decl. ¶ 21.) ███████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████

---

[10] Defendants did not produce the 2026 medical records for Plaintiffs that Defendants rely on.

Plaintiffs harms are not hypothetical or speculative—they are tangible, concrete injuries that Plaintiffs experience each day that Defendants deny them medical care. *See Hicklin v. Precynthe*, No. 16-01357, 2018 WL 806764, at *9 (E.D. Mo. Feb. 9, 2018) (finding transgender prison established irreparable harm because she "suffers from depression, anxiety, and intrusive thoughts of self-castration as a result of Defendants' conduct"). Defendants' attempt to downplay these harms by alleging that each Plaintiff is doing "adequately" is insufficient to rebut Plaintiffs' sworn declarations and Plaintiffs' experts' medical opinions.

### C.      The Public Interest and Balance of Equities Favor Plaintiffs

Defendants do not identify any benefit to the public in continuing to deny medically necessary treatment to Plaintiffs. (ECF No. 82, Opp. at 32.) Nor, do Defendants raise any harms if an injunction is granted. Thus, Defendants concede that if Plaintiffs demonstrate a likelihood of success on their Eighth Amendment claim, the public interest and balance of equities favor an injunction.

### D.      Plaintiffs' Requested Injunctive Relief is Proper

Plaintiffs' proposed injunction conforms to the Prison Litigation Reform Act's (the "PLRA") requirement that "[p]reliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C.A. § 3626(a)(2).

Plaintiffs seek injunctive relief enjoining Defendants' continuous denial of medically necessary care for gender dysphoria in violation of the Eighth Amendment. (*See* ECF No. 35, Mot. for PI at 25.) Defendants claim the relief sought is too broad and assert the PLRA bars preliminary injunctive relief extending beyond the named Plaintiffs, relying on 18 U.S.C. § 3626(a)(1)(A),

18

which limits prospective relief to correcting "the violation of the Federal right of a particular plaintiff or plaintiffs." (ECF No. 82, Opp at 33-35.) But preliminary injunctive relief is governed by § 3626(a)(2), which omits this "particular plaintiff or plaintiffs" language, requiring only that relief "extend no further than necessary to correct the harm the court finds requires preliminary relief." "[W]hen Congress includes particular language in one section of a statute but omits it in another—let alone in the very next provision—this Court presumes that Congress intended a difference in meaning." *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (cleaned up).

Even if the "particular plaintiff or plaintiffs" language applied, it does not prohibit the relief sought here. *Brown v. Plata*, 563 U.S. 493, 531 (2011). In *Plata*, the Supreme Court held that this language "means only that the scope of the order must be determined with reference to the constitutional violations established by the specific plaintiffs before the court" and that "collateral effects" beyond the plaintiff do not invalidate an otherwise proper remedy. *Id.* at 531-32. Therefore, the PLRA does not foreclose the possibility of facial relief if dictated by the scope of the violation. *See Fields*, 653 F.3d at 558-59 (finding injunction enjoining entirety of facially invalid statute banning gender affirming care was narrowly tailored); *Clement v. California DOC*, 364 F.3d 1148, 1152 (9th Cir. 2004) (upholding injunction addressing unconstitutional system-wide policy); *Jordan v. Pugh*, No. 02-01239, 2007 WL 2908931 (D. Colo. 2007) at *4 (upholding injunctive relief prohibiting the enforcement of regulation against any inmate where regulation was facially invalid). In the same vein, injunctive relief barring the enforcement of Defendants' blanket bans and other policies preventing Plaintiffs from receiving medically-necessary treatments is the only way to remedy the violation of Plaintiffs' rights.

Defendants also claim that Plaintiffs waived any challenge to GEN-29.00. (ECF No. 82, Opp. at 10, n. 5.) This is inaccurate. While Defendants did not disclose the existence of the GEN-29.00 policy until after Plaintiffs filed the present Motion, the injunctive relief sought by Plaintiffs is broad enough to encompass Defendants' evolving policies and procedures, while still narrowly tailored in a way that only addresses the specific unconstitutional conduct at issue—the denial of individualized medically necessary treatment contrary to medical guidelines.

### E.    Defendants' Motions Should be Denied

To the extent Defendants have incorporated the same arguments they have made in other filings in their opposition to Plaintiffs' Motion for a Preliminary Injunction, those arguments should be rejected for all of the reasons in the previously filed Opposition briefs (ECF Nos. 81 and 85). None of those arguments undermines why the preliminary relief Plaintiffs seek is warranted.

### III.    CONCLUSION

Plaintiffs respectfully request that the Court make the necessary findings under the PLRA § 3626(a)(2), and issue injunctive relief (i) barring Defendants from enforcing H.B. 252 and GEN-29.00's blanket ban on the initiation of medically necessary hormone therapy because it is both unconstitutional on its face and as-applied to Plaintiffs, (ii) directing Defendants to provide Plaintiffs adequate medical care including medically necessary hormone therapy for their gender dysphoria, and (iii) enjoining Defendants from utilizing GEN-29.00's ICST to override the medical judgment of medical providers on the provision of medical care.

Respectfully submitted April 17, 2026,

Jacqueline A. Domenella*
Diane O'Connell*
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606-6361
Telephone: 312-876-8000
Email: jacqui.domenella@dentons.com
Email: diane.oconnell@dentons.com

Evan Wolfson*
Hannah Rochford*
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone: 212-768-6700
Email: evan@freedomtomarry.org
Email: hannah.rochford@dentons.com

Anna Isernia*
DENTONS US LLP
1900 K Street NW
Washington, DC 20006
Telephone: 202-496-7500
Email: anna.isernia@dentons.com

s/ *David W. Tufts*

David W. Tufts (Bar No. 8736)
DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111
Telephone: 801-415-3000
Email: david.tufts@dentons.com

Jason M. Groth (Bar No. 16683)
Abigail Cook (Bar No. 19781)
Tom Ford (Bar No. 19795)
Masami T. Kanegae (Bar No. 20270)
ACLU OF UTAH FOUNDATION, INC.
311 South State St., Suite 310
Salt Lake City, UT 84111
Telephone: 801-521-9862
Email: jgroth@acluutah.org
Email: acook@acluutah.org
Email: tford@acluutah.org
Email: mkanegae@acluutah.org

Sonja D. Kerr*
Elizabeth P. Dankers*
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Telephone: 610-675-7192
Email: skerr@lambdalegal.org
Email: ldankers@lambdalegal.org

Richard Saenz*
Whit Washington*
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: 212-809-8585
Email: rsaenz@lambdalegal.org
Email: wwashington@lambdalegal.org

*Counsel for Plaintiffs*
**Pro hac vice* granted by the Court.

21

## CERTIFICATE OF SERVICE

I certify that on April 17, 2026, a true and correct copy of the foregoing was filed using the Court's electronic filing system, which caused the same to be served upon all counsel of record.

*/s/ Kristin Hughes*

Kristin Hughes

# EXHIBIT 1

No. 25-14263

---

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

ISIS BENJAMIN, *et al.*,

*Plaintiffs-Appellees*,

v.

COMMISSIONER TYRONE OLIVER, in his official capacity, *et al.*,

*Defendants-Appellants*.

---

Appeal from the U.S. District Court for the Northern District of Georgia
No. 1:25-cv-04470 (Calvert, J.)

---

## BRIEF OF DR. KELLAN BAKER, AS *AMICUS CURIAE*, IN
## SUPPORT OF PLAINTIFFS-APPELLEES SEEKING AFFIRMANCE

---

Luke A. Barefoot
Thomas Kessler
Jack Massey
Noopur Sen (*pro hac vice*)
Ariel Sheffey (*pro hac vice*)
Saifeldeen Zihiri (*pro hac vice*)
CLEARY GOTTLIEB
STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
T: (212) 225-2000
tkessler@cgsh.com

T. Brandon Waddell
CAPLAN COBB LLC
75 14th St. NE #2700
Atlanta, GA 30309
T: (404) 596-5602
bwaddell@caplancobb.com

*Counsel for Amicus Curiae*

---

*Benjamin, et al. v. Oliver, et al.*; No. 25-14263

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 29-2, 26.1-1(a)(4), and 26.1-2(b), the undersigned counsel certifies that the following persons and parties may have an interest in the outcome of this case:

1. Baker, Dr. Kellan E.

2. Barefoot, Luke A.

3. Barta, James A.

4. Benjamin, Isis

5. Bentley, Michael J.

6. Bird, Brenna

7. Bondurant Mixson & Elmore LLP

8. Bradley Arant Boult Cummings LLP-MS

9. Brown, Derek

10. Calvert, Honorable Victoria Marie

11. Caplan Cobb LLC

12. Carr, Christopher M.

13. Center For Constitutional Rights

14. Centurion of Georgia LLC

C-1 of C-6

*Benjamin, et al. v. Oliver, et al.*; No. 25-14263

15.  Cleary Gottlieb Steen & Hamilton LLP

16.  Consovoy McCarthy PLLC

17.  Cox, Stephen J.

18.  Doe, John

19.  Drummond, Gentner

20.  Early, Emily

21.  Ezie, Andrea Chinyere

22.  Felder, Korbin

23.  Fitch, Lynn

24.  Frankson, Michael Geoffrey

25.  Griffin, Tim

26.  Grouev, Zachary P.

27.  Hanaway, Catherine L.

28.  Harris, Jeffrey M.

29.  Hilgers, Michael T.

30.  Huff, Powell & Bailey LLC

31.  Horton, Fantasia

32.  Kairey, Julius

*Benjamin, et al. v. Oliver, et al.*; No. 25-14263

33. Karasic, Dr. Dan

34. Kautz, Keith G.

35. Kessler, Thomas

36. Knudsen, Austin

37. Kobach, Kris W.

38. Labrador, Raúl R.

39. Madison, Naeomi

40. Mardis, Dr. Marlah

41. Marshall, Steve

42. Massey, Jack

43. McCuskey, John B.

44. Murrill, Liz

45. Montenegro, Steve

46. Oliver, Tyrone

47. Owen, Dr. Katherine Haynes

48. Paxton, Ken

49. Peterson, Warren

50. Petrany, Stephen J.

*Benjamin, et al. v. Oliver, et al.*; No. 25-14263

51.  Rokita, Theodore E.

52.  Sauls, Randy

53.  Seals, Amanda Kay

54.  Sellers, Matthew

55.  Sen, Noopur

56.  Sheffey, Ariel

57.  State of Alabama

58.  State of Alaska

59.  State of Arkansas

60.  State of Idaho

61.  State of Indiana

62.  State of Iowa

63.  State of Kansas

64.  State of Louisiana

65.  State of Mississippi

66.  State of Missouri

67.  State of Montana

68.  State of Nebraska

*Benjamin, et al. v. Oliver, et al.*; No. 25-14263

69.  State of North Dakota

70.  State of Ohio

71.  State of Oklahoma

72.  State of South Carolina

73.  State of Texas

74.  State of Utah

75.  State of West Virginia

76.  State of Wyoming

77.  Steeves, Jaden

78.  The Arizona Legislature

79.  Thompson, John Henry

80.  Vinson, Kayla

81.  Waddell, T. Brandon

82.  Wilson, Alan

83.  Wilson, Brynn

84.  Wrigley, Drew H.

85.  Wynne, Dr. Gerald

86.  Wyrick, Rachael C.T.

*Benjamin, et al. v. Oliver, et al.*; No. 25-14263

87. Yost, Dave

88. Zarian, Michael A.

89. Zhu, Celine

90. Zihiri, Saifeldeen

Dated: March 27, 2026

/s/ *T. Brandon Waddell*
T. Brandon Waddell

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..................................................C-1

TABLE OF CONTENTS ........................................................................ i

IDENTITY AND INTERESTS OF AMICUS CURIAE .......................................1

STATEMENT OF THE ISSUES ..................................................................4

SUMMARY OF THE ARGUMENT ..............................................................4

ARGUMENT ...........................................................................................8

   I.   The District Court Rightfully Rejected Defendants-Appellants'
Mischaracterizations Of The Baker Review .........................................8

   II.   The Baker Review Underscores That Hormone Therapy Is A Clinically
Appropriate And Evidence-Backed Treatment For Adults with Gender
Dysphoria ..................................................................................10

   III.   Defendants-Appellants Mischaracterize The Findings Of The Baker
Review To Support The Inaccurate Assertion That Hormone Therapy For Adult
Gender Dysphoria Is Subject To Scientific Or Medical Controversy..................13

     A.   Defendants-Appellants Falsely Characterize The Evidence Supporting
Hormone Therapy As Deficient .........................................................13

     B.   Defendants-Appellants Misinterpret The Baker Review's Call For Further
Research Into Hormone Therapy ........................................................21

     C.   Defendants-Appellants Draw An Improper Parallel Between The Baker
Review And The Cass Review..........................................................23

CONCLUSION .....................................................................................25

CERTIFICATE OF COMPLIANCE..............................................................27

CERTIFICATE OF SERVICE ....................................................................28

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*E.E.O.C. v. Pet Inc., Funsten Nut Div.*,
No. 78-377-N, 1981 WL 27116 (M.D. Ala. Dec. 14, 1981)................................8

*Lebron v. Sec. of Fla. Dep't of Child. and Fam.*,
772 F.3d 1352 (11th Cir. 2014).........................................................................8

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) .........................................................................................19

*McCasland v. Pro Guard Coatings, Inc.*,
799 F. App'x 731 (11th Cir. 2020).....................................................................6

**Rules and Statutes**

Fed. R. Evid. 803(18) ...................................................................................5, 8

Fed. R. Evid. 803(18), advisory committee's note (1972).............................5-6, 8-9

**Other Authorities**

Anna Nobili, Cris Glazebrook & Jon Arcelus, *Quality of Life of Treatment-Seeking Transgender Adults: A Systematic Review and Meta-Analysis,* Reviews in Endocrine and Metabolic Disorders (2018) ....................................12

B.J. Nolan et al., *Early Access to Testosterone Therapy in Transgender and Gender-Diverse Adults Seeking Masculinization: A Randomized Clinical Trial,* JAMA Network Open (2023)...................................................................17

Brian P. Kavanagh, *The GRADE System for Rating Clinical Guidelines,* PLoS Medicine (2009) ........................................................................................19

Carla Pelusi et al., *Effects of Three Different Testosterone Formulations in Female-to-Male Transsexual Persons,* The Journal of Sexual Medicine (2014) .................................................................................................................17

ii

David M. Doyle, Thomas Lewis & Manuela Barreto, *A Systematic Review of Psychosocial Functioning Changes After Gender-Affirming Hormone Therapy Among Transgender People*, Nature Human Behaviour (2023)..........23

David Moher et al., *Epidemiology and Reporting Characteristics of Systematic Reviews*, PLoS Med. (2007)................................................................11

Florence Ashley et al., *Randomized-Controlled Trials Are Methodologically Inappropriate in Adolescent Transgender Healthcare*, International Journal of Transgender Health (2023)..................................................16

Gordon Guyatt et al., *Systematic Reviews Related to Gender-Affirming Care,* McMaster University (2025), https://hei.healthsci.mcmaster.ca/systematic-reviews-related-to-gender-affirming-care/ ................................................................................21

Gordon H. Guyatt et al., *GRADE: An Emerging Consensus on Rating Quality of Evidence and Strength of Recommendations*, BMJ (2008)...............15

Jaclyn M. White Hughto & Sari L. Reisner *A Systematic Review of the Effects of Hormone Therapy on Psychological Functioning and Quality of Life in Transgender Individuals*, Transgender Health (2016)........................12

Jeremy Howick, The Philosophy of Evidence-Based Medicine (Wiley-Blackwell, 2011) ................................................................................15

K. K. H. Tan et al., *Unmet Need for Gender-Affirming Care as a Social Determinant of Mental Health Inequities*, J. Pub. Health (2023), https://doi.org/10.1093/pubmed/fdac131 ........................................16

Lucas Shelemy et al., *Systematic Review of Prospective Adult Mental Health Outcomes Following Affirmative Interventions for Gender Dysphoria*, International Journal of Transgender Health (2024) .........................................12

Luis H. Braga et al., *Randomized Controlled Trials - The What, When, How and Why*, Journal of Pediatric Urology (2025)......................................18

iii

Mohammad Hassan Murad et al., *Hormonal Therapy and Sex Reassignment: A Systematic Review and Meta-Analysis of Quality of Life and Psychosocial Outcomes*, Clinical Endocrinology (2010)............................12

Padhraig S. Fleming et al., *High Quality of the Evidence for Medical and Other Health-Related Interventions Was Uncommon in Cochrane Systematic Reviews*, Journal of Clinical Epidemiology (2016)..........................18

R.L. Moss et al., *The Role of Prospective Randomized Clinical Trials in Pediatric Surgery: State of the Art*, Journal of Pediatric Surgery (2001) ..........15

Rachana Desai et al., *Cigarette Smoking and Reasons for Leaving School Among School Dropouts in South Africa*, Tobacco Induced Diseases (2018) ..................................................................................................22

Sari L. Reisner, et al., *Gender-Affirming Hormone Therapy and Depressive Symptoms Among Transgender Adults*, JAMA Network Open (2025) .............23

Stefan Rowniak, Lindsay Bolt & Claire Sharifi, *Effect of Cross-Sex Hormones on the Quality of Life, Depression and Anxiety of Transgender Individuals: A Quantitative Systematic Review*, JBI Database of Systematic Reviews & Implementation Reports (2019) ...................................12

Taylah R. van Leerdam, Jeffrey D. Zajac & Ada S. Cheung, *The Effect of Gender-Affirming Hormones on Gender Dysphoria, Quality of Life, and Psychological Functioning in Transgender Individuals: A Systematic Review*, Transgender Health (2023) ...................................................................12

Theodore E. Schall, Kaitlyn Jaffe & Jacob D. Moses, *Roles of Randomized Controlled Trials in Establishing Evidence-Based Gender-Affirming Care and Advancing Health Equity*, AMA J. Ethics (2024), https://doi.org/10.1001/amajethics.2024.684 ......................................................16

Thomas R. Frieden, *Evidence for Health Decision Making - Beyond Randomized, Controlled Trials*, The New England Journal of Medicine (2017) ......................................................................................................18

Tim C. van de Grift et al., *Waiting for Transgender Care and its Effects on Health and Equality: A Mixed-Methods Population Study in the Netherlands*, EClinicalMedicine (2024), https://www.thelancet.com/journals/eclinm/article/PIIS2589-5370%2824%2900236-0/fulltext? .......................................................................16

Waleed M. Sweileh, *Research Publications on the Mental Health of Transgender People: A Bibliometric Analysis Using Scopus Database* (1992–2021), Transgender Health (2022) .........................................................11

## IDENTITY AND INTERESTS OF AMICUS CURIAE[1]

Dr. Kellan E. Baker ("Dr. Baker" or "*Amicus*") is the Senior Advisor for Health Policy at the Movement Advancement Project, an independent, nonprofit think tank that provides rigorous research and communications insights to advance equality and opportunity for all. Dr. Baker also currently holds academic appointments as affiliate faculty in the Department of Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health and the Department of Health Policy and Management at the George Washington University Milken Institute School of Public Health. Prior to his work at the Movement Advancement Project, Dr. Baker was the Executive Director and Chief Learning Officer of the Institute for Health Research and Policy at Whitman-Walker. In this role, he oversaw a multi-million-dollar portfolio of research funded by the National Institutes of Health (the "NIH"), the Patient-Centered Outcomes Research Institute ("PCORI"), and other leading sponsors of scientific research.

In addition, Dr. Baker is currently the co-chair of the Presidential Advisory Council on HIV/AIDS and has served in an advisory capacity for numerous other

---

[1] The parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), counsel for *amicus curiae* states that no counsel for a party authored this brief in whole or in part, and no person—other than the *amicus* and their counsel—made a monetary contribution intended to fund the preparation or submission of this brief.

1

private and public entities, including the NIH National Advisory Council on Minority Health and Health Disparities; the National Academies of Sciences, Engineering, and Medicine; the Scientific Advisory Council for the United States Transgender Study; and the Sexual and Gender Minority Research Working Group of the NIH Council of Councils.  Cumulatively, Dr. Baker has over twenty years of experience as a nationally recognized leader in the fields of health policy and health services research.

Dr. Baker received his Ph.D. in Health Policy and Management from the Johns Hopkins Bloomberg School of Public Health, a Master of Public Health from the George Washington University Milken Institute School of Public Health, and a Master of Arts in International Development Studies from the George Washington University Elliott School of International Affairs.

Dr. Baker is the author of thirty-six peer-reviewed journal articles, numerous published reports, and four book chapters.  His articles have been published in high-impact journals such as *Journal of the American Medical Association*, *New England Journal of Medicine*, and *American Journal of Public Health*, among others.

Dr. Baker's systematic review, *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review* (the "Baker Review" or the "Review"), has been cited numerous times by Defendants-

2

Appellants in the proceedings below and before this Court in their attempt to

establish a factual dispute as to medically necessary care for adults with gender

dysphoria.  *See, e.g.,* Opening Br. of Appellants, Dkt. 26 at 17, 20–22, 24, 36–38,

41–42, and 44; State Defs.' Mot. for Partial Summ. J., R. 72 at 17, 19; State Defs.'

Opp. to Pls.' Mot. for Partial Summ. J., R. 80 at 9, 25; State Defs.' Reply in Supp.

of Mot. for Partial Summ. J., R. 93 at 9–10, 14.[2]  Defendants-Appellants also rely

on Dr. Hilary Cass's *Independent Review of Gender Identity Services for Children*

*and Young People* (the "Cass Review"), in which the Baker Review is cited and

discussed.  *See, e.g.,* R. 72-3 at 132, 177-178 (citing R. 72-2 at 2, 14 ); *see also,*

*e.g.,* Opening Br. of Appellants, Dkt. 26 at 20, 24–25, 38–40, 43.

Dr. Baker has an interest in ensuring that medical care for people with

gender dysphoria is appropriately informed by scientific research and that the

research is properly understood by the wider public.  Moreover, as the lead author

of the Baker Review, Dr. Baker has a unique interest in ensuring that, should the

Court depart from the approach taken by the District Court and consider his report,

his scholarship is properly understood by the Court free from

Defendants-Appellants' mischaracterizations.

---

[2] *Amicus* refers to materials filed on the appellate docket using the following
format: Dkt-[docket number(s)].  Materials filed on the district court docket are
cited with the corresponding pagination: R-[district court docket number(s)].  All
page numbers refer to the page number generated by the respective court's
electronic filing system.

## STATEMENT OF THE ISSUES

1. Whether the academic treatises Defendants-Appellants submitted, without a corresponding expert to lay the foundation and provide further context, were not admissible evidence and could not be considered for purposes of creating a fact dispute as to deliberate indifference.

2. Whether Defendants-Appellants mischaracterized the Baker Review in their attempt to create a factual dispute regarding the propriety of providing gender-affirming care to adults with gender dysphoria.

## SUMMARY OF THE ARGUMENT

Dr. Baker was the lead author of *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review* (2021), a research paper that identifies positive associations between hormone therapy and measures of mental health and quality of life for people with gender dysphoria across their lifespans.  Specifically, the Baker Review finds that the hormone treatments routinely prescribed by doctors to people with gender dysphoria are positively correlated with statistically significant and clinically meaningful improvements in mental health and quality of life.  The Review notes that these treatments have long been part of the widespread clinical consensus on medical care for people with gender dysphoria, have benefits that are supported by scientific evidence, and are neither novel nor controversial.

4

Defendants-Appellants heavily rely on the Baker Review to support their contention that hormone therapy for adults with gender dysphoria is somehow controversial or at odds with the consensus view on generally accepted medical practice—a conclusion with no basis in the Review. Despite citing the Review at least thirty-nine times across their opening brief and the briefing below, Defendants-Appellants never contacted Dr. Baker to inquire, much less verify, whether their interpretations of the Baker Review were an accurate reflection of his scholarship and findings. Had they done so, Dr. Baker would have corrected their fundamental misunderstanding of the Review's conclusions. Unfortunately, the Court has been presented with deep mischaracterizations of the Review, particularly as to the strength of evidence supporting hormone therapy, without the benefit of any expert guidance to assist the Court in contextualizing the Review and Defendant-Appellants' mischaracterizations of it. It is exactly this harm that the Federal Rules of Evidence seek to avoid by requiring academic reviews or "learned treatises" to be accompanied by "an expert witness on cross-examination or [] direct examination," failing which, the contents of such documents constitute inadmissible hearsay. Fed. R. Evid. 803(18). This rule is based on the "likelihood that the treatise will be misunderstood and misapplied without expert assistance and supervision." Fed. R. Evid. 803(18), advisory committee's note (1972). Courts have thus long relied on experts to inform judgments across a wide range of

5

scientific contexts, including the determination of acceptable methods of medical treatment. *See McCasland v. Pro Guard Coatings, Inc.*, 799 F. App'x 731, 733 (11th Cir. 2020) ("[I]n cases where a [factfinder] is asked to assess complex medical or scientific issues outside the scope of a layperson's knowledge, an expert's testimony is required").

Defendants-Appellants have twisted the fundamental conclusions of the Baker Review, which synthesizes decades of clinical research and practice establishing that hormone therapy *is* an essential component of the treatment of gender dysphoria, to support an argument diametrically opposed to what the Review actually finds. One of the grounds on which the District Court rightfully declined to consider the Review was precisely to avoid such "misinterpretation and misapplication" of a scientific treatise. Fed. R. Evid. 803(18), advisory committee's note (1972); Op., Order, and Permanent Inj., R. 94 at 14–18.

Dr. Baker respectfully submits this *amicus* brief to explain the findings of the Baker Review, should the Court decide to consider it, and to correct Defendants-Appellants' mischaracterizations. As detailed herein, the Baker Review demonstrates that hormone therapy is an evidence-based treatment for people with gender dysphoria that a clinician may appropriately prescribe based on individual medical need. Defendants-Appellants' characterizations to the contrary are incorrect and exemplify the risk of relying on medical literature without

accompanying expert testimony.  Based on his scholarship and decades-long expertise in the field, and in line with the conclusions of the Baker Review, Dr. Baker urges the Court to affirm the District Court's holding.

## ARGUMENT

### I.    The District Court Rightfully Rejected Defendants-Appellants' Mischaracterizations Of The Baker Review

Courts have long refused to consider scientific evidence without a competent expert to explain and contextualize it.  The Federal Rules of Evidence make clear that academic reviews, or "learned treatises," are inadmissible hearsay unless "the statement is called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination."  Fed. R. Evid. 803(18).  This rule corrects for the "likelihood that the treatise will be misunderstood and misapplied without expert assistance and supervision."  Fed. R. Evid. 803(18), advisory committee's note (1972); *see also Lebron v. Sec. of Fla. Dep't of Child. and Fam.*, 772 F.3d 1352, 1371 (11th Cir. 2014) ("We are hard-pressed to ascribe significance to these studies without an appropriately credentialed expert to vet them");  *E.E.O.C. v. Pet Inc., Funsten Nut Div.,* No. 78-377-N, 1981 WL 27116, at *1 (M.D. Ala. Dec. 14, 1981) ("[T]his Court will not appropriate to itself the task of deciding the validity of statistical proof without the benefit of an expert witness' analysis of the matter") (citing *Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 620 (1974)).

In the District Court proceedings, Defendants-Appellants repeatedly "misunderstood and misapplied" the Baker Review.  Fed. R. Evid. 803(18), advisory committee's note (1972); *see* State Defs.' Opp'n to Mot. for Partial

8

Summ. J. and Entry of Permanent Inj., R. 80 at 25 (incorrectly citing to the Baker Review to claim it "is unproven and speculative" that "providing cross-sex hormones will improve mental health"); State Defs.' Reply in Supp. of Mot. for Partial Summ. J., R. 93 at 15 (incorrectly claiming that the Baker Review "speak[s] for [itself] in discussing the lack of reliable evidence showing any benefits from cross-sex hormones").[3]  The desire to avoid such "misunderst[anding] and misappli[cation]" is precisely why the District Court correctly declined to consider Defendants-Appellants' arguments with respect to the Baker Review as evidence of a material factual dispute.  *See* Fed. R. Evid. 803(18), advisory committee's note (1972);  Op., Order, and Permanent Inj., R. 94 at 17.  As the District Court explained, "even if the Court were to consider the Review[] as evidence in the abstract, creating a fact dispute with [it] would require the testimony of an expert to put the Review[] into context," which Defendants-Appellants failed to produce. Op., Order, and Permanent Inj., R. 94 at 17.

In their Opening Brief before this Court, Defendants-Appellants continue to entirely misapprehend the conclusions of the Baker Review in service of a position that is diametrically opposed to the medical facts and evidence clearly laid out in the Review itself.  The Baker Review is a scientific paper intended for an academic

---

[3] Defendants-Appellants' misinterpretations, and the actual conclusions of the Baker Review, are explained further *infra* Sections II–III.

audience.  Accordingly, it should not be assessed by a court of law without the aid of an expert to contextualize its significance, something Defendants-Appellants chose not to do below and cannot do for the first time on appeal.  Should the Court consider the Baker Review, it should reject the mischaracterizations of the Review put forth by Defendants-Appellants, for the reasons that follow.

**II.    The Baker Review Underscores That Hormone Therapy Is A Clinically Appropriate And Evidence-Backed Treatment For Adults with Gender Dysphoria**

The Baker Review was conducted in 2018–2020 by a team of researchers affiliated with Johns Hopkins University, led by Dr. Baker.  The Review analyzes psychological outcomes, including quality of life, associated with hormone therapy for people with gender dysphoria.  The development, execution, and reporting of the Baker Review followed standardized formats prescribed by an independent global network of health researchers and professionals.

The Baker Review assesses common medical treatments for patients with gender dysphoria: puberty-delaying medications for transgender adolescents of any gender, treatment with testosterone for transgender men, and treatment with estrogen and/or an anti-androgen for transgender women.  The Review synthesizes existing medical research on how these treatments impact psychological and health outcomes.

To arrive at their conclusions, the Review's researchers compiled scientific

10

studies focused on transgender health published between 1967 and 2020.  This search strategy initially returned more than 1,700 studies, indicative of the breadth and depth of scientific research on transgender healthcare conducted over decades in the United States and around the world.[4]  After isolating studies that assessed one or more of the key outcomes of quality of life, depression, anxiety, and death by suicide among people with gender dysphoria receiving gender-affirming hormone therapy, the Baker Review ultimately analyzed twenty studies reported across twenty-two publications, representing participants from at least ten countries and study sizes ranging from twenty to 1,331 participants.[5]  The volume and nature of evidence synthesized by the Review is comparable to industry-leading systematic reviews in other areas of medical care.[6]

The Baker Review concludes that hormone treatment is positively correlated with stability or improvement in measures of depression, anxiety, and quality of life among people with gender dysphoria.  Among studies included in the Review, none showed that these treatments were associated with *decreases* in any health outcomes, nor did any conclude that hormone therapy causes harm.  Significantly,

---

[4] Waleed M. Sweileh, *Research Publications on the Mental Health of Transgender People: A Bibliometric Analysis Using Scopus Database* (1992–2021), Transgender Health (2022), https://doi.org/10.1089/trgh.2022.0006.
[5] *See* R. 72-2 at 3–4 for a detailed description of the search and selection strategy.
[6] David Moher et al., *Epidemiology and Reporting Characteristics of Systematic Reviews*, 4 PLOS Med. e78 (2007).

the findings of the Baker Review echo those of previous systematic reviews on the topic,[7] and its findings have since been replicated by other reviews and individual studies.[8]

The Review demonstrates that hormone therapy for gender dysphoria is an evidence-based treatment that should be prescribed based on individual medical need. As the Review notes, hormone therapy is "an essential component of care that promotes the health and well-being of transgender people," R. 72-2 at 14, which is to say, it is a medically necessary form of care for adults with gender dysphoria.

---

[7] *See, e.g.*, Mohammad Hassan Murad et al., *Hormonal Therapy and Sex Reassignment: A Systematic Review and Meta-Analysis of Quality of Life and Psychosocial Outcomes*, 72 Clinical Endocrinology 214 (2010); Anna Nobili, Cris Glazebrook & Jon Arcelus, *Quality of Life of Treatment-Seeking Transgender Adults: A Systematic Review and Meta-Analysis,* 19 Reviews in Endocrine and Metabolic Disorders 199 (2018); Stefan Rowniak, Lindsay Bolt & Claire Sharifi, *Effect of Cross-Sex Hormones on the Quality of Life, Depression and Anxiety of Transgender Individuals: A Quantitative Systematic Review*, 17 JBI Database of Systematic Reviews & Implementation Reports 1826 (2019); Jaclyn M. White Hughto & Sari L. Reisner *A Systematic Review of the Effects of Hormone Therapy on Psychological Functioning and Quality of Life in Transgender Individuals*, 1 Transgender Health 21 (2016).

[8] *See, e.g.*, Lucas Shelemy et al., *Systematic Review of Prospective Adult Mental Health Outcomes Following Affirmative Interventions for Gender Dysphoria*, 26 International Journal of Transgender Health 480 (2024); Taylah R. van Leerdam, Jeffrey D. Zajac & Ada S. Cheung, *The Effect of Gender-Affirming Hormones on Gender Dysphoria, Quality of Life, and Psychological Functioning in Transgender Individuals: A Systematic Review*, 8 Transgender Health 6 (2023).

**III.    Defendants-Appellants Mischaracterize The Findings Of The Baker Review To Support The Inaccurate Assertion That Hormone Therapy For Adult Gender Dysphoria Is Subject To Scientific Or Medical Controversy**

Defendants-Appellants repeatedly cite to the Baker Review to support their argument that hormone therapy is a controversial treatment for adults with gender dysphoria.  Not only does that proposition find no home in the Baker Review, the Review's findings support precisely the opposite conclusion.

Defendants-Appellants mischaracterize the findings of the Baker Review in several ways.  In particular, Defendants-Appellants misunderstand the import of evidence labeled "low" strength, confusing this scientific term of art with the unrelated lay concept of unreliability.  Defendants-Appellants' fundamental misunderstanding of the Review's significance demonstrates the risk of relying on academic literature without the aid of expert testimony—a risk that courts, like the District Court, account for by declining to consider scientific evidence without credible expert testimony. *See* Op., Order, and Permanent Inj., R. 94 at 17–18.

**A. Defendants-Appellants Falsely Characterize The Evidence Supporting Hormone Therapy As Deficient**

Defendants-Appellants repeatedly mistake the Baker Review as concluding that there is only weak evidence supporting the medical benefits of hormone therapy for adults with gender dysphoria.  *See, e.g.,* Opening Br. of Appellants, Dkt. 26 at 17 (claiming that the Baker Review has been "sharply critical of the

strength of evidence underlying the treatment guidelines offered by advocacy groups such as WPATH"); *id*. at 39 (alleging the Review supports the notion that WPATH relied on "flawed" studies deemed as low quality). Specifically, Defendants-Appellants seize on the fact that the Baker Review labels the quality of evidence in the studies analyzed as "low." *See* Opening Br. of Appellants, Dkt. 26 at 17 (stating that the Baker Review found the strength of evidence low for hormone therapy benefits); *id*. at 36–39 (claiming the Baker Review found the strength of evidence low due to concerns about the studies). In so doing, Defendants-Appellants fundamentally misunderstand the technical significance of evidence characterized as "low" strength, as used in the discipline of evidence-based medicine. Such a characterization does *not* mean that a body of evidence is deficient or unreliable but rather is a reflection of the type of study design available to, and employed by, researchers in the field.

Evidence-based medicine tools assess the quality or "strength" of evidence according to specific evidence-rating scales, which usually provide four levels of evidence: high, moderate, low, and very low or insufficient. Though the ratings can be adjusted up or down according to various elements of the study's methodology, evidence that comes from randomized controlled trials starts with a presumptive "high" rating, while evidence from observational studies starts with a

14

presumptive "low" rating.[9]  These presumptive ratings are applied even before a

given study is fully assessed because of the emphasis these tools place on

randomized controlled trials.

In the context of gender dysphoria research, as in many other medical fields,

randomized controlled trials often are not possible.  In the abstract, randomized

controlled trials are considered the "gold standard" in terms of scientific evidence

quality, but many areas of medicine often cannot use them for ethical reasons.[10]

This is because randomized controlled trials typically involve withholding the

relevant treatment from a subset of the study population and comparing that

group's medical outcomes with the group that *does* receive treatment.  This type of

study can only be performed ethically where researchers do not know at the outset

of the trial whether the treatment works.  If there is existing evidence that the

treatment *does* work, running a randomized controlled trial that withholds a

treatment that works from a group of study participants would be contrary to

medical ethics.  As a result, for treatments that have been previously shown to

work, researchers must typically use study designs that yield "lower quality" data,

---

[9] Gordon H. Guyatt et al., *GRADE: An Emerging Consensus on Rating Quality of Evidence and Strength of Recommendations*, 336 BMJ 924 (2008).

[10] R.L. Moss et al., *The Role of Prospective Randomized Clinical Trials in Pediatric Surgery: State of the Art*, 36 Journal of Pediatric Surgery 1182 (2001); Jeremy Howick, The Philosophy of Evidence-Based Medicine (Wiley-Blackwell, 2011).

but do not involve withholding medical treatment from patients where medical science has already established the treatment to be beneficial.

Transgender health is one such area. The body of scientific evidence and clinical expertise available in the field today indicates that providing gender-affirming treatment to adults with gender dysphoria is beneficial, while withholding treatment is harmful.[11] As a result, longstanding principles of medical research ethics generally do not support the use of randomized controlled trials to test gender-affirming care for transgender populations.[12] As discussed below, that does not diminish the analytic weight or scientific value of the evidence.

---

[11] In 2018, for instance, Dr. Baker reviewed all peer-reviewed articles published in English between 1991 and 2017 that assessed the effects of medical treatment reflecting the prevailing clinical consensus on various health-related outcomes among transgender people. This 2018 review identified 55 primary research studies on this topic, of which 51 (93%) found that these treatments improve outcomes for transgender people, while 4 (7%) reported mixed or null findings. The review found *no studies* concluding that treatment according to the widespread clinical consensus causes harm. Further research has supported that withholding treatment is harmful. *See* K. K. H. Tan et al., *Unmet Need for Gender-Affirming Care as a Social Determinant of Mental Health Inequities*, 45 J. Pub. Health e225 (2023), https://doi.org/10.1093/pubmed/fdac131; Tim C. van de Grift et al., *Waiting for Transgender Care and its Effects on Health and Equality: A Mixed-Methods Population Study in the Netherlands*, EClinicalMedicine (2024), https://www.thelancet.com/journals/eclinm/article/PIIS2589-5370%2824%2900236-0/fulltext?.

[12] Theodore E. Schall, Kaitlyn Jaffe & Jacob D. Moses, *Roles of Randomized Controlled Trials in Establishing Evidence-Based Gender-Affirming Care and Advancing Health Equity*, 26 AMA J. Ethics E684 (2024), https://doi.org/10.1001/amajethics.2024.684.; Florence Ashley et al., *Randomized-Controlled Trials Are Methodologically Inappropriate in Adolescent Transgender Healthcare*, 25 International Journal of Transgender Health 1 (2023).

In addition to being unethical, randomized controlled trials are also often *infeasible* for studies of transgender health treatments. Most randomized controlled trial designs require that study participants be unaware of whether they are receiving the treatment or a placebo. This is typically impossible in the context of gender-affirming treatments, such as hormone interventions, that create visible physical effects, as it becomes obvious to study participants even over short periods of time whether they are assigned to the treatment or control group.

Therefore, much of the highest quality research evidence in transgender health is—according to the framework of ethical evidence-based medicine— designated as "low" quality.[13] But this is a relative designation, not an absolute one. Indeed, the majority of medical evidence across a wide variety of fields, including "state of the art" evidence in many fields, is based on study designs other

---

[13] A small number of randomized controlled trials using innovative study designs (*i.e.*, not placebo-controlled) have been conducted in transgender health. The findings of these randomized controlled trials align with the overall conclusions of systematic reviews in this field. *See* B.J. Nolan et al., *Early Access to Testosterone Therapy in Transgender and Gender-Diverse Adults Seeking Masculinization: A Randomized Clinical Trial*, 6 JAMA Network Open (2023). For example, a randomized controlled trial included in the Baker Review that compared different routes of testosterone administration for transgender men showed a statistically significant increase in quality of life relative to no treatment for all three routes of administration, with no difference across treatment arms. *See* Carla Pelusi et al., *Effects of Three Different Testosterone Formulations in Female-to-Male Transsexual Persons*, 11 The Journal of Sexual Medicine 3002 (2014).

than randomized controlled trials, such as observational studies.[14]  If this Court

finds "low" quality evidence to be an appropriate basis for denying treatment to

incarcerated individuals, states could just as easily deny life-saving treatments for

cancer or cardiovascular disease.  Indeed, a review of industry-standard guidelines

across fifty-two areas of medicine, including anesthesia, cancer, and cardiovascular

disease, showed that only 13.5% are based on evidence deemed "high" quality,

while more than half are based on evidence whose quality was rated "low" (31.7%)

or "very low" (24%).[15]  Similarly, fewer than one in six systematic reviews across

medical sectors found "high" quality evidence for a primary health outcome of

interest, and fewer than one in five reported "high" quality evidence for *any* health

outcome.[16]  Under Defendants-Appellants' argument, states could deny prisoners a

substantial number of medically necessary treatments based exclusively on the fact

that the clinical evidence supporting those treatments was technically classified as

low.

There is no research documenting a relationship between evidence scoring

---

[14] Luis H. Braga et al., *Randomized Controlled Trials - The What, When, How and Why*, 21 Journal of Pediatric Urology 397 (2025); Thomas R. Frieden, *Evidence for Health Decision Making - Beyond Randomized, Controlled Trials*, 377 The New England Journal of Medicine 465 (2017).

[15] Padhraig S. Fleming et al., *High Quality of the Evidence for Medical and Other Health-Related Interventions Was Uncommon in Cochrane Systematic Reviews*, 78 Journal of Clinical Epidemiology 34 (2016).

[16] *See id*. at 39.

highly in quality grading systems and improved patient care, nor is there an expectation or requirement that clinical guidelines and treatment protocols be based solely or chiefly on "high" strength evidence.[17]  As the Supreme Court has acknowledged, "medical professionals and researchers do not limit the data they consider to the results of randomized controlled trials or to statistically significant evidence."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 41 (2011) (citations omitted).

The Baker Review finds, consistently across the studies it analyzes, that the medical literature supports a positive association between hormone therapy and measures of quality of life, depression, and anxiety.  Indeed, *no* reviewed study found that these medications negatively impacted mental health outcomes, and most studies found substantial improvements in one or more of these indicators.  Thus, though the Review classifies this body of evidence as "low" quality (meaning that it came from studies that were not randomized controlled trials), the overall consensus of the evidence supports the conclusion that hormone treatment is associated with better quality of life, decreased depression, and decreased anxiety for transgender people.  On this basis, the Review concludes that hormone therapy is an essential component of care for transgender people.

---

[17] Brian P. Kavanagh, *The GRADE System for Rating Clinical Guidelines*, 6 PLoS Medicine (2009).

Nonetheless, Defendants-Appellants misleadingly assert that the "low" strength evidence grades assigned to studies in the Baker Review imply that hormone therapy is a controversial treatment that somehow cannot be considered part of generally accepted clinical practice. *See, e.g.,* Opening Br. of Appellants, Dkt. 26 at 20 (claiming that the Baker Review "cast[s] serious doubt on the claimed benefits of cross-sex hormones."); *id.* at 21–22 (characterizing the Baker Review as a "landmark systematic review[] questioning the evidence supporting cross-sex hormonal interventions"). In so doing, Defendants-Appellants conflate the scientific analysis of "low" strength evidence with the lay concepts of unreliability or uncertainty, when, in fact, the majority of widely accepted medical science and clinical practice are derived from evidence not deemed "high" strength.

Moreover, evidence from medical research at large is only one component of the development and application of clinical practice guidelines. Clinical care always requires consideration of multiple factors, including expert clinical judgment and individualized evaluations and assessments of patient need. In the context of "low" quality evidence, these other factors become more important—not less. In fact, the "father of evidence-based medicine," Dr. Gordon Guyatt, has expressed serious concerns about the growing misuse of concepts from evidence-based medicine to support restrictions on care for transgender people. Specifically,

20

he and his coauthors write:

> It is profoundly misguided to cast health care based on low-certainty evidence as bad care or as care driven by ideology, and low-certainty evidence as bad science. Many of the interventions we offer are based on low certainty evidence, and enlightened individuals often legitimately and wisely choose such interventions. Thus, forbidding delivery of gender-affirming care and limiting medical management options on the basis of low certainty evidence is a clear violation of the principles of evidence-based shared decision-making and is unconscionable. The appropriate use of our work is in ensuring patients receive needed care[.][18]

In short, Defendants-Appellants' reliance on the Baker Review to cast doubt on the appropriateness of hormone therapy reflects a fundamental misunderstanding of ethical evidence-based medicine. Contrary to Defendants-Appellants' claims, the Baker Review confirms the widespread clinical consensus that hormone therapy is a medically necessary component of treatment for adults with gender dysphoria.

## B. Defendants-Appellants Misinterpret The Baker Review's Call For Further Research Into Hormone Therapy

Defendants-Appellants distort the Baker Review's call for further research. *See* Opening Br. of Appellants, Dkt. 26 at 38 (citing R. 72-2 at 14) (arguing that "[t]he district court concluded that the medical necessity of cross-sex hormones is

---

[18] Gordon Guyatt et al., *Systematic Reviews Related to Gender-Affirming Care*, McMaster University (2025), https://hei.healthsci.mcmaster.ca/systematic-reviews-related-to-gender-affirming-care/.

21

[] far beyond dispute" while the Baker Review concludes that "[m]ore research is needed to further explore the relationship between hormonal interventions and [quality of life], death by suicide, and other psychological outcomes in transgender-identifying persons."). Scientific research papers routinely include a call for further research. An acknowledgment that further study would be beneficial simply reflects the goal of building on a baseline of fundamental knowledge to continue to further refine our understanding. It is in no way a call for a moratorium on hormone therapy for adults with gender dysphoria—a treatment that the existing research has already shown to benefit these patients.[19]

Indeed, the very paragraph cited by Defendants-Appellants ends with the conclusion that hormone therapy is "an essential component of care." *See* R. 72-2 at 14 ("our review indicates that gender-affirming hormone therapy is likely associated with improvements in [quality of life], depression, and anxiety. . . . These benefits make hormone therapy an essential component of care that promotes the health and well-being of transgender people."). Moreover, since the Baker Review was published, more research has explored the relationship between

---

[19] As an analogy, a study on cigarette smoking among high school dropouts claiming that "more research is needed to further explore the relationship between tobacco smoking and reasons for leaving school," would not mean the authors encourage high schools to stop intervening when students smoke tobacco. *See* Rachana Desai et al., *Cigarette Smoking and Reasons for Leaving School Among School Dropouts in South Africa*, 16 Tobacco Induced Diseases 362 (2018).

hormone therapy and psychological outcomes, reaffirming that hormone therapy is a medically necessary component of care for many adults with gender dysphoria.[20]

### C. Defendants-Appellants Draw An Improper Parallel Between The Baker Review And The Cass Review

Defendants-Appellants also rely on Dr. Hilary Cass's *Independent Review of Gender Identity Services for Children and Young People*.  *See, e.g.,* Opening Br. of Appellants, Dkt. 26 at 20, 38–44.  The Court should reject consideration of the Cass Review for the reasons discussed in Section I *supra*:  Without a competent expert to explain and contextualize scientific evidence, courts rightfully refuse to consider it, as the Federal Rules of Evidence require.  Otherwise, courts risk the misapplication and misinterpretation of scientific literature, a concern made evident by Defendants-Appellants' mischaracterization of the Baker Review.

If the Court does consider the Cass Review, it should reject the parallel that Defendants-Appellants improperly attempt to draw between the Cass Review and the Baker Review.  For example, Defendants-Appellants argue that the Cass Review "built on the Baker Review's critiques" of hormone treatment and assert that the Baker Review "questioned the efficacy" of hormone therapy and

---

[20] *See, e.g.,* David M. Doyle, Thomas Lewis & Manuela Barreto, *A Systematic Review of Psychosocial Functioning Changes After Gender-Affirming Hormone Therapy Among Transgender People*, 7 Nature Human Behaviour 1320 (2023); Sari L. Reisner, et al., *Gender-Affirming Hormone Therapy and Depressive Symptoms Among Transgender Adults*, 8 JAMA Network Open (2025). https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2831643.

denounced studies rated "low quality" as "flawed."  Opening Br. of Appellants,

Dkt. 26 at 39.  But as explained in Sections II and III(A)–(B) *supra*, the Baker

Review says no such thing—it *affirms* hormone therapy as an essential component

of care for people with gender dysphoria.  *See supra* Sections II–III(A)–(B).  Even

the Cass Review bolsters this point, finding that hormone therapy for transgender

adults is a "well-established practice that has transformed the lives of many

transgender people."  R. 72-3 at 183.  Furthermore, unlike the Baker Review, the

Cass Review's focus was providing recommendations regarding the efficacy of

hormone therapy for "children and young people," and it expressly acknowledges

that "[t]here are different issues involved in considering gender care for children

and young people than adults."  R. 72-3 at 27.  Defendants-Appellants omit this

critical difference throughout their brief, further evidencing precisely why courts

require expert testimony to contextualize scientific literature.

## CONCLUSION

In light of the foregoing, Dr. Baker respectfully requests that this Court affirm the District Court's judgment that the academic treatises Defendants-Appellants submitted, without a corresponding expert to lay the foundation and provide further context, were not admissible evidence and could not be considered for purposes of creating a fact dispute as to deliberate indifference.  In the alternative, should this Court decide to consider those academic treatises, Dr. Baker respectfully requests that the Court conclude that Defendants-Appellants mischaracterized the Baker Review—which concluded that hormone therapy is an essential component of care for people with gender dysphoria—in their attempt to create a factual dispute regarding the propriety of providing gender-affirming care to adults with gender dysphoria.

Dated: March 27, 2026

Respectfully submitted,

/s/ Luke A. Barefoot
Luke A. Barefoot
Thomas Kessler
Jack Massey
Noopur Sen (*pro hac vice*)
Ariel Sheffey (*pro hac vice*)
Saifeldeen Zihiri (*pro hac vice*)
CLEARY GOTTLIEB
STEEN & HAMILTON LLP

25

One Liberty Plaza
New York, NY 10006
T: (212) 225-2000
F: (212) 225-3999
lbarefoot@cgsh.com
tkessler@cgsh.com
jamassey@cgsh.com
nsen@cgsh.com
asheffey@cgsh.com
szihiri@cgsh.com


*/s/ T. Brandon Waddell*

T. Brandon Waddell
CAPLAN COBB LLC
75 14th St. NE #2700
Atlanta, GA 30309
T: (404) 596-5602
F: (404) 596-5604
bwaddell@caplancobb.com

## CERTIFICATE OF COMPLIANCE

In accordance with Fed. R. App. P. 27 and 32, I certify that this motion is set in 14-point Times New Roman, a proportionately spaced font, and as, calculated by Microsoft Word, contains 5,477 words. I further certify that this motion is virus free, as determined by Windows Security – Virus & Threat Protection.

Dated: March 27, 2026

/s/ T. Brandon Waddell
T. Brandon Waddell

## CERTIFICATE OF SERVICE

I hereby certify that today I electronically filed this brief using the appellate ECF system and that all participants are registered ECF users and will be served via that platform.


Dated: March 27, 2026

/s/ T. Brandon Waddell
T. Brandon Waddell

# EXHIBIT 2

# Filed Under Seal

# Tucker Medical Records

# EXHIBIT 3

# Filed Under Seal

## Dombroski Medical Records

# EXHIBIT 4

# Filed Under Seal

## Phillips Medical Records